1  Daniel Alberstone (SBN 105275)
   dalberstone@baronbudd.com
2  Roland Tellis (SBN 186269)
   rtellis@baronbudd.com
3  Mark Pifko (SBN 228412)
   mpifko@baronbudd.com
4  Michael Isaac Miller (SBN 266459)
   imiller@baronbudd.com
5  BARON & BUDD, P.C.
   15910 Ventura Boulevard, Suite 1600
6  Encino, California  91436
   Telephone:   (818) 839-2333
7  Facsimile:   (818) 986-9698
8
9  *Additional Counsel Identified Below*

10 Attorneys for Plaintiff
   DAVID WEINER, individually, and on
11 behalf of other members of the public
   similarly situated
12

13              UNITED STATES DISTRICT COURT
14              EASTERN DISTRICT OF CALIFORNIA
15

| | |
|---|---|
| 16 DAVID WEINER, individually, and on behalf of other members of the public similarly situated, | Case Number:<br>**CLASS ACTION COMPLAINT FOR:** |
| 18            Plaintiff, | (1)  Violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.*); |
| 19       vs. | (2)  Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(c)); |
| 20 OCWEN FINANCIAL CORPORATION, a Florida corporation, and OCWEN LOAN SERVICING, LLC, a Delaware limited liability company, | (3)  Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(d)); |
| 23            Defendants. | (4)  Violations of the Rosenthal fair Debt Collection Practices Act (Cal. Civ. Code §§ 1788, *et seq.*); |
| 25 | (5)  Unjust Enrichment |
| 26 | (6)  Fraud; and |
| 27 | (7)  Breach of Contract |
| 28 | **Jury Trial Demanded** |

For his complaint against Ocwen Financial Corporation ("OFC") and Ocwen Loan Servicing, LLC ("OLS") (collectively "Ocwen" or "Defendants"), Plaintiff David Weiner ("Plaintiff"), individually, and on behalf of all other members of the public similarly situated, based on information and belief, alleges as follows:

## NATURE OF THE ACTION

1.     This case concerns fraudulent practices committed by Ocwen in connection with its home mortgage loan servicing business.  Taking advantage of the economic downturn and the increasing number of loans in default, Ocwen devised a scheme to deceive homeowners who are behind on their mortgage payments into paying, or believing they have to pay, hundreds or thousands of dollars in unlawfully marked-up fees.

2.     Ocwen uses an enterprise of affiliated companies, including Altisource Portfolio Solutions S.A. ("Altisource") -- a wholly-owned subsidiary of OFC until 2009, when it was spun-off into a separate company -- to engage in its scheme to disguise hidden, marked-up fees so that it could earn additional, undisclosed profits.  Through this unlawful enterprise, Ocwen assesses homeowners fees for services performed by vendors, which are unlawfully marked up, often by 100% or more.

3.     More specifically, when home mortgage borrowers get behind on their payments and go into "default," Ocwen obtains a number of default-related services which purportedly are designed to protect the lender's interest in the property.  To obtain these services, Ocwen funnels the work through its affiliated company, Altisource, who then orders these services using a network of third-party vendors.  As a matter of practice, Altisource marks up the third-party vendors' actual cost for their services, and then, passes along the marked-up charge to Ocwen.  Without disclosing the mark-up, Ocwen, in turn, assesses the marked-up fees for these default-related service on homeowners' accounts.

4.     Ocwen is well-aware that its marked-up fees violate the disclosures made in homeowners' mortgage contracts because the fees exceed the actual cost of the default-

related services, so when Ocwen collects, or attempts to collect, such fees, it is not merely being "paid back," or collecting "amounts disbursed," nor are such fees "reasonable and appropriate" to protect the note holder's interest in the property and rights under the deed of trust.  Nevertheless, through this fraudulent scheme, Ocwen is able to quietly profit from default-related service fees at the expense of distressed homeowners -- a particularly vulnerable class of consumers who are struggling to keep their homes.

5.     Ocwen's fraudulent loan servicing practices are designed to avoid detection, even when examined in bankruptcy proceedings.  As one court has explained, "[l]enders have apparently been operating under the assumption that the fees and costs in their proofs of claim are invulnerable to challenge because debtors lack the sophistication, the debtors' bar lacks the financial motivation, and bankruptcy courts lack the time. . . .[T]he Court believes that certain members of the mortgage industry are *intentionally* attempting to game the system by requesting undocumented and potentially excessive fees."[1]

6.     This type of rampant abuse by mortgage servicers like Ocwen has led federal regulators to enter into numerous consent orders, but according to Mark Pearce, Director, Division of Depositor and Consumer Protection, Federal Deposit Insurance Corporation:[2]

---

[1] *In re: Prevo*, 394 B.R. 847, 848, 851 (Bankr. S.D. Tex. 2008) (emphasis added).

[2] *See* Mark Pearce, Director, Division of Depositor and Consumer Protection, Federal Deposit Insurance Corporation, *Mortgage Servicing:  An Examination of the Role of Federal Regulators in Settlement Negotiations and the Future of Mortgage Servicing Standards*, before the Subcommittees on Financial Institutions and Consumer Credit, and Oversight and Investigations Committee on Financial Services, U.S. House of Representatives, July 7, 2011, available at http://financialservices.house.gov/UploadedFiles/070711pearce.pdf (last visited, Feb. 1, 2012).

these consent orders do not fully identify and remedy past errors in mortgage-servicing operations of large institutions; in fact, the scope of the interagency review did not include a review of . . . the fees charged in the servicing process. Much work remains to identify and correct past errors and to ensure that the servicing process functions effectively, efficiently, and fairly going forward.

7.     In addition to marking up fees for default-related services, Ocwen also has a policy, practice, and procedure of misapplying homeowners' payments, which, in turn, generates fee income and larger profits for Ocwen and its affiliates.

8.     Plaintiff brings this action, seeking injunctive relief and damages on behalf of himself and the thousands of other homeowners who have been victimized by Ocwen's uniform scheme.

## JURISDICTION AND VENUE

9.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the class of plaintiffs are citizens of states different from Defendants. Further, greater than two-thirds of the members of the Class reside in states other than the states in which Defendants are citizens.

10.     This Court also has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1961, 1962 and 1964. This Court has personal jurisdiction over Defendants under 18 U.S.C. §1965. In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

11.     Venue lies within this judicial district under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendants' contacts are sufficient to subject them to personal jurisdiction in this District, and therefore, Defendants reside in this District for purposes of venue, or under 28 U.S.C. § 1391(b)(2) because certain acts giving rise to the claims at issue in this Complaint occurred, among other places, in this District.

**PARTIES**

12.     Plaintiff David Weiner is an individual and a citizen of California.

13.     Defendant Ocwen Financial Corporation is a corporation organized under the laws of Florida, with its principal place of business in Atlanta, Georgia.

14.     Defendant Ocwen Loan Servicing, LLC is Delaware limited liability company, and an indirect wholly-owned subsidiary of Ocwen Financial Corporation. Ocwen Loan Servicing, LLC maintains operations in this District related to the activities at issue in this case, including operations concerning the management of loans that are in default, which are conducted from offices located in Burbank, California.  Ocwen Loan Servicing, LLC's headquarters are located in West Palm Beach, Florida.  It is licensed to service mortgage loans in all fifty states, including California, the District of Columbia, and two U.S. territories.

15.     Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendants committed in connection with the enterprise, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

16.     Plaintiff is informed and believes, and based thereon, alleges that, at all material times herein, each of the Defendants was the agent, servant, or employee of the other Defendants, and acted within the purpose, scope, and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other Defendants, and ratified and approved the acts of the other Defendants.

17.     Defendants are the ultimate recipient of the ill-gotten gains described herein. The fraudulent scheme at issue in this case was organized by executives working at the highest levels of Defendants' respective companies, and carried out by both executives and subordinate employees working for Defendants.

**FACTUAL BACKGROUND**

4

## America's Lending Industry Has Divorced itself
## from the Borrowers it Once Served

18.     Ocwen's unlawful loan servicing practices exemplify how America's lending industry has run off the rails.

19.     Traditionally, when people wanted to borrow money, they went to a bank or a "savings and loan."  Banks loaned money and homeowners promised to repay the bank, with interest, over a specific period of time.  The originating bank kept the loan on its balance sheet, and serviced the loan -- processing payments, and sending out applicable notices and other information -- until the loan was repaid.  The originating bank had a financial interest in ensuring that the borrower was able to repay the loan.

20.     Today, however, the process has changed.  Mortgages are now packaged, bundled, and sold to investors on Wall Street through what is referred to in the financial industry as mortgage backed securities or MBS.  This process is called securitization.  Securitization of mortgage loans provides financial institutions with the benefit of immediately being able to recover the amounts loaned.  It also effectively eliminates the financial institution's risk from potential default.  But, by eliminating the risk of default, mortgage backed securities have disassociated the lending community from homeowners.

21.     Numerous unexpected consequences have resulted from the divide between lenders and homeowners.  Among other things, securitization has led to the development of an industry of companies which make money primarily through servicing mortgages for the hedge funds and investment houses who own the loans.

22.     Loan servicers do not profit directly from interest payments made by homeowners.  Instead, these companies are paid a set fee for their loan administration services.  Servicing fees are usually earned as a percentage of the unpaid principal balance of the mortgages that are being serviced.  A typical servicing fee is approximately 0.50% per year.

23.     Additionally, under pooling and servicing agreements ("PSAs") with investors and noteholders, loan servicers assess fees on borrowers' accounts for default-related services.  These fees include, *inter alia*, Broker's Price Opinion ("BPO") fees,

appraisal fees, and title examination fees.

24.     Under this arrangement, a loan servicer's primary concern is *not* ensuring that homeowners stay current on their loans.  Instead, they are focused on minimizing any costs that would reduce profit from the set servicing fee, and generating as much revenue as possible from fees assessed against the mortgage accounts they service.  As such, their "business model . . . encourages them to cut costs wherever possible, even if [that] involves cutting corners on legal requirements, and to lard on junk fees and in-sourced expenses at inflated prices."[3]

25.     As one Member of the Board of Governors of the Federal Reserve System has explained:

> While an investor's financial interests are tied more or less directly to the performance of a loan, the interests of a third-party servicer are tied to it only indirectly, at best.  The servicer makes money, to oversimplify it a bit, by maximizing fees earned and minimizing expenses while performing the actions spelled out in its contract with the investor. . . . The broad grant of delegated authority that servicers enjoy under pooling and servicing agreements (PSAs), combined with an effective lack of choice on the part of consumers, creates an environment ripe for abuse.[4]

### Ocwen's Subprime Mortgage Servicing Business Grows Rapidly, and Draws the Attention of Regulators

26.     Seeking to capitalize on these circumstances, Ocwen has positioned itself as a major player in the residential mortgage servicing industry.  In fact, "Ocwen was the

---

[3] *See* Adam J. Levitin, *Robo-Singing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing*, before the House Financial Services Committee, Subcommittee on Housing and Community Opportunity, Nov. 18, 2010, available at http://financialservices.house.gov/Media/file/hearings/111/Levitin111810.pdf (last visited Feb. 1, 2012).

[4] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov. 12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Jan. 23, 2012).

CLASS ACTION COMPLAINT

fourth largest mortgage servicer in the United States in 2013, collecting payments on nearly one out of every twenty home loans."[5]

27.     As larger banks have shifted their attention to servicing the mortgage loans of their core customers -- *i.e.*, prime loan borrowers who use their lending banks' other services -- Ocwen has focused on servicing loans obtained by non-prime, or credit impaired, borrowers.

28.     Elaborating on the tremendous growth in its servicing business in recent years, Ocwen states:

> Our residential servicing portfolio has grown from 351,595 residential loans with an aggregate [unpaid principal balance ("UPB")] of $50.0 billion at December 31, 2009, to 2,861,918 residential loans with an aggregate UPB of $464.7 billion at December 31, 2013. Through acquisitions, we have substantially increased the share of our servicing portfolio that is made up of conventional (loans conforming to the underwriting standards of the government sponsored entities, the Federal National Mortgage Association (Fannie Mae) or the Federal Home Loan Mortgage Corporation (Freddie Mac) (collectively, the GSEs and Agency), government insured (loans insured by the Federal Housing Authority (FHA) of the Department of Housing and Urban Development (HUD) or Department of Veterans Affairs (VA) (collectively, government insured)) and prime non-Agency loans (loans generally conforming to the underwriting standards of the GSEs whose UPB exceeds the GSE loan limits, commonly referred to as jumbo loans). At December 31, 2013, these loans comprise 56.8% of the UPB of our servicing portfolio, up from 24.4% at December 31, 2012.[6]

29.     Ocwen goes on to explain that "[t]he mortgaged properties securing the residential loans that [they] service are geographically dispersed throughout all 50 states,

---

[5] *See* Karen Freifeld, Peter Rudegeair, and Andrew Hay, *NY regulator suspects Ocwen Financial of possible 'self-dealing'*, Reuters, Apr. 21, 2014, available at http://www.reuters.com/article/2014/04/21/ocwen-financial-letter-idUSL2N0ND0R120140421 (last visited, Nov. 5, 2014).

[6] Ocwen Financial Corp, SEC FORM 10-K (Period Ending Dec. 31, 2013), available at http://www.sec.gov/Archives/edgar/data/873860/000144530514000799/a2013123110k.htm (last visited April 1, 2014).

the District of Columbia and two U.S. territories."[7]  The five largest concentrations of properties, comprising approximately 39% of the loans serviced by Ocwen as of December 31, 2013, are located in California, Florida, New York, Texas and New Jersey.[8]  California has the largest concentration with 436,374 loans, approximately 15% of the total number of loans serviced.[9]

30.     Fueled by these increases in its residential servicing portfolio, Ocwen's revenue has jumped from $360 million in 2010 to a staggering $2 billion in 2013.[10]

31.     Ocwen's rapid growth and business practices have not gone unnoticed by state regulators, including Benjamin Lawsky, Superintendent of New York's Department of Financial Services (the "Department").  As a result of a consent order entered into by Lawsky's office and Ocwen in late 2012, a compliance monitor was installed at Ocwen in 2013.[11]  Additionally, on or around February 6, 2014, Lawsky halted indefinitely Wells Fargo's transfer of approximately $39 billion in servicing rights to Ocwen.[12]

32.     Speaking at the annual meeting of the New York Bankers Association in February 2014, Lawsky cautioned that Ocwen's explosive growth "raises red flags," that he sees "corners being cut" by non-bank servicers like Ocwen, and that Ocwen's use of

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] James Sterngold and Saabira Chaudhuri, *Ocwen to Restate Results After Accounting Change*, The Wall Street Journal, August 12, 2014, available at http://online.wsj.com/articles/ocwen-financial-to-restate-some-results-1407852143 (last visited, Nov. 5, 2014).

[11] Michael Corkery, *State Regulator Halts Deal Between Wells Fargo and Loan Servicer*, N.Y. Times, February 6, 2014, available at http://dealbook.nytimes.com/2014/02/06/new-york-regulator-halts-mortgage-servicing-rights-deal/?_php=true&_type=blogs&_r=0 (last visited, Nov. 5, 2014).

[12] *Id.*

technology to handle distressed loans is "too good to be true."[13]

33.     Such concerns about Ocwen's loan servicing practices are well-founded.  For companies like Ocwen, who are determined to maximize the money they earn from servicing loans, the right to charge default-related service fees has opened the door to a world of exploitation.

34.     Taking full advantage of this opportunity for such explotation, Ocwen formed an unlawful enterprise of affiliated companies, including Altisource, in order to increase mortgage servicing revenues by fraudulently concealing marked-up fees for default-related services on homeowners' accounts.

### Ocwen's "Tangled Web Of Conflicts" and Self-Dealing with Affiliated Company Altisource

35.     To maximize profits, Ocwen assigns the complex task of administering the millions of loans it services to computer software programs.  The software programs are designed to manage homeowners' loan accounts and assess fees, according to protocols and policies designed by the executives at Ocwen.

36.     Prior to August 2009, Ocwen's technology platforms were provided by the Ocwen Solutions line of businesses, which consisted primarily of Ocwen's former unsecured collections and its residential fee-based loan processing businesses.  These businesses provided technological services across the full spectrum of the mortgage lifecycle, from due diligence and underwriting to default processing and property preservation, all the way up to collections and customer relationship management.  OFC developed this technology platform over a period of more than 20 years at a cost of more

---

[13] Kate Berry, *Lawsky Bashes Ocwen, Says Servicer's Growth 'Raises Red Flags,'* National Mortgage News, February 12, 2014, available at http://www.nationalmortgagenews.com/mortgage-servicing/lawsky-bashes-ocwen-says-servicers-growth-raises-red-flags-1041092-1.html?zkPrintable=true (last visited, Nov. 5, 2014).

than $150 million.[14]

37.     In order to allow Ocwen to focus on growing its core servicing business, on August 10, 2009, Ocwen completed the distribution of the Ocwen Solutions line of businesses via the spin-off of Altisource.[15]   As part of the separation, William C. Erbey -- Ocwen's Chairman of the Board and the owner of 13% of Ocwen's common stock -- also became the Chairman of the Board for Altisource.[16]

38.     As of June 30, 2014, Mr. Erbey owns approximately 27% of the common stock of Altisource.[17]   He also has taken a very active role in the company.   As Altisource explains in its Form 10-K Statement, its success is "dependent" upon Mr. Erbey's services, and the loss of his services "could have a material adverse effect upon business, operating results and financial conditions."[18]

39.     In fact, Ocwen and Altisource are so interconnected, that Altisource points to its relationship with Ocwen as a potential "risk factor" to its business:

> Given this close and continuing relationship with Ocwen, we may encounter difficulties in obtaining and retaining other customers who compete with Ocwen.   Should these and other

---

[14] Ocwen Financial Corp, SEC FORM 10-K (Period Ending Dec. 31, 2012), available at http://www.sec.gov/Archives/edgar/data/873860/000101905613000314/ocn_10k12a.htm (last visited Sept. 9, 2013).

[15] Altisource was originally incorporated on November 4, 1999 in Luxembourg as Ocwen Luxembourg S.à r.l.   *See* Altisource Portfolio Solutions S.A., SEC FORM 10-K (Period Ending Dec. 31, 2012), available at http://www.sec.gov/Archives/edgar/data/1462418/ 000110465913009969/a13-2839_110k.htm (last visited Sept. 9, 2013). The entity was renamed Altisource Portfolio Solutions S.à r.l. on May 12, 2009, and converted into Altisource on June 5, 2009.  *Id.*  Prior to August 10, 2009, Altisource was a wholly-owned subsidiary of Ocwen. *Id.*

[16] *Id.*

[17] Ocwen Financial Corp., SEC Form 10-Q (Period Ending June 30, 2014), available at http://www.housingwire.com/ext/resources/files/Editorial/Documents/SEC-ABEA-6F4AAO-873860-14-16.pdf (last visited October 23, 2014).

[18] *See* Altisource Portfolio Solutions S.A., SEC FORM 10-K (Period Ending Dec. 31, 2012), available at http://www.sec.gov/Archives/edgar/data/1462418/ 000110465913009969/a13-2839_110k.htm (last visited Sept. 9, 2013).

potential customers continue to view Altisource as part of Ocwen or as too closely related to or dependent upon Ocwen, they may be unwilling to utilize [Altisource's] services, and [Altisource's] growth could be inhibited as a result.[19]

40.   This "close and continuing relationship" between Ocwen and Altisource was the subject of a letter Benjamin Lawsky, New York's top bank regulator, sent to Ocwen on February 26, 2014.  In the letter, Lawsky addressed potential conflicts of interest between Ocwen and Altisource:

The Department's ongoing review of Ocwen's mortgage servicing practices has uncovered a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated. Indeed, the facts our review has uncovered to date cast serious doubts on recent public statements made by the company that Ocwen has a "strictly arms-length business relationship" with those companies. We are also concerned that this tangled web of conflicts could create incentives that harm borrowers and push homeowners unduly into foreclosure.

. . .

Pursuant to the December 4, 2012 Consent Order between Ocwen and the Department, we have engaged an independent on-site compliance monitor at Ocwen to conduct a comprehensive review of Ocwen's servicing operations. It is in the course of the monitorship that we uncovered these potential conflicts between and among Ocwen, Altisource Portfolio Solutions, S.A. ("Altisource Portfolio"), Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd. (together, the "affiliated companies"), all of which are chaired by William C. Erbey, who is also the largest shareholder of each and the Executive Chairman of Ocwen.[20]

---

[19] *Id.*

[20] Letter from Benjamin M. Lawsky, Superintendent of Financial Services, New York State Department of Financial Services, to Timothy Hayes, General Counsel, Ocwen Financial Corporation (Feb. 26, 2014), available at http://www.dfs.ny.gov/about/press2014/pr140226-letter.pdf (last visited, Nov. 5, 2014).

41.    Lawsky's letter noted that "Ocwen's management owns stock or stock options in the affiliated companies," which "raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of the affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result."[21]

42.    Lawsky's review of Ocwen's operations revealed that the company's Chief Risk Officer served in the same role for Altisource, and "reported directly to Mr. Erbey in both capacities."[22]  As Lawsky explained, Ocwen and Altisource's joint Chief Risk Officer "seemed not to appreciate the potential conflicts of interest posed by this dual role, which was particularly alarming given his role as Chief Risk Officer."[23]  Lawsky's letter further explains that the Chief Risk Officer told the on-site compliance monitor that Ocwen "paid his entire salary, but he did not know and apparently never asked which company paid his risk management staff."[24]  Lawsky concluded that, while the Chief Risk Officer has since been removed from his role at Altisource, "his and Ocwen's failure to affirmatively recognize this conflict demonstrates that the relationship between Ocwen and the affiliated companies warrants further examination."[25]

43.    According to Lawsky, the Department's "review of Ocwen's mortgage servicing practices . . . also found that Ocwen relies extensively on affiliated companies for its information management system (from the programming of comment codes to functioning as Ocwen's IT help desk), as well as procurement of third party services," which "further demonstrates the interconnected nature of Ocwen's relationship with the affiliated companies."[26]

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

44.     Indeed, following the separation in 2009, Ocwen is contractually obligated to purchase mortgage and technology services from Altisource under service agreements that extend through 2020.[27]  Ocwen is now Altisource's largest customer, accounting for 60% of Altisource's total revenue in 2012.[28]

45.     As part of the Department's ongoing examination of Ocwen's mortgage servicing practices, in April 2014 Lawsky sent Ocwen another letter addressing "conflicted business relationships" and "self-dealing" between Ocwen and Altisource.[29] More specifically, Lawsky stated that:

> One particularly troubling issue is the relationship between Ocwen and Altisource Portfolio's subsidiary, Hubzu, which Ocwen uses as its principal online auction site for the sale of its borrowers' homes facing foreclosure, as well as investor-owned properties following foreclosure.  Hubzu appears to be charging auction fees on Ocwen-serviced properties that are up to three time times the fees charged to non-Ocwen customers
>
> . . .
>
> The relationship between Ocwen, Altisource Portfolio, and Hubzu raises signficiant concerns regarding self-dealing.  In particular, it creates questions about whether those companies are charging inflated fees through conflicted business relationships, and thereby negatively impacting homeowners and mortgage investors.  Alternatively, if the lower fees are necessary to attract non-Ocwen business on the open market, it raises concerns about whether Ocwen-serviced properties are

---

[27] Altisource Portfolio Solutions S.A., SEC FORM 10-K (Period Ending Dec. 31, 2012), available at http://www.sec.gov/Archives/edgar/data/1462418/ 000110465913009969/a13-2839_110k.htm (last visited Sept. 9 2012).

[28] *Id.*

[29] Letter from Benjamin M. Lawsky, Superintendent of Financial Services, New York State Department of Financial Services, to Timothy Hayes, General Counsel, Ocwen Financial Corporation (April 21, 2014), available at http://www.housingwire.com/ext/resources/files/Editorial/Lawsky-Letter-to-Ocwen-RE-Altisource-Hubzu.pdf (last visited, Nov. 5, 2014).

being funneled into an uncompetitive platform at inflated costs.[30]

46.     On August 4, 2014, Lawsky sent yet another letter raising concerns about Ocwen's use of related companies to provide fee based services.[31]  As Lawsky explained, "[b]ecause mortgage servicing presents the extraordinary circumstance where there is effectively no customer to select a vendor for ancillary services, Ocwen's use of related companies to provide such services raises concerns about whether such transactions are priced fairly and conducted at arms-length."[32]

47.     Once again, Lawsky's August 2014 letter was particularly concerned with transactions between Ocwen and "related" company Altisource:

> [T]he Department has serious concerns about the apparently conflicted role played by Ocwen Executive Chairman William Erbey and potentially other Ocwen officers and directors in directing profits to Altisource, which is "related" to Ocwen but is formally a separate, publicly traded company.  As you know, Mr. Erbey is Ocwen's largest shareholder and is also the Chairman of and largest shareholder in Altisource.  In fact, Mr. Erbey's stake in Altisource is nearly double his stake in Ocwen: 29 percent versus 15 percent.  Thus, for every dollar Ocwen makes, Mr. Erbey's share is 15 cents, but for every dollar Altisource makes, his share is 29 cents.
>
> The Department and its Monitor have uncovered a growing body of evidence that Mr. Erbey has approved a number of transactions with related companies, despite Ocwen's and Altisource's public claims -- including in SEC filings -- that he recuses himself from decisions involving related companies.
>
> …

---

[30] *Id.*

[31] Letter from Benjamin M. Lawsky, Superintendent of Financial Services, New York State Department of Financial Services, to Timothy Hayes, General Counsel, Ocwen Financial Corporation (Aug. 4, 2014), available at http://www.dfs.ny.gov/about/press2014/pr140804-ocwen-letter.pdf (last visited, Nov. 5, 2014).

[32] *Id.*

> Finally, Ocwen and Altisource state in their public filings that rates charged under agreements with related companies are market rate, but Ocwen has not been able to provide the Monitor with any analysis to support this assertion.[33]

48.     Lawsky is not the only regulator raising questions about Ocwen's business dealings.  According to OFC's most recent filing with the Securities and Exchange Commission ("SEC"), on June 12, 2014 it received an SEC subpoena, in which the SEC requested "production of various documents relating to [OFC's] business dealings with Altisource, HLSS, [Altisource Asset Management Corp], and Altisource Residential and the interests of [OFC's] directors and executive officers in these companies."[34]

49.     Despite the fact that Lawsky, the SEC, and other financial regulators have raised significant concerns about the "tangled web of conflicts" between the entities, Ocwen continuously, and systematically, engages in "self-dealing" transactions with Altisource.

50.     Accordingly, although Ocwen and Altisource technically are separate entities, they are effectively joined together, as affiliated companies, operating as a continuing unit with a common purpose.

**Ocwen's Scheme to Mark Up Fees for Default-Related Services**

51.     In its loan servicing operations, Ocwen follows a strategy to generate fraudulently concealed default-related fee income.  Rather than simply obtain default-related services directly from independent third-party vendors, and charge homeowners for the actual cost of these services, Ocwen has a policy, practice, and procedure of marking up fees for default-related services on homeowners' loan accounts.   As a result, even though the mortgage market has collapsed, and more and more borrowers are falling into delinquency, Ocwen continues to earn substantial profits.

---

[33] *Id.* (internal citations omitted).

[34] Ocwen Financial Corp., SEC Form 10-Q (Period Ending June 30, 2014), available at http://www.housingwire.com/ext/resources/files/Editorial/Documents/SEC-ABEA-6F4AAO-873860-14-16.pdf (last visited October 23, 2014).

52.    Ocwen's scheme works as follows:  Ocwen directs Altisource to order and coordinate default-related services, and, in turn, Altisource places orders for such services with third-party vendors.  The third-party vendors charge Altisource for the performance of the default-related services, Altisource then marks up the price of the vendors' services, in numerous instances by 100% or more, before "charging" the services to Ocwen.  In turn, Ocwen bills the marked-up fees to homeowners.

53.    Through this complex arrangement with Altisource, which is intended to disguise the marked-up fees for default-related services, Ocwen effectively side-steps the borrower protections in the mortgage contract.

54.    The mortgage contract between a lender and a homeowner generally consists of two documents:  (i) the promissory note (the "Note"); and (ii) the mortgage/security instrument/deed of trust (the "Deed of Trust").  The mortgage contacts serviced by Ocwen are substantially similar because they conform to the standard Fannie Mae form contract. The contract contains certain disclosures describing what is supposed to happen if borrowers default on their loans.

55.    The Deed of Trust discloses to homeowners that, in the event of default, the loan servicer will:

> pay for whatever is reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, including protecting and/or assessing the value of the property, and securing and/or repairing the property.

(emphasis added.)

56.    The Deed of Trust further discloses that any such "amounts disbursed" by the servicer to a third party shall become additional debt of the homeowner secured by the Deed of Trust and shall bear interest at the Note rate from the date of "disbursement." (emphasis added.)

57.    Additionally, the Note discloses to homeowners that with respect to "Payment of the Note Holder's Costs and Expenses," if there is a default, the homeowner will have to "pay back" costs and expenses incurred in enforcing the Note to the extent

not prohibited by applicable law.

58.    Thus, the mortgage contract discloses to homeowners that the servicer will <u>pay</u> for default-related services when reasonably necessary, and will be reimbursed or "<u>paid back</u>" by the homeowner for amounts "<u>disbursed</u>."  Nowhere is it disclosed to borrowers that the servicer may engage in self-dealing to mark up the actual cost of those services to make a profit.  Nevertheless, that is exactly what Ocwen does.

59.    BPOs are a significant category of third party default-related services for which, in furtherance of Ocwen's unlawful enterprise, fees are assessed on homeowners' loan accounts with substantial, undisclosed mark-ups, fraudulently generating revenue in the loan servicing business.

60.    As discussed above, by charging marked-up fees for BPOs, Ocwen violates the disclosures made to borrowers.  Furthermore, the wrongful nature of the marked-up fees is demonstrated by the fact that Ocwen conceals the marked-up profits assessed on homeowners' loan accounts.

61.    Although Ocwen assesses fees for BPOs on borrowers' accounts in the range of $100 to $109, as of December 2010, under Fannie Mae guidelines, the maximum reimbursable rate for an exterior BPO was $80,[35] and in practice, the actual cost was much less.  According to the National Association of BPO Professionals, the actual cost of a BPO may be as little as $30.[36]

62.    Ocwen indisputably is aware that the actual cost of a BPO is significantly less than the marked-up fee it assesses to borrowers.

63.    In fact, Ocwen has a significant amount of experience in the BPO marketplace.  Beginning in mid-2000, Ocwen Federal Bank FSB ("Ocwen Bank"), a

---

[35] *See* Fannie Mae, *Broker Price Opinion Providers and Pricing Structure*, available at https://efanniemae.com/sf/guides/ssg/annltrs/pdf/2010/ntce121710a.pdf (last visited Feb. 1, 2012).

[36] *See* National Association of BPO Professionals (NABPOP), *Broker Price Opinion – BPO Brief*, available at http://www.nabpop.org/Advocacy-BPOBrief-2.php (last visited Feb. 2, 2012).

former wholly-owned subsidiary of OFC, began "selling" marked-up BPOs to Wall Street firms acquiring large pools of underperforming loans.

64.     Ocwen Bank's in-house BPO shop was the subject of the litigation styled *Cartel Asset Management v. Ocwen Financial Corp.*, Case No. 1:01-cv-01644-REB-CBS (D. Colo.) ("*Cartel*").  In *Cartel*, Cartel Asset Management, Inc. ("CAM"), a large national BPO vendor, sued OFC, Ocwen Technology XChange, Inc., and Ocwen Bank for theft of CAM's trade secret -- a confidential list of experienced, responsive and competent realtors who produced high-quality BPOs.[37]  Ocwen Bank facilitated this theft by secretly copying the names and contact information of realtors identified on BPOs that it purchased from CAM, and then embedding the stolen information into its own incomplete database of BPO providers.[38]

65.     In 2004, a jury awarded CAM compensatory and punitive damages.[39]  While the judgment was on appeal, OFC dissolved Ocwen Bank and transferred the database containing the stolen names and contact information to OLS, who continued to use and profit from CAM's trade secret.  OLS was added as a defendant in *Cartel* after the Tenth Circuit remanded for a new trial on damages.  In September 2010, a jury returned a verdict in CAM's favor for more than $13.7 million in compensatory and punitive damages based on the theft of the trade secret.[40]  This jury verdict covered the period up through August 10, 2009, the date when OFC transferred the BPO product line and the database to its affiliated company Altisource.  As with OLS before it, Altisource has continued to use and generate profits from CAM's trade secret.

66.     Notably, in *Cartel*, William C. Erbey, OFC's Executive Chairman, offered the following testimony, under penalty of perjury, concerning Ocwen Bank's BPO

[37] *See Cartel*, Case No. 1:01-cv-01644-REB-CBS, Dkt. 438 at 1-4 (D. Colo. Sept. 18, 2007).
[38] *Id.* at 13-17.
[39] *Id.* at 17-18.
[40] *Id.*, Dkt. 825.

business:

> [A]s of 2004, ***[Ocwen] Bank would pay an agent or broker approximately $45 to $50 to provide a BPO and then sell the BPO for a profit***.  A reviewed BPO would be sold for approximately $150 and an unreviewed BPO for approximately $70.[41]

67.    Despite knowing the actual cost of a BPO is approximately $50, Ocwen routinely and repeatedly assesses borrowers BPO fees of $100 or more, representing a 100% mark-up, in clear violation of the mortgage contract.

68.    Ocwen also assesses fees for services related to the examination of the title to the property securing the loan, all of which are ordered through Altisource.  These fees typically appear as a "Title Search" fee, a "Title Report Fee," or  fees for "FC Thru Title Searches" on homeowners' monthly statements.

69.    Upon information and belief, the title examination fees assessed by Ocwen are significantly marked-up.  For example, a title search fee typically ranges between $150 and $450.  Nevertheless, Ocwen routinely charges homeowners $829 for a "Title Search."

70.    Using its enterprise -- comprised of affiliated companies, like Altisource, and third party "property preservation" vendors -- and its automated mortgage loan management system, Ocwen engaged in a scheme to fraudulently conceal and assess unlawfully marked-up fees for default-related services on homeowners' loan accounts, cheating hundreds of thousands of borrowers out of hundreds of millions dollars.  Furthermore, to conceal its activities and mislead homeowners about the true nature of its actions, Ocwen employed a corporate practice that omits the true nature of the fees that are being assessed on homeowners' loan accounts.  These practices are common to all of Ocwen's files.

71.    As a result of the practices of Ocwen's unlawful enterprise, hundreds of thousands of unsuspecting borrowers are cheated out of millions of dollars.

---

[41] *Id.*, Dkt. 438 at 25 (emphasis added).

## Ocwen Misapplies Borrowers' Payments

72.     For subprime servicers such as Ocwen, late fees alone constitute a significant fraction of its total income and profit.  As a result, Ocwen has an incentive to push homeowners into default and keep them there.

73.     Ocwen accomplishes this objective by, *inter alia*, misapplying homeowners' payments, and then cascading their loan accounts with illicit late fees.

74.     These unlawful late fees have forced many homeowners into default, opening the flood gates for additional late fees and significant charges for defaulted-related services.  Over time, these egregious late fees and fees for default-related services can total up to thousands of dollars, making it nearly impossible for homeowners to become current on their loan.

75.     Ocwen's method of misapplying payments in order to charge innocent borrowers thousands of dollars in fees and charges is a widespread practice.

76.     Under the terms of Paragraph 2, "Application of Payments or Proceeds," of the Deed of Trust in the Fannie Mae a standard form mortgage contract, there is a hierarchy in which funds from customer payments are to be applied.  Specifically, funds are to be applied in the following order:  (1) interest due under the promissory note; (2) principal due under the promissory note; (3) amounts due for any "escrow items"; (4) late charges; and (5) fees for default-related services and other amounts.  Escrow items are generally defined as taxes or assessments which may take priority over the lender's interest in the property and premiums for insurance a homeowner is required to have under the terms of the mortgage contract.

77.     One way Ocwen misapplies payments is to divert a portion of the interest and principal payments made by homeowners who pay their own property taxes and maintain proper insurance to "escrow accounts."

78.     An escrow account is an account set up and controlled by a lender on behalf of a homeowner to pay these "escrow items."   As mentioned above, a homeowners' monthly payment cannot be diverted to an escrow account until that payment covers, in

full, the borrowers interest and principal payment due in that given month.

79.   Ocwen routinely violates the payment hierarchy contained in homeowners' mortgage contracts and diverts customer payments away from principal and interest on the loan.

80.   As a result of this violation, homeowners who timely pay their own real estate taxes and insurance premiums are denied the proper interest and principal credits under the loan agreement.  Ocwen instead diverts a portion of the funds (which end up not being needed to pay escrow items) to an escrow account or flat out rejects the payment.

81.   Ocwen's failure to accept or properly credit homeowners' payments to cover, in full, their monthly interest and principal obligations forces homeowners into default. Once in default, Ocwen then makes demands that these homeowners make significant payments, which are riddled with unjust late and default-related service fees.

82.   Additionally, when Ocwen forces homeowners who pay their own property taxes and maintain their own insurance into default by misapplying their payments to an escrow account, these homeowners are denied the ability to access the surplus in their escrow account.

83.   Under the terms of the loan agreement, Ocwen will refund homeowners their surplus escrow funds only when their loan is paid in full.

84.   Ocwen, in essence, is using the escrow account as one way to justify the late and default-related fees it charges homeowners.

**Homeowners Suffer Harm as a Result of Ocwen's Practices**

85.   In addition to the direct monetary damages caused to homeowners, in the form of the difference between the actual cost of the services provided and the marked-up fees assessed on homeowners' loan accounts, homeowners suffer other, less obvious injuries as a result of the practices described herein.

86.   The assessment of these marked-up fees can make it impossible for homeowners to become current on their loan.  Charges for such default-related services can add hundreds or thousands of dollars to homeowners' loans over time, driving them

further into default.

87.   When homeowners get behind on their mortgage, and fees for these default-related services are stacked on to the past-due principal and interest payments, Ocwen's practices make it increasingly difficult for homeowners to ever bring their loan current. Even if homeowners pay the delinquent principal and interest payments, the late and default-related service fees ensure that homeowners stay in default.  Although the next payment comes in on time, often through automatic payment deductions from homeowners' bank accounts, part of the payment is applied to the fees first, so there is not enough to cover the entire monthly payment.  This makes that payment late, creating a cascade of more fees, and more arrears, that keeps homeowners in delinquency.  By the time homeowners are aware, Ocwen is threatening to foreclose unless a huge payment is made, and the weight of these marked-up fees drops homeowners into a financial abyss.

88.   Additionally, as a result of Ocwen's practices, which force homeowners to move deeper into default, homeowners are driven into foreclosure.

## Plaintiff's Claims Against Ocwen

89.   Plaintiff Weiner is a resident of Amador County, California.

90.   Plaintiff Weiner originated his loan with Mylor Financial on December 10, 2003, for $322,700 at 6.5000%.  His monthly interest and principal payment was $2,039.68.

91.   Prior to late 2012 or early 2013, GMAC serviced Plaintiff Weiner's mortgage.  However, on or around late 2012 or early 2013, Ocwen took over the servicing of Plaintiff Weiner's mortgage.

92.   Ocwen misapplied Plaintiff Weiner's principal and interest payment to an escrow account established after GMAC paid Plaintiff Weiner's property taxes in 2010.

93.   Plaintiff Weiner fully reimbursed GMAC in early 2011 for the property taxes it paid.  He also paid a $400 escrow fee.  Following this incident, Plaintiff Weiner had telephone conversations with GMAC staff where he arranged that he would pay his own property taxes going forward.  Plaintiff Weiner promised to provide timely proof of said

payments.

94.     Since making this arrangement, Plaintiff Weiner has paid in full all property taxes associated with his property and has maintained the proper insurance required by his mortgage contract.  Plaintiff Weiner also has always provided Ocwen with timely notice of his property tax payments.

95.     Notwithstanding Plaintiff Weiner's timely property tax and insurance premium payments, Ocwen charges Plaintiff Weiner a fee of $600 per year for maintaining an escrow account, and it has failed to properly apply his interest and principal payments to his loan.  Instead, Ocwen has diverted funds to his escrow account. Although Ocwen has never once used it to pay property taxes or insurance, and Plaintiff Weiner's escrow account has a positive balance of more than $10,000.  More recently, Ocwen has flat out rejected Plaintiff Weiner's interest and principal payments on the basis that they are not sufficient to satisfy the defaulted amount on the loan, *i.e.*, interest and principal *plus* escrow fees.

96.     By diverting a portion of Plaintiff Weiner's interest and principal payments to an escrow account, Ocwen has failed to properly credit Plaintiff Weiner's account.

97.     Ocwen's failure to properly credit Plaintiff Weiner's interest and principal payments has burdened his account with unscrupulous fees and has forced his loan into default.

98.     Plaintiff Weiner not only has been denied the right to have his payments applied correctly to his loan account, but he has also been unable to claim interest deductions on his federal and state tax returns, refinance his loan, has been subjected to harassing telephone calls, and has been under the constant fear of imminent foreclosure.

99.     Because Ocwen has forced his loan into default, Plaintiff Weiner has been denied access to the surplus in his escrow account.

100.   Ocwen also continually assessed marked-up fees for default-related services on the mortgage account of Plaintiff Weiner, thereby subjecting him to an invalid debt.

101.   Ocwen assessed BPO fees of $109 and $100 on the mortgage account of

Plaintiff Weiner on September 4, 2013 and February 27, 2014, respectively.

102.   Ocwen also charged Plaintiff Weiner a series of title report, title search, and other default-related service fees that are either not legally due under the mortgage contract and applicable law, or that are in excess of amounts legally due.

103.   Ocwen assessed a "Title Search" fee in the amount of $829 on the mortgage account of Plaintiff Weiner on June 9, 2014.

104.   Ocwen alone maintains a complete accounting of all fees assessed and paid, and the details of each and every fee assessed and paid cannot be alleged with complete precision without access to Ocwen's records.  Nevertheless, Plaintiff Weiner is informed and believes, and on that basis alleges, that he paid some or all of the unlawful fees assessed on his account.

## STATUTE OF LIMITATIONS

105.   Any applicable statutes of limitations have been tolled by Ocwen's knowing and active concealment, denial, and misleading actions, as alleged herein.  Plaintiff and members of the Class, as defined below, were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part.  Plaintiff and members of the Class could not reasonably have discovered the true nature of the Ocwen's scheme.

106.   Ocwen is under a continuous duty to disclose to Plaintiff and members of the classes the true character, quality, and nature of the default-related service fees they assess on borrowers' accounts.  Ocwen knowingly, affirmatively, and actively concealed, and continues to conceal, the true character, quality, and nature of its assessment of marked-up fees on homeowners' loan accounts.  Plaintiff and members of the Class reasonably relied upon Ocwen's knowing, affirmative, and active concealment.  Based on the foregoing, Ocwen is estopped from relying on any statutes of limitation as a defense in this action.

107.   The causes of action alleged herein did or will only accrue upon discovery of the true nature of the charges assessed against borrowers' accounts, as a result of Ocwen's continuing fraudulent concealment of material facts.  Plaintiff and members of the Class

did not discover, and could not have discovered, through the exercise of reasonable diligence, the true nature of the unlawful fees assessed against their accounts.

108.   Legal scholars have explained that, as a result of these deceptive practices, it is impossible for borrowers to determine that they are victims of these violations, because "without a true itemization that identifies the nature of each fee, parties cannot verify that a mortgage claim is correctly calculated . . . the servicer could be overreaching and charging fees that are not permitted by law or by the terms of the contract.  . . . By obscuring the information needed to determine the alleged basis for the charges, servicers thwart effective review of mortgage claims. The system can only function as intended if complete and appropriate disclosures are made."[42]

109.   Additionally, judges examining similar conduct have found that, "[a]t the heart of the problem is [the loan servicer's] failure to disclose to its borrowers/debtors, the trustee, or the Court, the nature or amount of fees and charges assessed . . . [l]ack of disclosure facilitates the injury.  Naive borrowers/debtors, trustees and creditors rightly assume that [the loan servicer] is complying with the plain meaning of its notes, mortgages, court orders and confirmed plans.  Why would anyone assume otherwise?  . . . How are they to challenge a practice or demand correction of an error they do not know exists."[43]

## CLASS ACTION ALLEGATIONS

110.   Plaintiff brings this action, on behalf of himself and all others similarly situated, as a class action under Rule 23 of the Federal Rules of Civil Procedure.

111.   The classes Plaintiff seeks to represent (collectively, the "Class") are defined as follows:

---

[42] *See* Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87 Tex. L. Rev. 121, 155 (2008).

[43] *See In re: Jones*, 418 B.R. 687, 699 (E.D. La. 2009).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> All residents of the United States of America who had a loan serviced by Ocwen, continuing through the date of final disposition of this action (the "Class").
>
> All residents of the State of California who had a loan serviced by Ocwen, continuing through the date of final disposition of this action (the "California Subclass").

112.   Plaintiff reserves the right to amend the Class definitions if discovery and further investigation reveals that the Class should be expanded or otherwise modified.

113.   Plaintiff reserves the right to establish sub-classes as appropriate.

114.   This action is brought and properly may be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3), and satisfies the requirements thereof.  As used herein, the term "Class Members" shall mean and refer to the members of the Class.

115.   Numerosity:  While the exact number of members of the Class is unknown to Plaintiff at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Ocwen.  At this time, Plaintiff is informed and believe that the Class includes hundreds of thousands of members.  Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

116.   Ascertainablity:  Names and addresses of members of the Class are available from Ocwen.  Notice can be provided to the members of the Class through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

117.   Typicality:  Plaintiff's claims are typical of the claims of the other members of the Class which they seek to represent under Federal Rule of Civil Procedure 23(a)(3) because each Plaintiff and each member of the Class has been subjected to the same

deceptive and improper practices and has been damaged in the same manner thereby.

118.   <u>Adequacy</u>:  Plaintiff will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiff is an adequate representative of the Class, because he has no interests which are adverse to the interests of the members of the Class.  Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

119.   <u>Superiority</u>: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a)   the expense and burden of individual litigation make it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action;

(b)   if separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

(c)   absent a class action, Ocwen likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

120.   Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3).

121.   The common questions of fact include, but are not limited to, the following:

(a)   Whether Ocwen engaged in unlawful, unfair, misleading, or deceptive business acts or practices in violation of California Business & Professions Code sections 17200 *et seq*.;

(b) Whether Ocwen's practice of charging marked-up fees to borrowers, as alleged herein, is illegal;

(c) Whether Ocwen's practice of misapplying borrowers' payments, as alleged herein, is illegal;

(d) Whether Ocwen was a member of, or participant in, the conspiracy alleged herein;

(e) Whether Ocwen engaged in a pattern or practice of racketeering, as alleged herein;

(f) Whether documents and statements provided to Plaintiff and members of the Class concealed material facts;

(g) Whether Plaintiff and members of the class sustained damages, and if so, the appropriate measure of damages; and

(h) Whether Plaintiff and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

122. In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

(a) The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Ocwen;

(b) The prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

(c) Ocwen has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole

and necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

123.   Plaintiff is not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action

## FIRST CAUSE OF ACTION

**BROUGHT ON BEHALF OF THE CALIFORNIA SUBCLASS**
**Violation of California's Unfair Competition Law**
**(California Business & Professions Code §§ 17200 *et seq*.)**

124.   Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

125.   Plaintiff Weiner brings this cause of action on behalf of himself and the members of the California Subclass.

126.   California Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice." For the reasons described above, Ocwen has engaged in unfair, or fraudulent business acts or practices in violation of California Business and Professions Code sections 17200 *et seq*.

127.   In the course and conduct of their loan servicing and collection, Ocwen knowingly, affirmatively, and actively concealed the true character, quality, and nature of their assessment of marked-up default-related service fees against borrowers' accounts. Relying on Ocwen, Plaintiff Weiner, and members of the California Subclass believe they are obligated to pay the amounts specified in Ocwen's communications.

128.   In truth and in fact, borrowers are not obligated to pay the amounts that have been specified in Ocwen's communications concerning default-related services, including BPOs and title searches. Ocwen disguises the fact that the amounts they represent as being owed have been marked-up beyond the actual cost of the services, violating the disclosures in the mortgage contract. Contrary to Ocwen's communications, they are not legally authorized to assess and collect these marked-up fees.

129.   Ocwen's knowing, affirmative, and active concealment, as set forth herein,

constitutes an "unlawful" practice because it violates Title 18 United States Code sections 1341, 1343, and 1962, as well as California Civil Code sections 1572, 1573, 1709, 1710, and 1711, California's Rosenthal Fair Debt Collection Practices Act, and the common law.

130.   Ocwen's practice of misapplying borrowers payment, thereby breaching borrowers' mortgage contracts, also constitutes an "unlawful" practice in violation of California Business and Professions Code sections 17200 *et seq.*

131.   Ocwen's knowing, affirmative, and active concealment, as set forth herein, also constitute "unfair" business acts and practices within the meaning of California Business and Professions Code sections 17200 *et seq.*, in that Ocwen's conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous. Plaintiff Weiner also asserts a violation of public policy by concealing material facts from consumers.  Ocwen's violation of California's consumer protection and unfair competition laws in California resulted in harm to consumers.

132.   There were reasonable alternatives available to Ocwen to further their legitimate business interests, other than the conduct described herein.

133.   California Business and Professions Code section 17200 also prohibits any "fraudulent business act or practice."  Ocwen's concealment of material facts, as set forth above, was false, misleading, or likely to deceive the public within the meaning of California Business and Professions Code section 17200.  Ocwen's concealment was made with knowledge of its effect, and was done to induce Plaintiff Weiner and members of the California Subclass to pay the marked-up default related service fees.

134.   Plaintiff Weiner and members of the California Subclass relied on their reasonable expectation that Ocwen would comply with the disclosures set forth in the mortgage agreement, Notes, and Deeds of Trust, and as a result, Plaintiff Weiner and members of the California Subclass relied on Ocwen's disclosures about the fees on their statements, reasonably believing the default-related service fees to be valid charges that were not marked-up.  Indeed, to lull borrowers into a sense of trust and dissuade them

from challenging Ocwen's unlawful fee assessment, Ocwen concealed their scheme from borrowers by telling them, in statements and other documents, that such fees are in accordance with the terms of their mortgage.  Had the true nature of the fees been disclosed to Plaintiff Weiner and the members of the California Subclass, they would have been aware of the mark-ups and Plaintiff Weiner and the members of the California Subclass would have disputed the charges and not paid them.

135.   Plaintiff Weiner and the members of the California Subclass have been injured in fact and suffered a loss of money or property as a result of Ocwen's fraudulent, unlawful, and unfair business practices.  Plaintiff Weiner and the members of the California Subclass would not have paid Ocwen's unlawful fees or they would have challenged the assessment of such fees on their accounts had it not been for Ocwen's concealment of material facts.

136.   Ocwen has thus engaged in unlawful, unfair, and fraudulent business acts entitling Plaintiff Weiner and the members of the California Subclass to judgment and equitable relief against Ocwen, as set forth in the Prayer for Relief.

137.   Additionally, under Business and Professions Code section 17203, Plaintiff Weiner and members of the California Subclass seek an order requiring Ocwen to immediately cease such acts of unlawful, unfair, and fraudulent business practices, and requiring Ocwen to correct its actions.

## SECOND CAUSE OF ACTION

### Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(c))

138.    Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

139.   Plaintiff brings this cause of action on behalf of himself and the members of the Class.

**THE ENTERPRISE**

140.   Defendants OFC and OLS are "persons" within the meaning of Title 18 United States Code section 1961(3).

141.   At all relevant times, in violation of Title 18 United States Code section 1962(c), Ocwen, including their directors, employees, and agents, along with Altisource and Ocwen's property preservation vendors conducted the affairs of an associated-in-fact enterprise, as that term is defined in Title 18 United States Code section 1961(4) (the "Ocwen Enterprise").  The affairs of the Ocwen Enterprise affected interstate commerce through a pattern of racketeering activity.

142.   The Ocwen Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of limiting costs and maximizing profits by fraudulently concealing assessments for unlawfully marked-up fees for default-related services on homeowners' loan accounts.

143.   While the members of the Ocwen Enterprise participate in and are part of the enterprise, they also have an existence separate and distinct from the enterprise.  The Ocwen Enterprise has a systematic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities between Ocwen, Altisource, and the vendors that perform the default-related services.

144.   Operating the Ocwen Enterprise according to policies and procedures developed and established by its executives, Ocwen controls and directs the affairs of the Ocwen Enterprise and uses the other members of the Ocwen Enterprise as instrumentalities to carry out Ocwen's fraudulent scheme.

145.   These policies and procedures established by Ocwen's executives include: funneling default-related services through its affiliated company, Altisource, to disguise unlawful mark-ups of services provided by third parties; providing statements that conceal the true nature of the marked-up default related service fees; using mortgage loan management software designed to assess undisclosed marked-up fees on borrowers accounts; and failing to provide borrowers with accurate documentation to support

assessments of fees for BPOs.

146. By developing and implementing policies and procedures leading to the repeated, and unlawful, assessment of marked-up fees for default-related services, Ocwen engaged in the conduct of the Ocwen Enterprise distinct from Ocwen's own affairs as a loan servicer.

## THE PREDICATE ACTS

147. The Ocwen Enterprise's systematic scheme to fraudulently conceal unlawfully marked-up third party fees on the mortgage accounts of homeowners who have mortgage loans administered by Ocwen, as described above, was facilitated by the use of the United States Mail and wire. The Ocwen Enterprise's scheme constitutes "racketeering activity" within the meaning of Title 18 United States Code section 1961(1), as acts of mail and wire fraud, under Title 18 United States Code sections 1341 and 1343.

148. In violation of Title 18 United States Code sections 1341 and 1343, the Ocwen Enterprise utilized the mail and wire in furtherance of their scheme to defraud borrowers whose loans are serviced by Ocwen by obtaining money from borrowers using false or fraudulent pretenses.

149. Through the mail and wire, the Ocwen Enterprise provided mortgage invoices, loan statements, payoff demands, or proofs of claims to homeowners, affirmatively demanding that homeowners pay marked-up fees for default-related services. Defendants also accepted payments and engaged in other correspondence in furtherance of their scheme through the mail and wire.

150. The Ocwen Enterprise fraudulently and unlawfully assessed marked-up default-related service fees in violation of the disclosures made in homeowners' mortgage agreements.

151. Furthermore, to lull homeowners into a sense of trust and dissuade them from challenging Ocwen's unlawful fee assessment, Ocwen concealed their scheme from borrowers by telling them, in statements and other documents, that such fees are in accordance with the terms of their mortgage.

152.   The mortgage invoices, loan statements, or proofs of claims provided to borrowers disguised the fact that the default-related service fees assessed on homeowners' accounts were marked-up.  By disguising the true nature of amounts purportedly owed in communications to borrowers, the Ocwen Enterprise made false statements using the Internet, telephone, facsimile, United States mail, and other interstate commercial carriers.

153.   This fraudulent concealment was material to Plaintiff and the members of the Class.  Had the Ocwen Enterprise disclosed the true nature of the fees for default-related services, Plaintiff would have been aware of the mark-up, and would have challenged Ocwen's unlawful fee assessments or would not have paid them.

154.   Each of these acts constituted an act of mail fraud for purposes of Title 18 United States Code section 1341.

155.   Additionally, using the Internet, telephone, and facsimile transmissions to fraudulently communicate false information about these fees to borrowers, to pursue and achieve their fraudulent scheme, the Ocwen Enterprise engaged in repeated acts of wire fraud in violation of Title 18 United States Code section 1343.

156.   The Ocwen Enterprise's knowledge that its activities were fraudulent and unlawful is evidenced by, among other things, the fact that they concealed the marked-up nature of the default-related service fees in their communications to borrowers.

157.   The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of Title 18 United States Code section 1961(5) in which the Ocwen Enterprise have engaged under Title 18 United States Code section 1962(c).

158.   All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Ocwen Enterprise racketeering enterprise. The racketeering acts committed by the Ocwen Enterprise employed a similar method, were related, with a similar purpose, and they involved similar participants, with a similar impact on the members of the Class.  Because this case is brought on behalf of a class of similarly situated borrowers and there are numerous acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiff to plead all of the

details of the scheme with particularity.  Plaintiff cannot plead the precise dates of all of the Ocwen Enterprise's uses of the mail and wire because this information cannot be alleged without access to the Ocwen Enterprise's records.

159.   The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

160.   Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

161.   As a direct and proximate result of these violations of Title 18 United States Code sections 1962(c) and (d), Plaintiff and members of the class have suffered substantial damages.  Members of the Ocwen Enterprise are liable to Plaintiff and members of the Class for treble damages, together with all costs of this action, plus reasonable attorney's fees, as provided under Title 18 United States Code section 1964(c).

## THIRD CAUSE OF ACTION

**Violation of the Racketeer Influenced and Corrupt Organizations Act, Conspiracy to Violate Title 18 United States Code section 1962(c)**
**(18 U.S.C. § 1962(d))**

162.   Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

163.   Plaintiff brings this cause of action on behalf of himself and the members of the Nationwide Class.

164.   As set forth above, in violation of Title 18 United States Code section 1962(d), Defendants conspired to violate the provisions of Title 18 United States Code section 1962(c).

165.   As set forth above, Ocwen, having directed and controlled the affairs of the the Ocwen Enterprise, was aware of the nature and scope of the enterprise's unlawful scheme, and they agreed to participate in it.

166.   As a direct and proximate result, Plaintiff and the members of the Class have been injured in their business or property by the predicate acts which make up the Ocwen

Enterprise's patterns of racketeering activity in that marked-up fees for default-related services were assessed on their mortgage accounts.

## FOURTH CAUSE OF ACTION

### BROUGHT ON BEHALF OF THE CALIFORNIA SUBCLASS
### Violations of the Rosenthal Fair Debt Collection Practices Act
### (California Civil Code §§ 1788, *et seq.*)

167.   Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

168.   Defendants are "debt collectors" within the meaning of California Civil Code section 1788.2(c), because Defendants sent mortgage bills to Plaintiff and members of the California Subclass, Plaintiff and members of the California Subclass made their mortgage payments to Defendants, Defendants accepted those payments, and Defendants made demands for payment, including the payment of marked-up fees for default-related services, by sending letters, making telephone calls, and other attempts to collect mortgage payments and fees.

169.   The marked-up fees for default-related services purportedly owed by Plaintiff and members of the California Subclass are a "debt" within the meaning of California Civil Code section 1788.2(d), because they are "money, property or their equivalent which [are] due or owing or alleged to be due or owing from a natural person to another person."

170.   As alleged herein, and as set forth in detail above, Defendants have committed violations of the Rosenthal Fair Debt Collection Practices Act, California Civil Code section 1788, *et seq.* ("RFDCPA"), which incorporates by reference, and requires compliance with, the provisions of the federal Fair Debt Collection Practices Act ("FDCPA), 15 U.S.C. § 1692

171.   The FDCPA and, therefore, the RFDCPA, prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the

collection of any debt." 15 U.S.C. § 1692e

172.   Defendants knowingly, affirmatively, and actively concealed and suppressed material facts, namely the fact that Defendants assessed borrowers' accounts for marked-up default-related services.  Contrary to Ocwen's communications, they are not legally authorized to assess and collect these marked-up fees.

173.   Pursuant to California Civil Code sections 1788.17 and 1788.30, Plaintiff and members of the California Subclass are entitled to recover actual damages sustained as a result of Defendants' violations of the RFDCPA.  Such damages include, without limitation, monetary losses and damages.  Additionally, because Defendants' violations of the RFDCPA were committed willingly and knowingly, Plaintiff and members of the California Subclass are entitled to recover penalties of up to $1,000 per violation as provided for in the RFDCPA.

174.   Pursuant to California Civil Code sections 1788.17 and 1788.30, Plaintiff and the California Subclass are entitled to recover all attorneys' fees, costs, and expenses incurred in the bringing of this action.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment

175.   Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

176.   Plaintiff brings this cause of action on behalf of himself and the members of the Class.

177.   By their wrongful acts and omissions of material facts, Ocwen was unjustly enriched at the expense of Plaintiff and members of the Class.

178.   The mortgage contract with borrowers like Plaintiff and the members of the Class discloses that Ocwen will pay for default-related services when necessary, and they will be reimbursed by the homeowner.  Nowhere in the mortgage contract is it disclosed that Ocwen may mark-up the actual cost of those services to make a profit.

179.    Nevertheless, Ocwen marks-up the prices charged by vendors, often by 100% or more, and then, assesses borrowers' accounts for the higher, marked-up fee so that Ocwen can earn a profit.

180.    Furthermore, to lull homeowners into a sense of trust and dissuade them from challenging Ocwen's unlawful fee assessment, Ocwen further conceals their scheme from borrowers by telling them, in statements and other documents, that such fees are in accordance with the terms of their mortgage.

181.    Thus, Plaintiff and members of the Class were unjustly deprived.

182.    It would be inequitable and unconscionable for Ocwen to retain the profit, benefit and other compensation they obtained from their fraudulent, deceptive, and misleading conduct alleged herein.

183.    Plaintiff and members of the Class seek restitution from Ocwen, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Ocwen from their wrongful conduct.

## SIXTH CAUSE OF ACTION

### Fraud

184.    Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

185.    Plaintiff brings this cause of action on behalf of himself and the members of the Nationwide Class.

186.    Plaintiff reasonably expected that Ocwen would comply with the disclosures set forth in the mortgage agreement, Notes, Deeds of Trust, and as a result, Plaintiff relied on Ocwen's disclosures about the fees on their statements, reasonably believing the default-related service fees to be valid charges that were not marked-up.

187.    To lull homeowners into a sense of trust and dissuade them from challenging Ocwen's unlawful fee assessment, Ocwen concealed their scheme from borrowers by telling them, in statements and other documents, that such fees are in accordance with the

terms of their mortgage.

188.   Had the true nature of the fees been disclosed to Plaintiff and members of the Class, they would have been aware of the mark-up, and Plaintiff would have disputed the charges and not paid them.

189.   As a result of Ocwen's fraudulent concealment, Plaintiff and members of the Class have been injured in fact and suffered a loss of money or property.  Plaintiff and members of the Nationwide Class would have challenged the assessment of such fees on their accounts had it not been for Ocwen's concealment of material facts.

190.   Ocwen concealed material facts, as discussed above, with knowledge of the effect of concealing of these material facts.  Ocwen knew that by misleading consumers, they would generate higher profits.

191.   Plaintiff and members of the Nationwide Class justifiably relied upon Ocwen's knowing, affirmative, and active concealment.  By concealing material information about their scheme to assess marked-up default-related service fees on borrowers' accounts, Ocwen intended to induce Plaintiff and members of the Nationwide Class into believing that they owed Ocwen money that it was not actually entitled to.

192.   Ocwen acted with malice, oppression, or fraud.

193.   As a direct and proximate result of Ocwen's omissions and active concealment of material facts, Plaintiff and each member of the Nationwide Class has been damaged in an amount according to proof at trial.

## SIXTH CAUSE OF ACTION

### Breach of Contract

194.   Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

195.   Plaintiff brings this cause of action on behalf of himself and the members of the Nationwide Class.

196.   Ocwen assumed the obligations of Plaintiff's mortgage agreement, and the

mortgage agreement of all Class members, when it took over the servicing of their loans.

197.   Plaintiff satisfied his obligations under the mortgage agreement by making timely payments of principal and interest.

198.   Ocwen is in breach of contract by misapplying payments submitted by Plaintiff and members of the Class, placing such payments in suspense accounts without authorization by the mortgage agreements, and assessing late fees not authorized under the mortgage agreement.

199.   Ocwen knew or should have known that misapplying timely payments was and continues to be a material breach of homeowners' mortgage agreements.

200.   Ocwen is in further breach of contract by treating Plaintiff and members of the Class as if they were in default due to the misapplied payments, when, in fact, Plaintiff and members of the Class are not delinquent under the mortgage agreement.

201.   As a proximate result of Ocwen's breaches, Plaintiff and members of the Class have suffered compensatory damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

Plaintiff, and on behalf of himself and the Class of all others similarly situated, requests that the Court to enter judgment against Ocwen, as follows:

1.   Certifying the Class, as requested herein, certifying Plaintiff as the representative of the Class, and appointing Plaintiff's counsel as counsel for the Class;

2.   Ordering that Ocwen is financially responsible for notifying all members of the Class of the alleged fraudulent concealment discussed herein;

3.   Awarding Plaintiff and the members of the Class compensatory damages in an amount according to proof at trial;

4.   Awarding restitution and disgorgement of Ocwen's revenues or profits to Plaintiff and members of the Class;

5.   Awarding Plaintiff and the members of the Class treble damages in an amount according to proof at trial;

6.   Awarding declaratory and injunctive relief as permitted by law or equity,

including:  enjoining Ocwen from continuing the unlawful practices as set forth herein, and directing Ocwen to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Ocwen by means of any act or practice declared by this Court to be wrongful;

7.    Ordering Ocwen to engage in corrective advertising;

8.    Awarding interest on the monies wrongfully obtained from the date of collection through the date of entry of judgment in this action;

9.    Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

10.    For such other and further relief as the Court deems just and proper.

Dated:  November 5, 2014            BARON & BUDD, P.C.

By:   /s/ Mark Pifko
_____
Mark Pifko

Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Mark Pifko (SBN 228412)
Michael Isaac Miller (SBN 266459)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:   (818) 839-2333
Facsimile:    (818) 986-9698

Philip F. Cossich, Jr. (to be admitted *pro hac vice*)
David A. Parsiola (to be admitted *pro hac vice*)
COSSICH, SUMICH, PARSIOLA & TAYLOR, L.L.C.
8397 Highway 23, Suite 100
Belle Chasse, Louisiana 70037
Telephone:   (504) 394-9000
Facsimile:    (504) 394-9110

Attorneys for Plaintiff
DAVID WEINER, individually, and on behalf of other members of the public similarly situated

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiff hereby demands a trial of his claims by jury to the extent authorized by

3    law.

4    Dated:  November 5, 2014          BARON & BUDD, P.C.

5                                      By:   /s/ Mark Pifko

6                                            Mark Pifko

7                                            Daniel Alberstone (SBN 105275)
                                             Roland Tellis (SBN 186269)
8                                            Mark Pifko (SBN 228412)
                                             Michael Isaac Miller (SBN 266459)
9                                            BARON & BUDD, P.C.
10                                           15910 Ventura Boulevard, Suite 1600
                                             Encino, California  91436
11                                           Telephone:   (818) 839-2333
                                             Facsimile:   (818) 986-9698
12
13                                           Philip F. Cossich, Jr. (to be admitted *pro hac vice*)
14                                           David A. Parsiola (to be admitted *pro hac vice*)
                                             COSSICH, SUMICH, PARSIOLA & TAYLOR, L.L.C.
15                                           8397 Highway 23, Suite 100
16                                           Belle Chasse, Louisiana 70037
                                             Telephone:   (504) 394-9000
17                                           Facsimile:   (504) 394-9110
18
19                                           Attorneys for Plaintiff
20                                           DAVID WEINER, individually, and on
                                             behalf of other members of the public
21                                           similarly situated

22

23

24

25

26

27

28