Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
Michael Isaac Miller (SBN 266459)
imiller@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:   (818) 839-2333
Facsimile:   (818) 986-9698

*Additional Counsel Identified Below*

Attorneys for Plaintiff
DAVID WEINER, individually, and on
behalf of other members of the general
public similarly situated

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID WEINER, individually, and on behalf of other members of the public similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>OCWEN FINANCIAL CORPORATION, a Florida corporation, and OCWEN LOAN SERVICING, LLC, a Delaware limited liability company,<br><br>Defendants. | Case Number: 2:14-cv-02597-MCE-DAD<br><br>**CLASS ACTION**<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:  January 22, 2015<br>Time: 2:00 p.m.<br>Location:  Ctrm. 7<br><br>Judge: Hon. Morrison C. England, Jr. |

# TABLE OF CONTENTS

PAGE

PAGE I

I.    INTRODUCTION ................................................................. 1

II.   PLAINTIFF PROPERLY ALLEGES OCWEN'S FRAUDULENT
      CONDUCT ........................................................................ 2

      A.    Plaintiff's Detailed Factual Allegations Concerning Ocwen's
            Fraudulent Conduct Satisfy Rule 9(b)'s Particularity Requirement .............. 2

      B.    The Economic Loss Doctrine Is Inapplicable to Plaintiff's Common
            Law Fraud Claim ...................................................... 6

      C.    Plaintiff's RFDCPA Claim is not Time-Barred ............................. 7

III.  PLAINTIFF ADEQUATELY ALLEGES HIS CLAIMS UNDER RICO ............. 7

      A.    Plaintiff Properly Alleges an Associated-in-fact RICO Enterprise ............... 8

      B.    Plaintiff Adequately Alleges the RICO Predicate Acts ................................ 14

      C.    Plaintiff Adequately Alleges his RICO Conspiracy Claim .......................... 15

IV.   OCWEN'S MOTION FAILS TO PRESENT A SINGLE ARGUMENT
      WARRANTING DISMISSAL OF PLAINTIFF'S UCL CLAIMS ...................... 16

      A.    Plaintiff Adequately Alleges a UCL "Fraudulent" Prong Claim .................. 16

      B.    Ocwen's Reliance on *Walker* as a Basis to Dismiss Plaintiff's UCL
            "Unfair" Claim is Misplaced ...................................................... 17

V.    PLAINTIFF PROPERLY ALLEGES HIS UNJUST ENRICHMENT
      CLAIM ................................................................................ 19

VI.   PLAINTIFF PROPERLY ALLEGES A BREACH OF CONTRACT CLAIM
      BASED ON OCWEN'S MISAPPLICATION OF PAYMENTS ........................... 19

VII.  CONCLUSION .................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

CASE                                                                                                                                 PAGE(S)

*Baas v. Dollar Tree Stores, Inc.*,
   2007 U.S. Dist. LEXIS 65979 (N.D. Cal. Aug. 29, 2007) .............................................. 2

*Berger v. Home Depot USA, Inc.*,
   2014 U.S. App. LEXIS 2059 (9th Cir. Feb. 3, 2014) .................................................. 19

*Bias v. Wells Fargo & Co.*,
   942 F. Supp. 2d 915 (N.D. Cal. 2013) ................................................................*passim*

*Boyle v. U.S.*,
   556 U.S. 938 (2009) .......................................................................................... 8

*Cedric Kushner Promotions, Ltd. v. King*,
   533 U.S. 158 (2001) .......................................................................................... 8

*Cirino v. Bank of Am., N.A.*,
   No. 13-cv-8829-PSG, Dkt. No. 41 at 11 (C.D. Cal. Oct. 1, 2014) .............................. 18

*Cirino v. Bank of Am., N.A.*,
   No. 2:13-cv-00829, ECF No. 41 (C.D. Cal. Oct. 1, 2014) ...................................... 5, 18

*Cooper v. Pickett*,
   137 F.3d 616 (9th Cir. 1997) ................................................................................ 2

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Prac. Litig.*,
   601 F. Supp. 2d 1201 (S.D. Cal. 2009) ....................................................... 19

*Deruseeasu v. Bank of Am., N.A.*,
   2011 U.S. Dist. LEXIS 136508 (S.D. Cal. Nov. 29, 2011) ....................................... 20

*Friedman v. 24 Hour Fitness USA, Inc.*,
   580 F. Supp. 2d 985 (C.D. Cal. 2008) ....................................................... 11, 13, 14

*Giles v. GMAC*,
   494 F. 3d 865 (9th Cir. 2007) ............................................................................... 6

*Gottreich v. San Francisco Inv. Corp.*,
   552 F.2d 866 (9th Cir. 1977) ...................................................................... 5, 15, 16

*Lavie v. Procter & Gamble Co.*,
   105 Cal. App. 4th 496 (2003) ............................................................................. 17

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Lee v. City of L.A.*,
    250 F.3d 668 (9th Cir. 2001) .................................................................................20

*Loma Linda Univ. Med. Ctr. Inc. v. Farmers Group Inc.*,
    1995 U.S. Dist. LEXIS 9668 (E.D. Cal. May 15, 1995) ...........................................13

*In re Ocwen Financial Corporation*,
    Consent Order Pursuant to New York Banking Law § 44 (Dec. 19, 2014), available at
    http://www.dfs.ny.gov/about/ea/ea141222.pdf (last visited Jan. 2, 2015) ..................13

*Odom v. Microsoft Corp.*,
    486 F.3d 541 (9th Cir. 2007) ..............................................................................8, 13

*Robinson Helicopter Co., Inc. v. Dana Corp.*,
    34 Cal. 4th 979 (2004) ..........................................................................................7

*Schlagal v. Learning Tree Int'l.*,
    1998 U.S. Dist. LEXIS 20306 (C.D. Cal. Dec. 23, 1998)............................................2

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    580 F. Supp. 2d 896 (N.D. Cal. 2008) ....................................................................16

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) ...................................................................3, 5, 15, 16

*Terra Ins. Co. v. New York Life Inv. Mgmt.*,
    2009 U.S. Dist. LEXIS 67102 (N.D. Cal. July 30, 2009) ..........................................12

*In re TFT-LCD Antitrust Litig.*,
    586 F. Supp. 2d 1109 (9th Cir. 2005)........................................................................5

*In re TFT-LCD Antitrust Litig.*,
    599 F. Supp. 2d 1179 (N.D. Cal. 2009)....................................................................12

*Vega v. Ocwen Financial Corp.*,
    2014 U.S. Dist. LEXIS 166922 (C.D. Cal. Dec. 1, 2014)...................................*passim*

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) .................................................................................5

*Walker v. Countrywide Home Loans, Inc.*,
    98 Cal. App. 4th 1158 (2002) ...........................................................................17, 18

*Young v. Wells Fargo*,
    671 F. Supp. 2d 1006 (S.D. Iowa Oct. 27, 2009) ..............................................*passim*

**Statutes**

Cal. Civ. Code § 1788.3(f) ..................................................................................... 7

**Other Authorities**

Fed. R. Civ. P. 8 ..................................................................................................... 2

Fed R. Civ. P. 15 .................................................................................................. 20

PAGE I

I.      INTRODUCTION ......................................................................................... 1

II.     PLAINTIFF PROPERLY ALLEGES OCWEN'S FRAUDULENT
        CONDUCT ..................................................................................................... 2

        A.      Plaintiff's Detailed Factual Allegations Concerning Ocwen's
                Fraudulent Conduct Satisfy Rule 9(b)'s Particularity Requirement .............. 2

        B.      The Economic Loss Doctrine Is Inapplicable to Plaintiff's Common
                Law Fraud Claim ................................................................................ 6

        C.      Plaintiff's RFDCPA Claim is not Time-Barred ......................................... 7

III.    PLAINTIFF ADEQUATELY ALLEGES HIS CLAIMS UNDER RICO .............. 7

        A.      Plaintiff Properly Alleges an Associated-in-fact RICO Enterprise ............... 8

        B.      Plaintiff Adequately Alleges the RICO Predicate Acts ............................. 14

        C.      Plaintiff Adequately Alleges his RICO Conspiracy Claim .......................... 15

IV.     OCWEN'S MOTION FAILS TO PRESENT A SINGLE ARGUMENT
        WARRANTING DISMISSAL OF PLAINTIFF'S UCL CLAIMS ...................... 16

        A.      Plaintiff Adequately Alleges a UCL "Fraudulent" Prong Claim .................. 16

        B.      Ocwen's Reliance on *Walker* as a Basis to Dismiss Plaintiff's UCL
                "Unfair" Claim is Misplaced ................................................................ 17

V.      PLAINTIFF PROPERLY ALLEGES HIS UNJUST ENRICHMENT
        CLAIM .......................................................................................................... 19

VI.   PLAINTIFF PROPERLY ALLEGES A BREACH OF CONTRACT CLAIM BASED ON OCWEN'S MISAPPLICATION OF PAYMENTS ........................... 19

VII.   CONCLUSION ....................................................................................... 20

1

## I.      INTRODUCTION

2        Defendants Ocwen Financial Corporation and Ocwen Loan Servicing, LLC

3   (collectively "Defendants" or "Ocwen") are in the business of servicing mortgage loans

4   held by homeowners like Plaintiff David Weiner ("Plaintiff").  When homeowners fall

5   behind on their loan payments, Defendants hire third-party vendors to perform certain

6   default-related services, as disclosed in the mortgage contract.  However, Defendants are

7   ***not permitted to engage in self-dealing transactions to mark up or pad the fees in order***

8   ***to generate healthy profits***.  Nevertheless, using an enterprise of affiliated companies,

9   including Altisource Portfolio Solutions S.A. ("Altisource"), and third-party vendors,

10  Defendants devised a scheme to assess homeowners default-related service fees which are

11  unlawfully marked-up, often by more than 100%.  Along the way, Defendants reaped

12  millions from distressed homeowners who could least afford it.

13        Through this action, Plaintiff seeks to put a stop to Defendants' unlawful conduct,

14  once and for all.  To that end, Plaintiff's UCL, civil RICO, RFDCPA, and common law

15  fraud claims challenge Defendants' practice of assessing default-related service fees on

16  borrowers' accounts with ***substantial, undisclosed mark-ups***, in violation of the

17  disclosures in borrowers' mortgage contracts.  Separately, Plaintiff also contends that, by

18  misapplying timely loan payments, Defendants breach the deed of trust.

19        Faced with the gravity of Plaintiff's allegations, Defendants understandably seek a

20  dismissal of this case.  But, in doing so, they resort to a fundamental mischaracterization

21  of Plaintiff's claims.  As Defendants are well aware, this case alleges far more than a mere

22  "breach of contract."  At its core, this case is about Defendants' knowing, affirmative, and

23  active concealment of their unlawful assessment of marked-up default related service fees.

24  The Complaint, which provides detailed allegations supporting each of the claims against

25  Defendants, easily satisfies the applicable pleading standards.  At the pleading stage,

26  nothing more is required to put Defendants on notice of the claims against them so that

27  they can mount a defense -- if one exists.

28

## II.    PLAINTIFF PROPERLY ALLEGES OCWEN'S FRAUDULENT CONDUCT

Mischaracterizing Plaintiff's UCL, RICO, RFDCPA, and common law fraud claims as an attempt to "stretch [Plaintiff's] breach of contract claim into something more," Defendants assert that each of these fraud-based claims must be dismissed for lack of specificity under Rule 9(b).  (Mot. at 6.)  Defendants further assert that the economic loss rule bars Plaintiff's common law fraud claim, and that his RFDCPA claim is barred by the statute of limitations.  (Mot. at 8-10.)

These exact arguments were squarely rejected in two recent cases -- including a pending action against Defendants -- alleging loan servicers assessed improper default-related service fees.  *See Vega v. Ocwen Financial Corp.*, 2014 U.S. Dist. LEXIS 166922, at *2-4 (C.D. Cal. Dec. 1, 2014) (Wright, II, J.) (challenging Ocwen's practice of indiscriminately ordering and assessing borrowers fees for unnecessary property inspections, another type of default-related service); *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 923-26 (N.D. Cal. 2013) (Gonzalez Rogers, J.) (a virtually identical action challenging Wells Fargo's practice of assessing unlawfully marked-up BPO fees on the accounts of borrowers in default).  Consistent with *Vega* and *Bias*, this Court should reject Defendants' arguments and deny the motion to dismiss Plaintiff's fraud-based claims.

### A.    Plaintiff's Detailed Factual Allegations Concerning Ocwen's Fraudulent Conduct Satisfy Rule 9(b)'s Particularity Requirement

As the Ninth Circuit has explained, courts "cannot make Rule 9(b) carry more weight than it was meant to bear."  *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997); *see also Schlagal v. Learning Tree Int'l.*, 1998 U.S. Dist. LEXIS 20306, at *25 (C.D. Cal. Dec. 23, 1998) ("The Court must strike a careful balance between insistence on compliance with demanding pleading standards and ensuring that valid grievances survive.")  Instead, Rule 9(b) "must be read in harmony with Fed. R. Civ. P. 8's requirement of a 'short and plain' statement of the claim."  *Baas v. Dollar Tree Stores, Inc.*, 2007 U.S. Dist. LEXIS 65979, at *5 (N.D. Cal. Aug. 29, 2007).   Therefore, to comply with Rule 9(b), allegations of fraud need only be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud

charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).

Plaintiff's allegations indisputably meet this standard. Indeed, contrary to Defendants' motion, the Complaint "specif[ies] the disclosures at issue," "explains how they were purportedly violated," and identifies the date and content of communications which Plaintiff contends are fraudulent and misleading. (*See* Mot. at 6:21-23, 7:4-8.)

As alleged in the Complaint, "the mortgage contract discloses to homeowners that the servicer will pay for default-related services when reasonably necessary, and will be reimbursed or 'paid back' by the homeowner for amounts 'disbursed.'" (Compl. ¶¶ 54-58 (emphasis added).) While this provision gives Ocwen the basic right to seek reimbursement for the costs of default-related services, it does *not* permit them to "engage in self-dealing to mark up the actual cost of those services to make a profit." (*Id.* ¶ 58.) Indeed, "when Ocwen collects, or attempts to collect, such [marked-up] fees, it is not merely being 'paid back,' or collecting 'amounts disbursed,' nor are such fees 'reasonable and appropriate' to protect the note holder's interest in the property and rights under the deed of trust." (*Id.* ¶ 4.) Nevertheless, "Ocwen devised a scheme to deceive homeowners who are behind on their mortgage payments into paying, or believing they have to pay, hundreds or thousands of dollars in unlawfully marked-up fees." (*Id.* ¶ 1.) In furtherance of this scheme, Ocwen provided borrowers "mortgage invoices, loan statements, or proofs of claims . . . [which] disguised the fact that the default-related service fees assessed on homeowners' accounts were marked-up." (*Id.* ¶ 152.) Moreover, "to lull homeowners into a sense of trust and dissuade them from challenging Ocwen's unlawful fee assessment, Ocwen concealed their scheme from borrowers by telling them, in statements and other documents, that such fees are in accordance with the terms of their mortgage." (*Id.* ¶ 151.) Finally, Plaintiff alleges that Ocwen assessed marked-up BPO fees of $109 and $100 on his mortgage account on September 4, 2013 and February 27, 2014, respectively, and that he was assessed a marked-up "Title Search" fee of $829 on June 9, 2014. (*Id.* ¶¶ 101, 103.)

Plaintiff's detailed factual allegations are virtually identical to the fraud-based allegations the *Bias* court held to be sufficient under Rule 9(b).  *See Bias*, 942 F. Supp. 2d at 944.  In *Bias*, the court summarized the alleged "fraudulent practices" underlying plaintiffs' UCL, RICO and common law fraud claims against Wells Fargo as follows:

> [Wells Fargo] "formed an enterprise with their respective subsidiaries, affiliates, and 'property preservation' vendors,  . . . unlawfully mark[ed] up default-related fees charged by third parties[,] and assess[ed] them against borrowers' accounts" for an undisclosed profit. Specifically, "[Wells Fargo] order[ed] default-related services from their subsidiaries and affiliated companies, who, in turn, obtain[ed] the services from third-party vendors." The third-party vendors charged [Wells Fargo] for their services, but [Wells Fargo] "assess[ed] borrowers a fee that [wa]s significantly marked-up from the third-party vendors' actual fees for the services." Plaintiffs allege their mortgage contracts disclosed that [Wells Fargo] will pay for default-related services when necessary, which would be reimbursed by borrowers, but "[n]owhere [wa]s it disclosed to borrowers that the servicer may mark-up the actual cost of those services to make a profit." . . . When borrowers inquired about the fees, [Wells Fargo] allegedly concealed and misled the borrowers to dissuade them from challenging the charges, and told them that the fees were in accordance with their mortgages.

*Id.* at 923-24 (internal citations omitted).  The court found that "[a]s alleged, the fraud is equally about the failure to disclose material information as it is that the amounts demanded on mortgage statements were false because they did not correspond to the actual amounts owed pursuant to mortgage agreements relied upon by [Wells Fargo]."  *Id.* at 939.  Based on these allegations, the *Bias* court ultimately held that, "[p]laintiffs have pled sufficient detail in the SAC under *Rule 9(b)* to explain why the mortgage statements and explanation of fees were false and misleading, and [Wells Fargo] ha[s] sufficient notice of the alleged misconduct such that they can defend themselves in this action."  *Id.*

In addition to *Bias*, Plaintiff's claims are also analogous to the fraud claims alleged in *Vega*, another pending case challenging Ocwen's unlawful assessment of property inspection fees.  *See Vega*, 2014 U.S. Dist. LEXIS 166922, at *1.  In *Vega*, the plaintiff alleged that Ocwen "concealed the true nature of the property-inspection fees" in borrower's monthly statements, and "affirmatively misled borrowers by assessing fees for unnecessary property inspections."  *Id.* at *7, *12.  Therefore, as in this case, the *Vega*

plaintiff's fraud-based claims were premised on a "theory of misrepresentation about the nature and necessity of the fees." *Id.* at \*7-8.  The *Vega* court held that this theory "satisfied the particularity requirements of *Rule 9(b)*," and, in doing so, distinguished the *Kirkeby v. JP Morgan Chase Bank, N.A.* opinion relied upon here by Defendants.[1]  *Id.* at \*12.

Here, as in *Bias* and *Vega*, Plaintiff's fraud-based allegations indisputably satisfy Rule 9(b).  Rather than simply setting forth the "neutral facts necessary to identify the transaction," the Complaint alleges exactly why it is "false and misleading" for Defendants to demand payment of marked-up default-related service fees.  *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).  Such detailed allegations concerning Defendants' fraudulent conduct are more than sufficient to allow them to "defend against the charge[s]" and "prepare an adequate answer from the allegations." *Swartz*, 476 F.3d at 764; *Gottreich v. San Francisco Inv. Corp.*, 552 F.2d 866, 866 (9th Cir. 1977).  Therefore, it would be inappropriate to dismiss Plaintiff's fraud-based claims at this early stage of the litigation.  *See In re TFT-LCD Antitrust Litig.*, 586 F. Supp. 2d 1109, 1120 (9th Cir. 2005) ("It is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly when the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the [defendants].")

---

[1] In addition to *Kirkeby*, Defendants' motion also cites *Cirino v. Bank of Am., N.A.*, No. 2:13-cv-00829, ECF No. 41 (C.D. Cal. Oct. 1, 2014).  However, *Cirino* did *not* involve "claims challenging *marked-up* property inspection fees," as Defendants assert in the motion.  (*See* Mot. at 7:25 (emphasis added).)  As Defendants are well aware -- particularly given that they submitted a copy of the opinion in connection with its motion -- in *Cirino*, the plaintiff alleged Bank of America "use[d] [automated] systems to charge borrowers fees for *unnecessary* property inspections."  (*See* Dkt. 6-2, Vergara Decl., Ex. A at 2 (emphasis added).)  Defendants' remaining precedent is equally unpersuasive, as it addressed allegations with far less specificity than the pages of detailed factual allegations set forth in the Complaint.

### B.    The Economic Loss Doctrine Is Inapplicable to Plaintiff's Common Law Fraud Claim

Recasting Plaintiff's common law fraud claim as a mere breach of contract, Defendants erroneously assert that the "claim is barred by the economic-loss doctrine because plaintiff's fraud allegations depend on the assumption that the challenged fees constituted a breach of the deed of trust."  (Mot. at 9:17-19.)

Defendants made this exact same economic loss argument in *Vega* to no avail.  *See Vega*, 2014 U.S. Dist. LEXIS 166922, at *13.  In rejecting the argument, the Honorable Otis D. Wright, II explained that:

> At this stage of the litigation, the Court is satisfied that Vega's allegations go beyond a mere breach of contract and the economic-loss doctrine does not apply.  Vega alleges that [Ocwen] not only assessed unnecessary property-inspection fees against her, but that the fees against her are part of a broader scheme to profit off. . . all defaulting borrowers whose loans [Ocwen] service[s].

*Id.* at *14-15; *see also Young v. Wells Fargo*, 671 F. Supp. 2d 1006, 1034-35 (S.D. Iowa Oct. 27, 2009) (holding that similar allegations that Wells Fargo indiscriminately assessed unnecessary default-related service fees went beyond a mere breach of contract and instead constituted "a systematic course of conduct to defraud mortgage borrowers").

The *Bias* court reached a similar holding, explaining that "[t]he Court is, again, not persuaded by Wells Fargo's arguments that the [marked up] fees were overall 'reasonable' and that the alleged conduct simply amounts to a breach of contract."  *Bias*, 942 F. Supp. 2d at 938 n.18 (citing *U.S. v. Ali*, 620 F.3d 1062, 1071 (9th Cir. 2010)).

Ultimately, Defendants fail to understand that the alleged misconduct goes much further than a mere failure to perform a contractual promise.  *See, e.g.*, *Giles v. GMAC*, 494 F. 3d 865, 874-75 (9th Cir. 2007) (explaining that, "[w]here tort claims have been barred, they have usually amounted to nothing more than a failure to perform a promise contained in a contract").  Here, as in *Vega*, Plaintiff alleges that Defendants' "policy, practice and procedure of marking up fees for default-related services" is part of a broader "strategy to generate fraudulently concealed default-related fee income."  (Compl. ¶ 51.)

Plaintiff also alleges that, in furtherance of this fraudulent scheme, "Ocwen

knowingly, affirmatively, and actively concealed the true character, quality, and nature of their assessment of marked-up default-related service fees against borrowers' accounts," not that Defendants breached the loan agreement.  (*Id.* ¶¶ 106, 127, 191.)  Accordingly, because Defendants' "fraud is a tort independent of [any] breach [of contract]," their economic loss argument necessarily fails.  *See Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 991 (2004); *see also Young*, 671 F. Supp. 2d at 1033 ("Though the basis of [p]laintiffs' relationship to Wells Fargo was established by contract, [p]laintiffs have alleged that Wells Fargo's practices constitute a systematic scheme to charge excessive fees and conceal those fees from mortgagors. . . .[I]t is well settled that allegations that a defendant engaged in deceptive business practices can support a claim for breach of contract or fraud, even when the defendant's actions are also contrary to the terms of a valid contract.")

### C.   Plaintiff's RFDCPA Claim is not Time-Barred

Defendants' assertion that Plaintiff's RFDCPA claim is "time-barred" is equally unavailing. (*See* Mot. at 9:23 - 10:6.)  As a threshold matter, Plaintiff alleges that any applicable statute of limitations has been tolled by Defendants' "knowing and active concealment, denial, and misleading actions."  (Compl. ¶¶ 105-107.)  Moreover, even assuming *arguendo* that the statute of limitations were not tolled, Plaintiff's claim is nevertheless timely.  Indeed, Defendants do not dispute that Plaintiff was assessed BPO fees on September 4, 2013 and February 27, 2014 and a "Title Search" fee on June 9, 2014.  (*See* Mot. 9:24-27.)  Accordingly, the RFDCPA's one-year statute of limitations would expire, if at all, in June 2015.  *See* Cal. Civ. Code § 1788.3(f).  Because Plaintiff filed his complaint in November 2014, his RFDCPA claim is timely.  *See Vega*, 2014 U.S. Dist. LEXIS 166922, at *23 ("[E]ven without tolling, Vega's RFDCPA claim is not time-barred because property-inspection fees were assessed through October 2013, which is within the one year limitations period.")

### III.   PLAINTIFF ADEQUATELY ALLEGES HIS CLAIMS UNDER RICO

The RICO statute is designed "to protect the public from those who would run

1   organizations in a manner detrimental to the public interest." *Cedric Kushner*

2   *Promotions, Ltd. v. King*, 533 U.S. 158, 165 (2001) (internal citations omitted).  Under

3   controlling Ninth Circuit precedent, RICO must "be liberally construed to effectuate its

4   remedial purposes." *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007).

5       Here, there can be no real question that Plaintiff states a claim under RICO.  As set

6   forth in the Complaint, Defendants utilized an enterprise of affiliated companies,

7   including Altisource, and third-party vendors to "engage in its scheme to disguise hidden,

8   marked-up fees so that it could earn additional, undisclosed profits."  (Compl. ¶ 2.)

9   Plaintiff's Complaint addresses all of the elements of RICO, alleging, with great detail,

10  the nature  and conduct of the enterprise, the role of each member, and the predicate acts.

11  Accordingly, Defendants' motion to dismiss Plaintiff's RICO claims should be denied.

12      **A.    Plaintiff Properly Alleges an Associated-in-fact RICO Enterprise**

13      As the Ninth Circuit noted in *Odom*, the definition of an associated-in-fact

14  enterprise is "not very demanding."  *Odom*, 486 F.3d at 548; *see also Boyle v. U.S.*, 556

15  U.S. 938, 944 (2009) ("[T]he very concept of an association in fact is expansive.").

16  Indeed, Plaintiff need only plead three elements to properly allege such an enterprise: (1)

17  "a common purpose of engaging in a course of conduct"; (2) an "ongoing organization,"

18  either "formal or informal"; and (3) "facts that, if proved, provide sufficient evidence that

19  the various associates function as a continuing unit."  *Odom*, 486 F.3d at 552.

20      Defendants' motion half-heartedly asserts that "Plaintiff has failed to allege any of

21  these essential elements."  (Mot. at 12:23.)  In so arguing, it appears Defendants did not

22  actually bother to read the Complaint.  As set forth therein, the alleged enterprise consists

23  of Defendants, their affiliated company Altisource, and Defendants' third-party vendors,

24  all of whom are "associated together for the common purpose of limiting costs and

25  maximizing profits by fraudulently concealing assessments for unlawfully marked-up fees

26  for default-related services on homeowners' loan accounts."  (Compl. ¶ 142.)

27      The Complaint alleges, in detail, the "role" played by each member of the

28  enterprise.  (Mot. at 13:16 - 14:12.)  To this end, Plaintiff alleges that Defendants

"controlled and directed the affairs of the … [e]nterprise." (Compl. ¶ 144.)  The Complaint further alleges that Defendants operate the enterprise according to specific "policies and procedures" developed by their executives, including:

> funneling default-related services through [Defendants'] affiliated company, Altisource, to disguise unlawful mark-ups of services provided by third parties; providing statements that conceal the true nature of the marked-up default-related service fees; using mortgage loan management software designed to assess undisclosed marked-up fees on borrowers accounts; and failing to provide borrowers with accurate documentation to support assessments of fees for BPOs.

(*Id.* ¶ 145.)  Plaintiff also alleges that, "[b]y developing and implementing policies and procedures leading to the repeated, and unlawful, assessment of marked-up fees for default-related services, [Defendants] engaged in the conduct of the . . . [e]nterprise distinct from [their] own affairs as a loan servicer."  (*Id.* ¶ 146.)   Finally, Plaintiff alleges that Defendants began "selling" marked-up BPOs to Wall Street firms in mid-2000, and facilitated this BPO business by stealing Cartel Asset Management's ("CAM") list of BPO realtors.  (*Id.* ¶¶ 63-64.)  This practice continued until August 10, 2009, when Defendants transferred the BPO product line and database containing CAM's stolen information to Altisource as part of the spin-off.  (*Id.* ¶¶ 2, 65.)

Plaintiff also addresses the role of Altisource and the third-party vendors, both of which Defendants used as "instrumentalities to carry out [their] fraudulent scheme."  (*Id.* ¶ 144.)  As described in the Complaint:

> To obtain [default-related] services, Ocwen funnels the work through its affiliated company, Altisource, who then orders these services using a network of third-party vendors.  As a matter of practice, Altisource marks up the third-party vendors' actual cost for their services, and then, passes along the marked-up charge to Ocwen.  Without disclosing the mark-up, Ocwen, in turn, assesses the marked-up fees for these default-related service[s] on homeowners' accounts.

(*Id.* ¶ 3; *see also id.* ¶¶ 143, 145.)

The role played by Altisource and Defendants' third-party vendors parallels the role of Premier Asset Services ("Premiere") and Wells Fargo's third-party vendors in the associated-in-fact enterprise at issue in *Bias*.  *See Bias*, 942 F. Supp. 2d at 940-41. In

holding that plaintiffs adequately alleged a RICO enterprise, the *Bias* court focused on the

following allegations:

> Plaintiffs allege conduct specifically between and among Wells Fargo
> Defendants *and* at least one other entity, namely Premiere, which supports
> the requirement that the enterprise members have "associated together for a
> common purpose."  As stated above, the alleged common purpose here was
> to limit costs and maximize profits through concealment of marked-up fees.
> As alleged, this scheme to profit is a sufficient common purpose.  Moreover,
> Wells Fargo and Premiere each played different roles from each other (and
> from the third-party vendors and brokers) to accomplish this purpose.

> Premiere sub-contracted the BPOs requested by Wells Fargo to different
> local real estate brokers and vendors. Premiere served a critical role
> connecting Defendants, who designed the scheme to defraud, with third-party
> vendors and brokers, who provided the default-related services at the core of
> the scheme.  Without the third-party vendors' and brokers' involvement,
> Wells Fargo would have been unable to seek reimbursement of fees in the
> first place.

*Bias*, 942 F. Supp. 2d at 941 (citing *Odom*, 486 F.3d at 551-52).  Tellingly, Defendants

fail to reference, much less address, any of these "specific factual allegations" in arguing,

incorrectly, that "Plaintiff's allegations . . . stand in sharp contrast to those found

sufficient to state a RICO enterprise in [*Bias*]."  (Mot. at 15:1-12.)

    Consistent with *Bias*, the allegations in the Complaint are more than sufficient to

plead that Defendants conducted or participated in the conduct of the enterprise's affairs,

not just their own affairs, as required under RICO.  *See also Vega*, 2014 U.S. Dist. LEXIS

166922, at *17-18 (citing *Odom*, 486 F.3d at 551-53) (holding that plaintiff sufficiently

alleged that Ocwen, Altisource and third-party vendors formed an associated-in-fact

enterprise, where Ocwen allegedly "control[ed] and direct[ed] the affairs of the enterprise

and use[d] other members as instrumentalities to carry out [their] fraudulent scheme,"

Ocwen's "executives set policies and procedures" to carry out the scheme, and Ocwen

"funnel[ed] work to Altisource. . . [who] in turn orders default-related services such as

property inspections from a network of third-party vendors"); *Young*, 671 F. Supp. 2d at

1028 ("Wells Fargo conducted the affairs of the enterprise by ordering the property

inspections, used its association-in-fact business arrangement with the property inspection

vendors to conduct its unlawful practice of imposing excessive fees on mortgagors, and engaged in mail and wire fraud to collect payments for the enterprise's benefit[.]").

Nevertheless, Defendants assert that Plaintiff's RICO claim is precluded, because the third-party vendors are "unnamed" and merely performed their "ordinary" contractual duties.  (Mot. at 12:24-27, 14:13-28.)  This argument lacks merit.  As an initial matter, other courts have expressly found similar allegations concerning loan servicers and their unidentified outside vendors to be sufficient. *See*, *e.g.*, *Vega*, 2014 U.S. Dist. LEXIS 166922, at *16-18 (holding that plaintiff properly alleged an enterprise including Ocwen, Altisource, and unidentified "third-party vendors,"  and rejecting Ocwen's argument that plaintiff's "failure to specifically identify the property-preservation vendors precludes here RICO claim based on their conduct"); *Bias*, 942 F. Supp. 2d at 923, 936-42 (finding RICO allegations adequate where plaintiffs alleged that defendants "formed an enterprise with their respective subsidiaries, affiliates, and 'property preservation' vendors"); *Young*, 671 F. Supp. 2d at 1026 (upholding RICO claim where plaintiffs alleged that Wells Fargo and unnamed property inspection vendors formed an associated-in-fact enterprise).

Moreover, even assuming *arguendo* that Defendants' third-party vendors were unwitting participants in the enterprise, as Defendants' motion seems to suggest, that would still *not* support dismissal of Plaintiff's claim.  *See Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985, 991 (C.D. Cal. 2008) (holding that plaintiff properly alleged a RICO enterprise consisting of defendant 24 Hour Fitness and non-parties, Paymentech and LaSalle -- payment processing vendors hired by defendant -- despite the fact that "Paymentech and LaSalle were unwitting participants in [d]efendant's scheme").

Next, ignoring the detailed allegations described above, Defendants argue that the Complaint "improperly lumps" them together simply because they are referred to "collectively." (Mot. at 13:5-8.)  In so arguing, however, Defendants overlook the fact that under circumstances such as those at issue here, courts have explained that, "[i]n cases of corporate fraud . . . the pleading standard is relaxed since the circumstances may make it difficult to attribute particular fraudulent conduct to each defendant as an

individual." *Terra Ins. Co. v. New York Life Inv. Mgmt.*, 2009 U.S. Dist. LEXIS 67102, at
*7 (N.D. Cal. July 30, 2009). Accordingly, Defendants demand far beyond what is
required, and Plaintiff need not allege more than he has. *See, e.g.*, *Bias*, 942 F. Supp. 2d
at 939-42 (finding that plaintiffs adequately alleged the "roles" Wells Fargo & Company
and Wells Fargo Bank, N.A. played in the alleged enterprise, even though the entities
were collectively referred to as "Wells Fargo" throughout the entire complaint); *In re
TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009) (rejecting
defendants' argument that "the complaints continue to 'lump together' the twenty-six
different named defendants in general allegations referring to 'defendants,' or groups of
defendants sorted by country or corporate family" where plaintiff alleged that the
"conspiracy was organized at the highest level of the defendant organizations and carried
out by both executives and subordinate employees").

Defendants' argument that Plaintiff has not sufficiently alleged Altisource's role in
the enterprise is equally unavailing. (*See* Mot. at 13:16 - 14:12.) In support of this
argument, Defendants assert, without actually establishing, that they and Altisource are
merely engaged in an "arm's-length contractual relationship." (Mot. at 13:24.) Nothing
could be further from the truth.

As set forth in the Complaint, following the 2009 spin-off, William C. Erby
("Erby") -- Ocwen's Executive Chairman and 13% owner of Ocwen's common stock --
owns approximately 23% of the common stock of Altisource, and "has taken a very active
role in the company," including serving a dual-role as Chairman of the Board for both
Altisource and Ocwen. (*Id.* ¶¶ 37-38.) This "close and continuing" relationship between
Ocwen and affiliated company Altisource caused Benjamin Lawsky, New York's top
bank regulator, to initiate a "review of Ocwen's mortgage servicing practices . . . [which]
uncovered a number of potential conflicts of interest between Ocwen and other public
companies with which Ocwen is closely affiliated," including Altisource. (*Id.* ¶ 40.) Mr.
Lawsky described his findings in a February 26, 2014 letter to Ocwen, explaining that
"***the facts our review has uncovered to date cast serious doubts on recent public***

*statements made by the company that Ocwen has a 'strictly arms-length business relationship' with those companies*." (*Id.* (emphasis added).)  Notably, Lawsky's investigation culminated in a Consent Agreement with Ocwen, executed on December 19, 2014, which requires Ocwen to pay $150 million in restitution and forces Erby to resign as Ocwen's CEO effective January 16, 2015.[2]

Despite the fact that Mr. Lawsky and other financial regulators (including the SEC) have raised significant concerns about the "tangled web of conflicts" between the entities, (Compl. ¶¶ 40-43, 45-48), Defendants have continuously, and systematically, engaged in "self-dealing" transactions with Altisource.  (*Id.* ¶ 49).  Accordingly, "although [Defendants] and Altisource are separate entities, they are effectively joined together, as affiliated companies, operating as a continuing unit with a common purpose." (*Id.* ¶ 50.)

Finally, contrary to Defendants' motion, Plaintiff need not allege that "Altisource had any role in drafting or sending" the allegedly fraudulent monthly mortgage statements.  (Mot. at 16:7-8.)  In order to meet the "common purpose" requirement, Plaintiff need not demonstrate that all members of the enterprise shared Defendants' "*fraudulent* purpose." *See Friedman*, 580 F. Supp. 2d at 991-93 (analyzing Ninth Circuit precedent, including *Odom*, and rejecting defendant's argument that "there must be a common *fraudulent* purpose shared by the associated-in-fact members of the enterprise" in order to state a claim under RICO) (emphasis in original).  Moreover, Defendants' reliance on Colorado law for the proposition that "a services contract among parties is insufficient to allege an enterprise" is misplaced.  (Mot. at 16:8-9.)  Under California law, "[i]t is clear that contractual relationships can establish a RICO enterprise." *Loma Linda Univ. Med. Ctr. Inc. v. Farmers Group Inc.*, 1995 U.S. Dist. LEXIS 9668, at *4 (E.D. Cal. May 15, 1995) (citing *River City Markets v. Fleming Foods West*, 960 F.2d 1458 (9th Cir. 1992)); *Vega*, 2014 U.S. Dist. LEXIS 166922, at *18 ("Nor does RICO require an

---

[2] N.Y. Dep't of Financial Services, *In re Ocwen Financial Corporation*, Consent Order Pursuant to New York Banking Law § 44 (Dec. 19, 2014), available at http://www.dfs.ny.gov/about/ea/ea141222.pdf (last visited Jan. 2, 2015).

enterprise to be something more than a contract-based relationship.")  Indeed, "[t]o require something more than a contract-based relationship would in effect resurrect the ascertainable structure requirement," which the Ninth Circuit expressly rejected. *Friedman*, 580 F. Supp. 2d at 993 (citing *Odom*, 486 F.3d at 551).

Because Defendants fail to raise a single valid argument warranting dismissal of Plaintiff's RICO claim, their motion to dismiss should be denied.

### B.      Plaintiff Adequately Alleges the RICO Predicate Acts

Defendants contend that, "absent an independent duty on [their] part . . . to disclose specific information, plaintiff cannot state a claim for mail or wire fraud."  (*See* Mot. at 11:10-12.)  This "independent duty" argument was squarely rejected in both *Vega* and *Bias*, and should be similarly rejected here.  *See Vega*, 2014 U.S. Dist. LEXIS 166922, at *19 (rejecting Ocwen's argument that plaintiff's RICO claims were based on a "theory of nondisclosure"); *Bias*, 942 F. Supp. 2d at 938 (rejecting  Wells Fargo's argument that plaintiffs' RICO claims should be dismissed because "[p]laintiffs fail[ed] to allege a duty to itemize . . . charges or disclose marked-up fees," and explaining that "regardless of whether [p]laintiffs identify a specific 'duty to disclose,' the omissions and misrepresentations are inextricably tied together such that the demands for reimbursement of fees in Wells Fargo's monthly mortgage statements are akin to misrepresentations").

Defendants' argument assumes, incorrectly, that the predicate acts at issue here are premised on a nondisclosure.  In reality, Plaintiff alleges Defendants facilitated their unlawful enterprise by making *affirmative misrepresentations* through the mail and wire:

> Through the mail and wire, the . . . [e]nterprise provided mortgage invoices, loan statements, payoff demands, or proofs of claims to homeowners, affirmatively demanding that homeowners pay marked-up fees for default-related services. Defendants also accepted payments and engaged in other correspondence in furtherance of their scheme through the mail and wire. . . . By disguising the true nature of amounts purportedly owed in communications to borrowers, the . . . [e]nterprise **made false statements** using the Internet, telephone, facsimile, United States mail, and other interstate commercial carriers. . . . Additionally, using the Internet, telephone, and facsimile transmissions to **fraudulently communicate false information** about these fees to borrowers, to pursue their fraudulent scheme, the . . . [e]nterprise engaged in repeated acts of wire fraud[.]

(Compl. ¶¶ 149, 152, 155 (emphasis added).)  Plaintiff further alleges that, as part of Defendants' fraudulent scheme, he received monthly statements demanding that he pay marked-up fees for BPOs assessed on September 4, 2013 and February 27, 2014, and a marked-up "Title Search" fee assessed to his account on June 9, 2014.[3]  (*Id.* ¶¶101, 103.)

These allegations, which are conveniently omitted from Defendants' argument, are closely analogous to the alleged RICO predicate acts held to be sufficient in *Vega* and *Bias*.  *See Vega*, 2014 U.S. Dist. LEXIS 166922, at *18-19 (holding that plaintiff alleged the requisite predicate acts by pleading that Ocwen's communications to borrowers contained "affirmative misrepresentations . . . that the monthly property inspections were necessary"); *Bias*, 942 F. Supp. 2d at 938-39 (holding that plaintiffs "sufficiently alleged a fraudulent scheme as is required for mail and wire fraud" based on allegations that "[t]hrough the mail and wire, the Wells Fargo Enterprise provided mortgage invoices, loan statements, payoff demands, or proofs of claims to borrowers, demanding that borrowers pay fraudulently concealed marked-up fees for default-related services").  As such, there can be no real argument that Plaintiff failed to allege mail or wire fraud.

Defendants also argue that Plaintiff's RICO claim fails, because "mere alleged breaches of a deed of trust do not constitute predicate acts actionable under RICO."  (Mot. at 17:27-28.)  This argument is baseless.  As with Plaintiff's other fraud-based claims, his RICO claim is *not* premised on a breach of contract.  *See* Sections II.A.-II.B., *supra*.

## C.   Plaintiff Adequately Alleges his RICO Conspiracy Claim

Defendants argue that Plaintiff's conspiracy to commit RICO claim under Section 1962(d) fails, because it is dependent on his "substantive" RICO claim under 1962(c), which Defendants assert is deficient.  (Mot. at 16:4-7.)  For the reasons discussed in

---

[3] These specific instances of mail and wire fraud are more than sufficient, even standing alone, to allow Ocwen to "defend against the charge[s]" and "prepare an adequate answer" from the RICO allegations. *Swartz*, 476 F.3d at 764; *Gottreich*, 552 F.2d at 866. Accordingly, this Court should reject the argument that Plaintiff failed to sufficiently identify the "date or contents" of any misstatement in support of his RICO mail and wire fraud claims.  (Mot. at 10:20-24.)

1   Sections II.A.-II.B. above, Defendants' argument lacks merit.

2          Defendants further argue that Plaintiff's Section 1962(d) claim is insufficient,

3   because Plaintiff purportedly fails to "identify the agreement or the parties thereto," and

4   "what, if any, predicate offenses they agreed to commit." (Mot. at 18:25 - 19:12.)  This

5   argument is equally meritless.  At this stage of the case, Plaintiff need only "make

6   allegations that plausibly suggest that each [d]efendant participated in the alleged

7   conspiracy," which he has indisputably done in the Complaint.  *See In re Static Random*

8   *Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008).  In

9   the end, Defendants cannot explain how Plaintiff's RICO allegations leave them unable to

10   "defend against the charge[s]" or "prepare an adequate answer from the allegations,"

11   which is fatal to their motion.  *Swartz*, 476 F.3d at 764; *Gottreich*, 552 F.2d at 866.

12   **IV.  OCWEN'S MOTION FAILS TO PRESENT A SINGLE ARGUMENT**
       **WARRANTING DISMISSAL OF PLAINTIFF'S UCL CLAIMS**

13          **A.     Plaintiff Adequately Alleges a UCL "Fraudulent" Prong Claim**

14          Consistent with the other fraud-based claims in the Complaint, the UCL fraud claim

15   is *not* premised on a "nondisclosure of the breakdown of [Defendants'] default-related

16   fees," as suggested in Defendants' motion. (Mot. at 17:23-26.)  Rather, Plaintiff's claim is

17   based on the theory that Defendants affirmatively *mislead* delinquent borrowers into

18   paying marked-up fees which Defendants are not authorized to collect.  In furtherance of

19   this fraudulent scheme, Defendants send delinquent borrowers monthly statements which

20          disguise[] the fact that the amounts [Defendants] represent as being owed
            have been marked-up beyond the actual cost of the services, violating the
21          disclosures in the mortgage contract.

22   (Compl. ¶ 128.)  With the "true character, quality, and nature of their assessment of

23   marked-up default-related service fees" concealed from unsuspecting borrowers,

24   Defendants use the full force of their position as a major financial institution to sell the

25   fraud and collect the prohibited fees.  (*Id.* ¶¶ 127, 133-135.)

26          Based on these allegations, there can be no real dispute that Defendants' "[conduct]

27   is such that it is probable that a significant portion of the general consuming public or of

28

targeted consumers, acting reasonably in the circumstances, could be mislead," as required to state a claim under the UCL's "fraudulent" prong.  *See Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 506-07 (2003); *see also Vega*, 2014 U.S. Dist. LEXIS 166922, at *12 (holding that allegations that Ocwen "affirmatively mislead borrowers by assessing fees for unnecessary property inspections" and "us[ed] their status as large financial institutions to disguise the 'true character, quality and nature of the fees'" were sufficient to state a UCL fraud claim); *Bias*, 942 F. Supp. 2d at 944 (holding that plaintiffs stated a UCL fraudulent prong claim based on Wells Fargo's practice of marking-up BPO fees, and noting that the "demands for reimbursement of [marked-up] fees in Wells Fargo's monthly mortgage statements are akin to misrepresentations").

**B.     Ocwen's Reliance on *Walker* as a Basis to Dismiss Plaintiff's UCL "Unfair" Claim is Misplaced**

The California Court of Appeals holding in *Walker v. Countrywide Home Loans, Inc.*, 98 Cal. App. 4th 1158, 1172 (2002) is inapposite to the facts of this case.  *See Bias*, 942 F. Supp. 2d at 933 n.12 (holding that *Walker* was "inapposite" to plaintiff's claim that Wells Fargo's practice of marking-up BPO fees violated the UCL's unfair prong, because *Walker* "arose at the summary judgment stage" and "did not involve the level of fraud and concealment alleged [by plaintiff]").  Contrary to Defendants' motion, the only issue presented in *Walker* was whether or not it is *ever* appropriate for a loan servicer to charge a delinquent borrower a property inspection fee.  *See, e.g.*, *Walker*, 98 Cal. App. 4th at 1164-78.  As Defendants are well aware, their basic right to charge for default-related services is not in dispute in this litigation.  Rather, the primary issue in this case is the ***manner*** in which Defendants fraudulently concealed the true nature of their assessment of ***marked-up*** default-related service fees, an issue not addressed in *Walker*.

Nevertheless, Defendants mistakenly rely on *Walker* throughout their motion, including for the proposition that Plaintiff's "UCL unfairness claim should be. . . rejected because the complained of conduct was contractually authorized."  (Mot. at 18:11-16 (citing *Walker*, 98 Cal. App. 4th at 1177-78).)  This argument is meritless.

As a threshold matter, Defendants' practice of ***marking-up*** default-related service fees is *not* authorized by Plaintiff and class members' mortgage contracts, as it expressly violates disclosures in those contracts "that the servicer will pay for default-related services when reasonably necessary, and will be reimbursed or 'paid back' by the homeowner for amounts 'disbursed.'"  (Compl. ¶¶ 54-58 (emphasis added).)

Moreover, Defendants' argument has been squarely rejected by multiple California courts, including most recently by the Central District of California in the *Vega* opinion. In *Vega*, Judge Wright stated:

> [Ocwen] first contend[s] that Vega's UCL claim fails because the assessment of monthly property-inspection fees on a borrower in default is expressly authorized in the deed of trust and the California Court of Appeal  has already ruled [in *Walker*] that these fees are not "unfair" under the UCL. . . . [Ocwen's] reliance on *Walker* is misplaced.  As Vega points out in her Opposition, the issue in *Walker* was broader than the issue presented in Vega's Complaint.  The California Court of Appeal in *Walker* considered whether it is ever appropriate for a loan servicer to charge a delinquent borrowers a property-inspection fee.  The answer was yes.  However, in this case, Vega is challenging the manner in which [Ocwen] charge[s] delinquent borrowers these fees -- by automatically ordering property inspections every month on every property in default without consideration of the necessity.

*Vega*, 2014 U.S. Dist. LEXIS 166922, at *10 (internal citations omitted); *see also* Vergara Decl., Ex. A, *Cirino v. Bank of Am., N.A.*, No. 13-cv-8829-PSG (MRWx), Dkt. No. 41 at 11 (C.D. Cal. Oct. 1, 2014) (finding that *Walker* does not address whether Bank of America's practice of indiscriminately ordering and assessing property inspection fees is unfair or fraudulent under the UCL); *Young*, 671 F. Supp. 2d at 1024-25 (denying motion to dismiss plaintiff's UCL claim on grounds that *Walker* only addressed "the imposition of property inspection fees in general," not the manner in which the fees were charged).

Consistent with *Bias*, *Vega*, *Cirino*, and *Young*, this Court should reject Defendants' argument that Plaintiff's UCL "unfair" claim fails under *Walker*.[4]

---

[4] Plaintiff has properly alleged RICO, RFDCPA, fraud, and unjust enrichment claims, all of which are "predicate" violations of the UCL's unlawful prong.  *See* Sections II-III, V. As such, this Court should similarly reject Defendants' argument that Plaintiff's UCL unlawful claim fails.  (Mot. at 18:17-27.)

## V.   PLAINTIFF PROPERLY ALLEGES HIS UNJUST ENRICHMENT CLAIM

Defendants argue that Plaintiff's unjust enrichment claim is not "cognizable," because the parties' "dispute" is "governed by an express contract."  (Mot. at 19:3-10.) This argument fails for two reasons.  First, contrary to Defendants' motion, the "subject matter of the dispute" concerns Defendants' fraudulent concealment of marked-up fees, *not* whether it is ever "appropriate" for a loan servicer to charge for default-related services.  *See* Section IV.B., *supra*.  Second, the fact that a loan agreement exists is of no moment when the claims asserted here are *not* a breach of such agreement.  *See In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Prac. Litig.*, 601 F. Supp. 2d 1201, 1220-21 (S.D. Cal. 2009) ("Although there are contracts at issue in this case, none appears to provide for the specific recovery sought by Plaintiffs' unjust enrichment claim.")  Indeed, following *In re Countrywide*, the *Bias* court expressly rejected Wells Fargo's argument that plaintiffs had "no viable unjust enrichment claim under either California or Louisiana law because [p]laintiffs explicitly allege Wells Fargo violated the disclosures in the mortgage agreement."  *Bias*, 942 F. Supp. 2d at 942-43 (citing *In re Countrywide*, 601 F. Supp. 2d at 1220-21).  This Court should similarly reject Defendants' arguments concerning Plaintiff's well-plead unjust enrichment claim.[5]

## VI.   PLAINTIFF PROPERLY ALLEGES A BREACH OF CONTRACT CLAIM BASED ON OCWEN'S MISAPPLICATION OF PAYMENTS

Plaintiff's breach of contract claim is straightforward.  Contrary to Defendants' motion, this claim does not involve the default-related service fees at issue in Plaintiff's fraud-based claims.  Nor does it involve Defendants' right to return a partial payment as insufficient or hold a partial payment in a suspense account, both of which are undisputed.

---

[5] The Ninth Circuit recently recognized that unjust enrichment is a valid cause of action under California law. *See Berger v. Home Depot USA, Inc.*, 2014 U.S. App. LEXIS 2059, at *19 (9th Cir. Feb. 3, 2014) (quoting *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000)) ("The elements of unjust enrichment are 'receipt of a benefit and unjust retention of the benefit at the expense of another.' This equitable test does not turn merely on transfer of money or other benefits from one party to another -- it requires injustice."). Accordingly, Defendants' suggestion that unjust enrichment cannot "be asserted as an independent cause of action under California law" is baseless.  (Mot. at 19 n.5.)

1    Rather, Plaintiff's breach of contract claim challenges the manner in which Defendants

2    *apply* payments.

3              Defendants' motion concedes, as it must, that monthly mortgage payments

4    (including partial payments) are to be applied according to paragraph 2 of Plaintiff's deed

5    of trust.  (*See* Mot. at 5:19-23.)  This paragraph requires that payments be applied to

6    interest and principal *before* being applied to "amounts due for any 'escrow items.'"

7    (Compl. ¶ 76.)  Nevertheless, as alleged in the Complaint, Defendants diverted funds from

8    Plaintiff's monthly mortgage payments to an escrow account without first applying any

9    funds to the interest and principal balance on his loan.  (*Id.* ¶ 95.)  This "failure to

10   properly credit [Plaintiff's] interest and principal payments has burdened his account with

11   unscrupulous fees and has forced his loan into default."  (*Id.* ¶ 97.)  Plaintiff further

12   alleges that Defendants "routinely violate[] the payment hierarchy contained in

13   homeowners' mortgage contracts and divert[] customer payments away from principal

14   and interest on the loan."  (*Id.* ¶ 79.)

15             These allegations, which must be taken as true for purposes of this motion,[6] are

16   more than sufficient to put Defendants on notice of the "payments [Plaintiff] contends

17   were improperly applied" and "how that application differed from the payment

18   application provisions of the deed of trust."  (*See* Mot. at 3:26-28.)  Nothing further is

19   required, as Plaintiff "need not provide detailed allegations of every error Defendants

20   allegedly made."  *Deruseeasu v. Bank of Am., N.A.*, 2011 U.S. Dist. LEXIS 136508, at

21   *22 (S.D. Cal. Nov. 29, 2011).

22   **VII.   CONCLUSION**

23             For each of the foregoing reasons, Plaintiff respectfully requests that Defendants'

24   Motion to Dismiss be denied in its entirety.  If this Court is inclined to grant any portion

25   of the Defendants' Motion, Plaintiff requests leave to amend.  Fed R. Civ. P. 15(a).

26   _____

27   [6] *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001) (explaining that a court must
     construe all "factual allegations set forth in the complaint . . . as true and . . . in the light

28   most favorable" to the plaintiff).

Dated:  January 8, 2015                    BARON & BUDD, P.C.

                                    By:   /s/ Mark Pifko
                                          Mark Pifko

                                          Daniel Alberstone (SBN 105275)
                                          dalberstone@baronbudd.com
                                          Roland Tellis (SBN 186269)
                                          rtellis@baronbudd.com
                                          Mark Pifko (SBN 228412)
                                          mpifko@baronbudd.com
                                          Isaac Miller (SBN 266459)
                                          imiller@baronbudd.com
                                          BARON & BUDD, P.C.
                                          15910 Ventura Boulevard, Suite 1600
                                          Encino, California 91436
                                          Telephone:   (818) 839-2333
                                          Facsimile:   (818) 986-9698

                                          Philip F. Cossich, Jr. (*pro hac vice* pending)
                                          David A. Parsiola (*pro hac vice* pending)
                                          COSSICH, SUMICH, PARSIOLA, & TAYLOR, L.L.C.
                                          8397 Highway 23, Suite 100
                                          Belle Chasse, Louisiana 70037
                                          Telephone:   (504) 394-9000
                                          Facsimile:   (504) 394-9110

                                          Attorneys for Plaintiff
                                          DAVID WEINER, individually, and on behalf
                                          of other members of the public similarly
                                          situated

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS