UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

DAVID WEINER, individually, and on behalf of other members of the public similarly situated,

           Plaintiff,

    v.

OCWEN FINANCIAL CORPORATION, a Florida corporation, and OCWEN LOAN SERVICING, LLC,  a Delaware limited liability company,

           Defendants.

No. 2:14-cv-02597-MCE-DAD

**MEMORANDUM AND ORDER**

Through the present action, Plaintiff David Weiner ("Plaintiff") alleges that his mortgage servicer, Ocwen Loan Servicing LLC ("OLS") and OLS' parent company, Ocwen Financial Corporation (collectively referred to as "Ocwen" unless otherwise indicated), improperly assessed default-related service fees that contained substantial, undisclosed mark-ups which violated the terms of his mortgage contract.  Plaintiff further alleges that Defendants misapplied his payments in violation of the terms of the applicable deed of trust.

Plaintiff also purports to represent a class of borrowers who have been similarly damaged by Defendants' allegedly improper actions in this regard.  Ocwen now moves

1

1   to dismiss Plaintiffs' Complaint for failure to state a claim upon which relief can be

2   granted in accordance with Federal Rule of Civil Procedure 12(b)(6).[1]  Additionally, with

3   respect to Plaintiff's claims premised on fraud, Ocwen further assert those claims fail

4   because they are not pled with the particularity required by Rule 9(b).  As set forth

5   below, Ocwen's Motion is DENIED.[2]

6

7                                   **BACKGROUND**[3]

8

9           Ocwen assumed the servicing of Plaintiff's home mortgage in late 2012 or 2013.

10  According to the Complaint, the previous servicer on the loan, GMAC, had paid Plaintiff's

11  property taxes in 2010 and accordingly had established an escrow account for Plaintiff's

12  pre-payment of those expenses in the future.  Plaintiff nonetheless claims that after fully

13  reimbursing GMAC for the taxes it paid in early 2011, and paying a $400.00 escrow fee,

14  Plaintiff arranged with GMAC that he would pay his own property taxes going forward

15  and would provide timely proof of his payments.  Despite meeting his commitment in that

16  regard, Plaintiff asserts that after Ocwen became his loan servicer it began charging a

17  $600.00 annual escrow account fee and further began diverting funds to that escrow

18  account such that the account carried a positive balance of more than $10,000.00.

19  Plaintiff was denied any access to those funds.  Plaintiff maintains that this diversion

20  resulted in Ocwen failing to properly apply his interest and principal payments, which he

21  alleges are supposed to be credited before any escrow amounts are withheld.[4]  This

22  _____

23       [1] All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless
     otherwise noted.

24       [2] Having determined that oral argument would not be of material assistance, the Court ordered this
     matter submitted on the briefs in accordance with E.D. Local Rule 230(g).

25       [3] This factual background is drawn directly from the allegations contained in Plaintiff's Class Action
26   Complaint (ECF No. 1).

27       [4] According to the applicable Deed of Trust, the "Application of Payments or Proceeds establishes
     a hierarchy in which funds from customer payments are to be applied.  Those funds are to be allocated in
     the following order:  1) interest due under the promissory note; 2) principal due under the promissory note;
28   3) amounts due for any "escrow item (such as property taxes or homeowners' insurance premiums); 4)

1   misallocation resulted ultimately in Ocwen's refusal to accept Plaintiff's interest and

2   principal payments altogether on grounds that they are insufficient to satisfy the

3   defaulted amount on the loan.  Plaintiff states that Ocwen's improper diversion of escrow

4   funds has made him unable to claim interest deduction on his federal and state tax

5   returns, has subjected him to harassing phone calls, has precluded him from refinancing

6   his loan, and has placed Plaintiff in constant fear of imminent foreclosure on his home.

7        In addition to misallocation of loan payments and being denied access to surplus

8   funds diverted to his escrow account, Plaintiff also claims that once Ocwen succeeded in

9   forcing him into default by misapplying his loan payments, it proceeded to improperly

10  assess marked-up fees for default related services on his mortgage accounts, including

11  so-called Broker Price Option ("BPO") fees, title report, and title search fees.  By way of

12  example, Plaintiff asserts that Ocwen assessed BPO fees of $109.00 and $110.00 on

13  September 4, 2013, and February 24, 2014, respectively, despite knowing that the

14  actual cost of a BPO is only approximately $50.00.  Additionally, with respect to fees for

15  services related to the examination of title, Plaintiff claims he was assessed a title search

16  fee on June 9, 2014 in the amount of $829.00, despite the fact that such a fee typically

17  ranges between $150.00 and $450.00.  In both instances, according to Plaintiff, the

18  markup on fees by Ocwen was double the appropriate amount.

19       According to Plaintiff, Ocwen profited from this arrangement, and was able to

20  avoid detection, because computer management programs designed to assess fees

21  were spun off by Ocwen, on August 10, 2009, to Altisource.  The Chairman of the Board

22  for both Altisource and Ocwen was the same individual, William C. Erbey, and according

23  to the Complaint Erbey owns some 27 percent of the common source of Altisource.

24  Because of the interconnection between the two companies, Plaintiff alleges that both

25  entities benefit from inflated fees.  More specifically, the Complaint states:

26

27  late charges; and 5) fees for default related services and other amounts.  Compl., ¶¶ 76, 77; see also
    Deed of Trust, Ex. 1 to Ocwen's Request for Judicial Notice, ¶ 2.  Ocwen's request that the Court judicially
    notice a redacted copy of Plaintiff's Deed of Trust, pursuant to Federal Rule of Evidence 201, is
28  unopposed and is hereby GRANTED.

1

> Ocwen directs Altisource to order and coordinate default-related services, and, in turn, Altisource places orders for such services with third-party vendors.   The third-party vendors charge Altisource for the performance of the default-related services, [and] Altisource then marks up the price of the vendors' services, in numerous instances by 100% or more, before "charging the services to Ocwen,   In turn, Ocwen bills the marked-up fees to homeowners."

Compl., ¶ 52.

Plaintiff points out that the applicable Deed of Trust[5] provided that, in the event of default, the loan servicer is authorized to:

> pay for whatever is reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, including protecting and/or assessing the value of the property, and securing and/or repairing the property.

Id. at ¶ 55; see also Deed of Trust, ¶ 9.

The Deed of Trust further discloses that any such "amounts disbursed by the servicer to a third party shall become additional debt of the homeowner secured by the deed of trust and shall bear interest at the Note rate from the date of "disbursement." Compl., ¶ 56.  Moreover, according to Plaintiff, the Promissory Note discloses that with respect to "Payment of the Note Holder's Costs and Expenses," if there is a default, the homeowner will have to "pay back" costs and expenses incurred in enforcing the Note to the extent not prohibited by applicable law.  Plaintiff therefore asserts that the mortgage instruments provide that the servicer will "pay for default-related services when reasonably necessary, and will be reimbursed of "paid back" by the homeowner for amounts "disbursed."  Compl., ¶ 58.  Plaintiff maintains that nowhere is it disclosed to borrowers that Ocwen may engage, as it purportedly does, in self-dealing to mark up the actual cost of those services to make a profit.  Id.

Plaintiff's Class Action Complaint alleges violations of:  1) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq. ("UCL"); 2) The Racketeer

---

[5] Plaintiff's mortgage contract consists of two documents, the Promissory Note and the Deed of Trust, which authorizes the loan servicer to take certain steps to protect the note holder's interest in the property.

4

1   Influenced and Corrupt Organizations Act, 182 U.S.C. §§ 1962(c) and (d) ("RICO"); and

2   3) the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788, et seq.

3   ("RFDCPA").  Plaintiff also includes state law claims for unjust enrichment, fraud and

4   breach of contract, and he further seeks to bring his claims on behalf of both himself and

5   others similarly situated by way of a class action under Rule 23.

6   .

7   **STANDARD**

8

9      **A.  Rule 12(b)(6)**

10      On a motion to dismiss for failure to state a claim under Federal Rule of Civil

11   Procedure 12(b)(6), all allegations of material fact must be accepted as true and

12   construed in the light most favorable to the nonmoving party.  Cahill v. Liberty Mut. Ins.

13   Co., 80 F.3d 336, 337-38 (9th Cir. 1996).  Rule 8(a)(2) "requires only 'a short and plain

14   statement of the claim showing that the pleader is entitled to relief' in order to 'give the

15   defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell

16   Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41,

17   47 (1957)).  A complaint attacked by a Rule 12(b)(6) motion to dismiss does not require

18   detailed factual allegations.  However, "a plaintiff's obligation to provide the grounds of

19   his entitlement to relief requires more than labels and conclusions, and a formulaic

20   recitation of the elements of a cause of action will not do."  Id. (internal citations and

21   quotations omitted).  A court is not required to accept as true a "legal conclusion

22   couched as a factual allegation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting

23   Twombly, 550 U.S. at 555).  "Factual allegations must be enough to raise a right to relief

24   above the speculative level."  Twombly, 550 U.S. at 555 (citing 5 Charles Alan Wright &

25   Arthur R. Miller, Federal Practice and Procedure § 1216 (3d ed. 2004) (stating that the

26   pleading must contain something more than "a statement of facts that merely creates a

27   suspicion [of] a legally cognizable right of action")).

28   ///

1    Furthermore, "Rule 8(a)(2) . . . requires a showing, rather than a blanket

2  assertion, of entitlement to relief." Twombly, 550 U.S. at 555 n.3 (internal citations and

3  quotations omitted).  Thus, "[w]ithout some factual allegation in the complaint, it is hard

4  to see how a claimant could satisfy the requirements of providing not only 'fair notice' of

5  the nature of the claim, but also 'grounds' on which the claim rests." Id. (citing Wright &

6  Miller, supra, at 94, 95).  A pleading must contain "only enough facts to state a claim to

7  relief that is plausible on its face." Id. at 570.  If the "plaintiffs . . . have not nudged their

8  claims across the line from conceivable to plausible, their complaint must be dismissed."

9  Id.  However, "[a] well-pleaded complaint may proceed even if it strikes a savvy judge

10  that actual proof of those facts is improbable, and 'that a recovery is very remote and

11  unlikely.'" Id. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

12    A court granting a motion to dismiss a complaint must then decide whether to

13  grant leave to amend.  Leave to amend should be "freely given" where there is no

14  "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice

15  to the opposing party by virtue of allowance of the amendment, [or] futility of the

16  amendment . . . ." Foman v. Davis, 371 U.S. 178, 182 (1962); Eminence Capital, LLC v.

17  Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (listing the Foman factors as those to

18  be considered when deciding whether to grant leave to amend).  Not all of these factors

19  merit equal weight.  Rather, "the consideration of prejudice to the opposing party . . .

20  carries the greatest weight." Id. (citing DCD Programs, Ltd. v. Leighton, 833 F.2d 183,

21  185 (9th Cir. 1987)).  Dismissal without leave to amend is proper only if it is clear that

22  "the complaint could not be saved by any amendment." Intri-Plex Techs. v. Crest Group,

23  Inc., 499 F.3d 1048, 1056 (9th Cir. 2007) (citing In re Daou Sys., Inc., 411 F.3d 1006,

24  1013 (9th Cir. 2005); Ascon Props., Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir.

25  1989) ("Leave need not be granted where the amendment of the complaint . . .

26  constitutes an exercise in futility . . . .")).

27  ///

28  ///

### B. Rule 9(b)

A plaintiff must plead allegations of fraud and those that "sound in fraud" with particularity.  Fed. R. Civ. P. 9(b); <u>Vess v. Ciba-Geigy Corp. U.S.A.</u>, 317 F.3d 1097, 1103-05 (9th Cir. 2003).  Conclusory allegations of fraud are insufficient.  <u>Moore v. Kayport Package Express, Inc.</u>, 885 F.2d 531, 540 (9th Cir. 1989).

A pleading satisfies Rule 9(b) when it is "specific enough to give defendants notice of the particular misconduct. . . . so that they can defend against the charge and not just deny that they have done anything wrong."  <u>Vess</u>, 317 F.3d at 1106 (internal quotation marks and citation omitted); *accord* <u>Moore</u>, 885 F.2d at 540 ("A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations.").  As a result, the plaintiff must plead the "who, what, when, where, and how" of the alleged fraud.  <u>Vess</u>, 317 F.3d at 1106 (internal quotation marks and citations omitted).  Further, if the plaintiff claims that a statement is false or misleading, "[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false."  <u>In re GlenFed, Inc. Sec. Litig.</u>, 42 F.3d 1541, 1548 (9th Cir. 1994).

Despite this heightened standard, the Ninth Circuit has opined that courts "cannot make Rule (b) carry more weight than it was meant to bear."  Cooper  v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997); <u>see also</u> <u>Schlagal v. Learning Tree Int'l.</u>, 1998 WL 1144581 at *8 (C.D. Cal. Dec 23, 1998) ("The Court must strike a careful balance between insistence on compliance with demanding pleading standards and ensuring that valid grievances survive." )  Instead, Rule 9(b) "must be read in harmony with Fed. R. Civ. P. 8's requirement of a 'short and plain' statement of the claim."  <u>Baas v. Dollar Tree Stores</u>, 2007 WL 2462150 at *2 (N.D. Cal. August 29, 2007).

///

///

///

///

**ANALYSIS**

### A.  Breach of Contract Claim

In his opposition, Plaintiff makes it clear that his breach of contract claim is "straightforward" and does not involve the fraud based allegations he makes elsewhere in his complaint.  Instead, Plaintiff limits his contractual challenge to the manner in which Ocwen applies mortgage payments.  Pl.'s Opp'n, 19:19-20:2.  Plaintiff avers that Ocwen diverted funds from Plaintiff's monthly mortgage payments to an escrow account without first applying funds to the interest and principal balance of the loan, as required by the Deed of Trust.  Compl., ¶¶ 76, 77.   According to Plaintiff, Ocwen diverted funds to an escrow account for taxes and insurance despite the fact that Plaintiff was paying those fees himself, and despite the fact that Ocwen had agreed he could do so long as Plaintiff provided timely proof of such payments, which he claims he in fact submitted.  Id. at ¶ 93.  As a result, Ocwen's escrow account has grown to more than $10,000.00, despite the fact that it has never once been used to pay property taxes and insurance.  Id. at ¶ 95.  Plaintiff contends that Ocwen's failure to properly credit his interest and principal payments "has burdened his accounts with unscrupulous fees and forced his loan into default."  Id. at ¶ 97.  In addition to default, Plaintiff also claims that Ocwen's conduct has made him unable to claim interest deductions on his federal and state tax returns, or to refinance his loan."  Id. at ¶ 98.

"A cause of action for damages for breach of contract is comprised of the following elements:  (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendants' breach, and (4) the resulting damages to plaintiff.  Careau & Co., v. Sec. Pac. Bus. Credit, Inc., 222 Cal. App. 3d 1371, 1388 (1990).  Here, there appears no question that the mortgage contract constitutes the requisite agreement, and that Plaintiff "performed" by paying the amounts due for principal and interest as specified by the contract.  The salient issue is whether Ocwen breached the agreement by, as Plaintiff alleges, improperly diverting money into an escrow account

8

1   when Ocwen had agreed otherwise.

2   　　　According to Ocwen, to state a breach of contract claim under Plaintiff's payment

3   misapplication theory, Plaintiff must allege which payments he contends were improperly

4   applied and how the application that was applied differed from the payment hierarch

5   established by the Deed of Trust.  Ocwen instead characterizes Plaintiff's contentions as

6   only "generalized allegations" without any factual specificity.  To the contrary, however,

7   Plaintiff's Complaint recites the payment application hierarchy specifically set forth in the

8   Deed of Trust, which requires that payments be credited to interest and then principal

9   before credit can be taken for any other purpose, including escrow items (like property

10  taxes and liability insurance) and default-related charges.  Compl., ¶ 76.  Plaintiff then

11  contends that Ocwen misapplies payments to divert interest and principal payments to

12  "escrow" accounts, even when homeowners pay their own property taxes and maintain

13  proper insurance.  Id. at ¶ 77.  Those allegations meet the requirement that a breach be

14  alleged, and for purposes of testing the pleading the Court must accept their veracity.

15  　　　While Ocwen claims that Plaintiff's failure to pay taxes in 2010 caused the

16  previous loan servicer, GMAC, to properly open an escrow account as withholding funds

17  is authorized by the Deed of Trust in those circumstances, Plaintiff asserts that GMAC

18  agreed in early 2011 that Plaintiff could in fact pay his own property taxes going forward

19  so long as timely proof of such payments was provided.  Id. at ¶ 93.  The Court's

20  reading of Plaintiff's Complaint indicates this arrangement continued for as much as two

21  years, until Ocwen took over the servicing of Plaintiff's loan from GMAC in late 2012 or

22  2013.  While Ocwen appears to argue that it was entitled to resume an escrow

23  arrangement despite GMAC's alleged agreement to the contrary, that contention is, at

24  best, problematic.  Nor does Ocwen's claim that any waiver of escrow be in writing

25  negate Plaintiff's purported agreement and course of conduct with GMAC, arrangements

26  that were in place for a significant amount of time before Ocwen's involvement with

27  Plaintiff's loan even began.

28  ///

1    Ocwen further claims that Plaintiff has not identified, as he must, the payments he

2    contends were improperly applied.  That contention also does not carry the day for

3    Ocwen's attack on Plaintiff's breach of contract claim.  Plaintiff claims not only that

4    Ocwen began charging a fee of $600.00 per year after it assumed the servicing of

5    Plaintiff's mortgage loan in late 2012 or early 2013, but also that its subsequent diversion

6    of funds to the escrow account resulted in a positive balance in that account of more

7    than $10,000.00.  Id. at ¶¶ 91, 95.  Those allegations are specific enough to apprise

8    Ocwen of just how Plaintiff claims the diversion occurred, the time frame involved and

9    the amount of monies involved.  Finally, between the amount of the allegedly diverted

10   funds and Plaintiff's claim that the diversion forced him into foreclosure, the contract

11   claim's damage component is also satisfied.

12   The Court concludes that Ocwen's request for dismissal of Plaintiff's Seventh

13   Cause of Action, for breach of contract, is misplaced.  Ocwen's motion is therefore

14   denied as to that claim.

15   **B.  Factual Specificity Required for Fraud-Based Claims**

16   In addition to the contractual breach identified above, Plaintiff also asserts, for his

17   Sixth Cause of Action, a state law claim for fraud.  Plaintiff also pleads a number of other

18   claims premised on the same fraudulent conduct.  Those claims include the First Cause

19   of Action, premised on violations of California's UCL, the Second and Third Causes of

20   Action, both of which allege RICO violations, and the Fourth Cause of Action asserting a

21   RFDCPA violation.

22   Plaintiff's fraud claim s are factually grounded on allegations that Ocwen marked

23   up BPO and title search fees by as much as 100 percent without disclosing the vendor's

24   markup.  According to the Complaint, Ocwen is able to conceal its fee markup given its

25   spin-off of servicing programs previously done in house (by the Ocwen Solutions line of

26   businesses) to an ostensibly independent company, Altisource.   Id. at ¶¶ 36-37.

27   According to Plaintiff, however, Altisource and Ocwen share the same Chairman of the

28   Board, William C. Erby, and Erbey owns not only 13 percent of Ocwen's common stock

but 27 percent of the common stock of Altisource as well.  Id. at ¶¶ 37-38.  Plaintiff goes

on to claim that Ocwen is contractually obligated to purchase mortgage and technology

services from Altisource under service agreements that extend through 2020.  That has

resulted, according to Plaintiff, in Ocwen being Altisource's largest customer, accounting

for some 60 percent of its total annual revenue.  Id. at ¶ 44.

      After citing evidence suggesting that Ocwen's use of related companies has

raised serious concerns about whether the transactions between the two companies are

priced fairly (as opposed to inflated fees through conflicted business relationships),

Plaintiff claims that Ocwen in fact directs Altisource to order and coordinate default

related services with Altisource marking the arrangements for the provision of such

services by third-party property preservation vendors.  After the vendors charge

Altisource for their services, Plaintiff alleges that Altisource, in turn, marks up their price

before "charging" the cost to Ocwen who then bills the marked up fees to homeowners.

Id. at ¶ 52.  As indicated above, Plaintiff personally claims that he has been charged

BPO fees of $109.00 and $100.00, and title search fees of $829.00 when those services

should have run just over $100.00 for BPOs and between $150.00 and $450.00 for a title

search.  Id. at ¶¶ 62, 69, 101, 103.  Plaintiff further provides the dates that both the BPO

fees (September 4, 2013 and February 27, 2014, respectively) and the title search fees

(June 9, 2014) were assessed on his mortgage account.  Id. at ¶¶ 101, 103.

      Ocwen correctly points out that allegations sounding in fraud must be pled with

particularity.  Fed. R. Civ. P. 9(b); Vess v. Ciba-Geigy Corp. U.S.A., 317 F.3d at 1103-

05).  Conclusory allegations of fraud are insufficient.  Moore v. Kayport Package

Express, Inc., 885 F.2d at 540.  The same heightened pleading standard also applies to

UCL claims (Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009) and to

claims alleging RICO violations.  See Schreiber Distrib. Co. v. Serv-Well Furniture Co.,

Inc., 806 F.2d 1393, 1400-01 (9th Cir. 1986).  Additionally, with respect to Plaintiff's

RFDCPA claim, factual particularity is also required.  Lopez v. Professional Collection

Consultants, 2011 WL 4964886 at *2 (C.D. Cal. Oct. 19, 2011).

1    Given the above-summarized description of Plaintiff's accusations of fraudulent

2    behavior against Ocwen, which describe the structure of Ocwen's scheme to charge

3    marked-up default services through use of a spin-off company with shared management

4    and ownership, as well as the specifics of how those marked up fees were charged

5    against Plaintiff (with both dates and the alleged mark-up figures described in detail), the

6    Court squarely rejects Ocwen's claim that Plaintiff's complaint utterly fails to state any

7    specific evidence to supports its claims of misrepresentation and/or omission.  Plaintiff

8    further cites language from the Deed of Trust which, fairly read, permits Ocwen to be

9    reimbursed for reasonable and appropriate fees but not marked up fees designed to

10   make a profit.

11   In <u>Kirkeby v. JP Morgan Chase Bank, N.A.,</u> 2014 WL 4364836 (S.D. Cal. Sept 3,

12   2014), a case cited by Ocwen as supporting its position, the complaint only generally

13   alleged the defendants' default-related fee practice but alleged "no specifics as to the

14   fraud allegedly committed on Plaintiff individually" and no allegations regarding dates or

15   how the fees in question were categorized.  <u>Id.</u> at *4.  Plaintiff's complaint, on the other

16   hand, provides specific allegations as described above.  Those allegations, taken as a

17   whole, are more than enough to satisfy even the heightened pleading standard

18   applicable to fraud-related claims.

19   ### C.  Economic-Loss Doctrine

20   In addition to arguing that Plaintiff's fraud-based claims have not been pled with

21   the requisite specificity, Ocwen also takes specific aim at Plaintiff's Sixth Cause of

22   Action, for common law fraud, on grounds that it is barred by the so-called economic-

23   loss doctrine.  Under California law, the economic-loss doctrine prevents those bound by

24   contract from suing in tort, unless they allege harm distinct from that that stemming from

25   the breached contract.  <u>See</u> <u>FoodSafety Net Servs. v. Eco Safe Sys. USA, Inc</u>., 209 Cal.

26   App. 4th 1118, 1130 (2010) ([A] party alleging fraud or deceit in connection with a

27   contract must establish tortious conduct independent of a breach of the contract itself,

28   that is, violation of 'some independent duty arising from tort law.'" (quoting <u>Robinson</u>

1   Helicopter Co. v. Dana Corp., 34 Cal. 4th 979, 990 (2004)); Giles v. GMAC, 494 F.3d

2   865, 874-75 (9th Cir. 2007).  Asserting that Plaintiff's fraud allegations hinge completely

3   on the assumption that the challenged fees constitute a breach of the Deed of Trust,

4   Ocwen argues that Plaintiff's fraud claim is precluded.

5        In Bias v. Wells Fargo & Co., 942 F.Supp. 2d 915 (N.D. Cal. 2013, under

6   circumstances nearly identical to those of this case, the plaintiff challenged Wells

7   Fargo's practice of assessing unlawfully marked-up BPO fees on the accounts of

8   borrowers in default.  The Northern District was unpersuaded by Wells Fargo's argument

9   that its conduct amounted, at most, to breach of contract.  Id. at 938 n.18.  See also

10  Young v. Wells Fargo, 671 F. Supp. 2d 1006, 1034-35 (S.D. Iowa 2009) (allegations that

11  Wells Fargo assessed unnecessary default-related service fees went beyond a mere

12  breach of contract and instead amounted to "a systematic course of conduct to defraud

13  mortgage borrowers").  Here, while Ocwen was clearly entitled under the terms of the

14  Deed of Trust to be reimbursed for fees it paid to protect its security interest in defaulted

15  property, according to Plaintiff's Complaint it went well beyond any contractual right in

16  that regard by failing to disclose that the fees for which it sought reimbursement had

17  been significantly marked-up.  Those allegations are sufficient to save Plaintiff's fraud

18  claim from being barred under the economic-loss doctrine.

19       **D.  Statute of Limitation as to RFDCPA Claim**

20       In his Fourth Cause of Action, Plaintiff claims that Ocwen violated the RFDCPA

21  which prohibits a debt collector from using "any false deceptive, or misleading

22  representation or means in connection with the collection of any debt."  Compl., ¶ 171,

23  citing 15 U.S.C. § 1692e.  By knowingly and actively concealing Ocwen's mark-up for

24  default related services, Plaintiff contends that those provisions have been abrogated.

25       In addition to arguing that Plaintiff's RFDCPA claim is subject to the heightened

26  pleading requirement of a fraud based claim, an assertion the Court has already rejected

27  above, Ocwen also argues that the claim is barred by one year statute of limitations

28  contained in California Civil Code § 1788.3(f).  Although Ocwen concedes that tolling

1   may result in an extension of that limitations period, it claims that Plaintiff "has not

2   alleged the required facts to suggest he was 'induced or tricked by [his]adversary's

3   misconduct into allowing the filing deadline to pass.'"  Ocwen's  Mot., 10:1-3, citing

4   Wilson v. Gordon & Wong Law Grp., P.C., 2013 WL 5230387 at *3 (E.D. Cal. Sept. 16,

5   2013 (dismissing RFDCPA claims as time-barred where plaintiff's tolling allegations were

6   conclusory).

7        Plaintiff claims that tolling has occurred due to Ocwen's "knowing and active

8   concealment, denial, and misleading actions" designed to "conceal the true character,

9   quality, and nature of its assessment of marked-up fees on homeowners' loan accounts."

10   See Compl., ¶¶ 105, 106.  As set forth above, Plaintiff has alleged specific instances

11   where he was assessed default-related fees whose mark-up was not disclosed.

12   Moreover, and in any event, as Plaintiff points out, he claims to have been assessed

13   marked-up fees occurred on February 27, 2014 and June  9, 2014, respectively, both of

14   which would fall within the one year preceding the filing of the instant complaint on

15   November 5, 2014.  Either way, Ocwen's contention that Plaintiff's RFDCPA claim is

16   time barred lacks merit.

17        **E.  RICO Claims**

18        To state a RICO claim under either 18 U.S.C. § 1962(c) or (d), as Plaintiff

19   purports to do in his Second and Third Causes of Action, he must first plead the

20   existence of an enterprise as that term is defined by RICO.  The requisite enterprise can

21   be "any individual partnership corporation, association or other legal entity, and any

22   union or group of individuals associated in fact although not a legal entity."  18 U.S.C. §

23   1961(4); see also Eclectic Props. East, LLC v. Marcus & Millichap Co., 751 F.3d 990,

24   997 (9th Cir. 2014); Sanford v. MemberWorks, Inc., 625 F.3d 550, 559 (9th Cir. 2010).

25   In order to allege an association-in-fact enterprise, a plaintiff must allege:  1) "a group of

26   persons associated together for a common purpose of engaging in a course of conduct,"

27   2) "an ongoing organization, either formal or informal," and 3) that "the various

28   associates function as a continuing unit."  Odom v. Microsoft Corp., 486 F.3d 541, 552-

1   53 (9th Cir. 2007).   The enterprise must consist of at least two entities, and must be

2   more than the RICO defendant "referred to by a different name."  See Cedric Kushner

3   Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001).

4        A viable RICO claim under § 1962(c) must allege conduct by a qualifying

5   enterprise through a pattern of racketeering activity.  Walter v. Drayson, 538 F.3d 1244,

6   1237 (9th Cir. 2008).  Consequently, in addition to demonstrating the existence of the

7   requisite enterprise, predicate racketeering acts must also be identified.  Ocwen

8   contends that Plaintiff's § 1962(c) RICO claim fails on both those counts.  In addition,

9   with regard to Plaintiff's § 1962(d) claim for conspiracy to violate RICO, Ocwen also

10  argues that because Plaintiff has demonstrated no substantive RICO violation, any

11  related conspiracy claim also necessarily fails.  Turner v. Cook, 362 F.3d 1219, 1231

12  n.17 (9th Cir. 2004) (affirming dismissal of § 1962(d) claim where plaintiff had failed to

13  allege the predicate § 1962(c) claim).  Therefore, in assessing the viability of Plaintiff's

14  RICO claim the Court will begin by considering first whether a qualifying enterprise has

15  been identified and, if it has, will then proceed to the question of whether the Complaint

16  adequately alleges a predicate racketeering act sufficient for purposes of RICO.

17               **1.  Enterprise**

18       Plaintiff alleges Ocwen, along with Altisource and Ocwen's property preservation

19  vendors, qualify as an associated-in-fact enterprise for RICO purposes under 28 U.S.C.

20  § 1961(4).  Compl., ¶ 141.  As Ocwen recognizes, however, Plaintiff's RICO claim is

21  based primarily on the contention the Ocwen and Altisource comprise such an

22  enterprise.  Ocwen's Mot., 13:16-17, citing Compl, ¶¶ 2, 35-50.  As stated above,

23  Plaintiff alleges that "Ocwen directs Altisource to order and coordinate default-related

24  services," with Altisource then placing orders for such services and charging Ocwen

25  "marked up" fees, which in turn are passed on to borrowers.  Compl., ¶ 52.  While

26  Ocwen contends there is nothing wrong with it charging to borrowers the fee it paid to

27  Altisource, whether marked-up or not, the fact remains that Plaintiff specifically alleges

28  that Altisource and Ocwen are related companies with at least partially shared ownership

1   and management such that they do not operate on an "arm's length" basis.  The two

2   companies acting together to collude in passing on "marked-up" default-related fees to

3   unwitting borrowers is, according to Plaintiff, the RICO enterprise.  The fact that the

4   arrangement may have benefitted both companies does not preclude it being effectuated

5   by way of the enterprise.  Additionally, while related, the two companies appear to

6   possess a distinct legal status which satisfied RICO's requirement that more than one

7   entity be involved.

8          As Plaintiff points out, the definition of an associated-in-fact enterprise is "not very

9   demanding."  Odom, 486 F.3d at 548.  Significantly, too, under controlling Ninth Circuit

10  precedent, RICO must in any event "be liberally construed to effectuate its remedial

11  purposes."  Id. at 547.  In addition to identifying the contours of the two companies as

12  stated above, Plaintiff makes specific allegations pertaining to the "policies and

13  procedures developed by Ocwen's executives, including:

14              funneling default-related services through [Ocwen's] affiliated
            company, Altisource, to disguise unlawful mark-ups of
15              services provided by third parties; providing statements that
            conceal the true nature of the marked-up default-related
16              service fees; using mortgage loan management software
            designed to assess undisclosed marked-up fees on
17              borrowers accounts; and failing to provide borrowers with
            accurate documentation to support assessment of fees for
18              BPOs.

19  Compl., ¶ 145.

20         In Bias, like the present case, the plaintiff alleged that defendants formed an

21  enterprise to unlawfully mark-up default-related fees, with borrowers ultimately being

22  charged a fee significantly in excess of what third-party vendors actually charged for

23  those services.  Similar too are allegations that an inter-company division of defendant

24  Wells Fargo called Premiere Asset Services participated as a member of the enterprise

25  by creating the impression that it was an independent company providing BPOs.

26  Although Bias differs from this case in the sense that Wells Fargo is claimed never to

27  have actually paid the marked-up invoices, given the interrelationship between Ocwen

28  and Altisource, and that fact that payments benefitted both companies, that factor is not

1  dispositive in distinguishing Bias from the present case, despite Ocwen's argument to

2  the contrary.

3       The Bias court found that plaintiffs met both the distinct entity and the "common

4  purpose" requirements for alleging an associated-in-fact enterprise under RICO.  Bias,

5  942 F. Supp. 2d at 940-41.  By identifying both Wells Fargo and at least one other entity,

6  Premiere Asset Services, as participating as a member of the enterprise, plaintiffs

7  satisfied the requirement that two different members be "associated together for a

8  common purpose to maximize profits through concealment of marked-up fees."  Id.  This

9  analysis applies squarely to the present case and causes the Court to conclude that

10  Plaintiff's RICO claim adequately pleads the existence of a RICO enterprise.

11                    **2.   Predicate Act**

12       As the requisite "predicate act" for establishing RICO liability, Plaintiff alleges that

13  Ocwen engaged in mail or wire fraud in violation of RICO by concealing, in statements

14  transmitted to borrowers, its mark-up of default related fees.  Compl., ¶¶ 152-57.

15  Additionally, according to Plaintiff, '[b]y disguising the true nature of amounts purportedly

16  owed in communications to borrowers," the enterprise in which Ocwen participated

17  "made false statements using the Internet, telephone, facsimile, United States mail, and

18  other interstate commercial carriers" (id. at ¶ 152), and "fraudulently communicat[ed]

19  false information about these fees to borrower in order "to pursue their fraudulent

20  scheme."  Id. at ¶ 155.  Ocwen argues that these allegations are insufficient for RIO

21  purposes because Plaintiff has not identified the date or contents of a single

22  misstatement in support of his RICO claims.  While Ocwen correctly points out that

23  predicate acts under RICO must be alleged with specificity under Rule 9(b) (Schreiber

24  Dist. Co., v. Serv-Well Furniture Co., Inc.,. 806 F.2d 1393, 1400-01 (9th Cir. 1986)), this

25  Court concludes, as it did with respect to Plaintiff's fraud allegations as discussed above,

26  that the requisite specificity has been met for pleadings purposes.  Unlike cases where

27  no individualized injury is identified, Plaintiff here contends he received monthly

28  statements demanding that he pay allegedly marked-up fees for BPO assessed on

17

1   September 4, 2013 and February 27, 2014, and a marked-up "Title Search" fee

2   assessed to his account on June 9, 2014.  Id. at ¶ 101, 103.  These allegations square

3   with assertions deemed sufficient by the Court in Bias, where the plaintiff alleged that,

4   "[t]hrough the mail and wire, [Wells Fargo] provided mortgage invoices, payoff demands,

5   or proofs of claims to borrowers, demanding that borrowers pay fraudulently concealed

6   marked-up fees for default-related services."  Bias, 942 F. Supp. 2d at 938-39.

7   ## 3.  Conspiracy

8   As indicated above, Plaintiff's Third Cause of Action alleges, under 18 U.S.C. §

9   1962(d), a conspiracy to violate the general RICO violations already set forth in the

10   Second Cause of Action.  Ocwen's claim that the conspiracy claim fails depends

11   primarily on the success of its assertion that Plaintiff has failed to allege a substantive

12   RICO violation under § 1962(c).  The Court's rejection of Ocwen's argument in that

13   regard disposes of the very foundation of Ocwen's same argument with respect to

14   conspiracy.  Ocwen's secondary argument that Plaintiff has failed to sufficiently allege

15   the nature and scope of the unlawful scheme for purposes of § 1962(d) is equally

16   unavailing.  Plaintiff's allegations, as discussed at length above, are more than sufficient

17   to withstand pleadings scrutiny at this juncture of the case.

18   ## F.  UCL Claims

19   Under Calfiornia's UCL, any person or entity that has engaged "in unfair

20   competition may be enjoined in any court of competent jurisdiction."  Cal. Bus. & Prof.

21   Code §§ 17201, 17203.  "Unfair competition" includes "any unlawful, unfair or fraudulent

22   business act or practice ."  Id. at § 17200.

23   Plaintiff here premises her UCL violations under the "fraudulent" and "unfair"

24   components of the statute.  Compl., ¶ 126.  To state a claim under the "fraudulent" prong

25   of the UCL, "it is necessary only to show that members of the public are likely to be

26   deceived" by the business practice.  In re Tobacco II Cases, 46 Cal. 4th 298, 312 (2009).

27   While no definitive test has been established to determine whether a business practice is

28   "unfair" in consumer cases, three tests for unfairness have been developed in the

1   consumer context.  First, a business practice is unfair where the practice implicates a

2   public policy that is "tethered to specific constitutional, statutory or regulatory provisions."

3   Harmon v. Hilton Group, 2011 WL 5914004 at *8 (N.D. Cal. Nov. 28, 2011).  The second

4   test "determine[s] whether the alleged business practice is immoral, unethical,

5   oppressive, unscrupulous, or substantially injurious to consumers and requires the court

6   to weigh the utility of the defendant's conduct against the gravity of the harm to the

7   alleged victim."  Id.  Finally, under the third test, "unfair" conduct requires that "(1) the

8   consumer injury must be substantial; (2) the injury must not be outweighed by any

9   countervailing benefits to consumers or competition; and (3) it must be an injury that

10  consumers themselves could not reasonably have avoided."  Davis v. Ford Motor Credit

11  Co., 179 Cal. App. 4th 581, 597-98 (2009).

12       Under the "fraudulent" prong of the statute, Plaintiff alleges that Ocwen

13  "affirmatively misled delinquent borrowers into paying marked-up fees which Defendants

14  are not authorized to collect."  Pl.'s Opp'n, 16:16-18.  Plaintiff goes on to contend that in

15  furtherance of this fraudulent scheme, Defendants send delinquent borrowers monthly

16  statements which

17            disguise[] the fact that the amounts [Ocwen] represent[s] as
          being owed have been marked-up beyond the actual cost of
18        the services, violating the disclosures in the mortgage
          contract.
19

20  Compl., ¶ 128.

21       According to Plaintiff, with the "true character, quality, and nature of their

22  assessment of marked-up default-related service fees" concealed from unsuspecting

23  borrowers, Defendants use the full force of their position as a major financial institution to

24  sell the fraud and collect the prohibited fees.  Id. at ¶¶ 127, 133-35.  Based on these

25  allegations, Plaintiff asserts that there can be no real dispute that Ocwen's conduct could

26  mislead and/or deceive the public so as to state a claim under the UCL's "fraudulent"

27  prong.

28  ///

19

1    Significantly, under very similar circumstances, the <u>Bias</u> court found that plaintiffs'

2    claim there sufficed to satisfy this requirement for pleadings purposes.  <u>Bias</u>, 942 F.

3    Supp. 2d at 935.  In <u>Bias</u>, like the present case, plaintiffs provided specific dates on

4    which they were charged marked-up fees as well as Wells Fargo's failure to inform them

5    that the fees were in face inflated.  Taken together, <u>Bias</u> found those allegations to

6    "adequately allege a fraudulent business practice likely to deceive the public" for UCL

7    purposes, despite the fact that as a claim grounded in fraud, the particularity requirement

8    of Rule 9(b) applies.  <u>Id.</u> at 935, 932.  The Court views this reasoning as persuasive and,

9    like <u>Bias</u>, denies the request for dismissal as to Plaintiff's UCL claim based on the

10   fraudulent prong.

11   Ocwen fares no better in its challenge to the "unfairness" component of Plaintiff's

12   UCL claim.  Citing <u>Walker v. Countrywide Home Loans, Inc.</u>, 98 Cal. App. 4th 1158

13   (2002),  Ocwen contends that Plaintiff's claim cannot be "unfair" for UCL purposes

14   because the Deed of Trust authorizes default-related services to protect the holder's

15   security interest in the subject property.  <u>Walker's</u> recognition that a loan servicer can

16   charge a delinquent borrower a property inspection fee for this purpose, however, does

17   not mean that Defendants can charge marked-up default-related service fees, an issue

18   not addressed in <u>Walker</u>.  Under either the second or third test for determining the

19   viability of a claim of "unfairness" under UCL, Plaintiff's claim suffices.

20   **G.  Unjust Enrichment**

21   Under California law, the elements of unjust enrichment are:  (1) receipt of a

22   benefit; and (2) the unjust retention of the benefit at the expense of another.  <u>Peterson v.</u>

23   <u>Cellco Partnership,</u> 164 Cal. App. 4th 1583, 1593 (2008).  Restitution  resulting from

24   unjust enrichment can "be awarded in lieu of breach of contract damages when the

25   parties had an express contract" but the contract "was procured by fraud or is

26   unenforceable or ineffective for some reason."  <u>McBride v. Boughton</u>, 123 Cal. App. 4th

27   379, 387 (2004).  Nonetheless, "where express binding agreements exist and define the

28   parties' rights," an action for unjust enrichment does not lie.  <u>Cal. Med. Ass'n, Inc. v.</u>

1 | Aetna U.S. Healthcare of Cal., 94 Cal. App. 4th 151, 172 (2001).

2 |   Plaintiff's unjust enrichment claim is premised on the same facts underlying

3 | Ocwen's alleged fraudulent concealment of its marked-up default related fees.  While

4 | default service fees themselves may be authorized by the Deed of Trust, the propriety of

5 | a mark-up is not governed by the mortgage contract, despite Ocwen's argument to the

6 | contrary.  Given the fact that Ocwen's challenge to the unjust enrichment claim is based

7 | solely on the contention that the fees at issue are authorized by contract, the Court's

8 | conclusion that they are not authorized by contract disposes of Ocwen's challenge, and

9 | mandates that its motion to dismiss as to the Fifth Cause of Action for unjust enrichment

10 | be denied.

11

12 | **CONCLUSION**

13

14 |   For all the reasons set forth above, Ocwen's Motion to Dismiss (ECF No. 6) is

15 | DENIED.

16 |   IT IS SO ORDERED.

17 | Dated:  July 28, 2015

18

19

20 |        MORRISON C. ENGLAND, JR., CHIEF JUDGE

21 |        UNITED STATES DISTRICT COURT

22

23

24

25

26

27

28