1
2
3
4
5
6
7

8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

11
12

DAVID WEINER, individually, and on behalf of other members of the public similarly situated,

No. 2:14-cv-02597-MCE-DB

13

Plaintiff,

**MEMORANDUM AND ORDER**

14

v.

15
16
17

OCWEN FINANCIAL CORPORATION, a Florida corporation, and OCWEN LOAN SERVICING, LLC,  a Delaware limited liability company,

18

Defendants.

19

20        Through the present action, Plaintiff David Weiner ("Plaintiff") alleges that his

21    mortgage servicer, Ocwen Loan Servicing, LLC  and OLS' parent company, Ocwen

22    Financial Corporation (collectively referred to as "Ocwen" or "Defendants" unless

23    otherwise indicated), improperly assessed default-related service fees that contained

24    substantial, undisclosed mark-ups which violated the terms of his mortgage contract.

25    Plaintiff further alleges that Defendants misapplied his payments in violation of the terms

26    of the applicable deed of trust.  Plaintiff also purports to represent a class of borrowers

27    who have been similarly damaged by Defendants' allegedly improper actions in this

28    regard.

1

1         On July 25, 2015, this Court issued a Memorandum and Order denying

2    Defendants' Motion to Dismiss brought pursuant to Federal Rule of Civil Procedure

3    12(b)(6).[1]  Ocwen now asks that that denial be certified for interlocutory appeal under

4    28 U.S.C. § 1292(b) on grounds that it purportedly is at odds with the Northern District's

5    decision granting a motion to dismiss in <u>Giotta v. Ocwen Financial Corp.,</u>

6    No. 15-cv-00620-BLF, 2016 WL 4447150 (N.D. Cal. Aug. 25, 2016) ("<u>Giotta</u>").

7    According to Ocwen, the alleged divergence between the two rulings creates an intra-

8    circuit split of authority on a controlling question of law, the resolution of which will

9    materially advance the ultimate termination of this litigation.  As set forth below,

10   Defendants' Motion is DENIED.[2]

11

12                           **BACKGROUND[3]**

13

14        Ocwen assumed the servicing of Plaintiff's home mortgage in late 2012 or 2013.

15   According to the Complaint, the previous servicer on the loan, GMAC, had paid Plaintiff's

16   property taxes in 2010 and accordingly had established an escrow account for Plaintiff's

17   pre-payment of those expenses in the future.  Plaintiff nonetheless claims that after fully

18   reimbursing GMAC for the taxes it paid in early 2011, and paying a $400.00 escrow fee,

19   Plaintiff arranged with GMAC that he would pay his own property taxes going forward

20   and would provide timely proof of his payments.  Despite meeting his commitment in that

21   regard, Plaintiff asserts that after Ocwen became his loan servicer it began charging a

22   $600.00 annual escrow account fee, and further began diverting funds to that escrow

23   account such that the account carried a positive balance of more than $10,000.00.

24   _____

[1] All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless
25   otherwise noted.

[2] Having determined that oral argument was not of material assistance, the Court ordered this
26   matter submitted on the briefs in accordance with E.D. Local Rule 230(g).

27   [3] This factual background is drawn directly from the allegations contained in Plaintiff's Class Action
Complaint (ECF No. 1).

28

Plaintiff further claims he was denied any access to those funds.  Plaintiff maintains that this diversion resulted in Ocwen failing to properly apply his interest and principal payments, which he alleges are supposed to be credited before any escrow amounts are withheld.[4]  This misallocation ultimately resulted in Ocwen's refusal to accept Plaintiff's interest and principal payments altogether on grounds that they are insufficient to satisfy the defaulted amount on the loan.  Plaintiff states that Ocwen's improper diversion of escrow funds has made him unable to claim interest deduction on his federal and state tax returns, has subjected him to harassing phone calls, has precluded him from refinancing his loan, and has placed Plaintiff in constant fear of imminent foreclosure on his home.

In addition to misallocation of loan payments and being denied access to surplus funds diverted to his escrow account, Plaintiff also claims that once Ocwen succeeded in forcing him into default by misapplying his loan payments, it proceeded to improperly assess marked-up fees for default-related services on his mortgage accounts, including the so-called Broker Price Option ("BPO") fees, title report fees, and title search fees.  By way of example, Plaintiff asserts that Ocwen assessed BPO fees of $109.00 and $110.00 on September 4, 2013, and February 24, 2014, respectively, despite knowing that the actual cost of a BPO is only approximately $50.00.  Additionally, with respect to fees for services related to the examination of title, Plaintiff claims he was assessed a title search fee on June 9, 2014, in the amount of $829.00, despite the fact that such a fee typically ranges between $150.00 and $450.00.  In both instances, according to Plaintiff, the markup on fees by Ocwen was double.

Plaintiff asserts that Ocwen profited from this arrangement, and was able to avoid detection, because the computer management programs designed to assess fees were

---

[4] According to the applicable Deed of Trust, the "Application of Payments or Proceeds" establishes a hierarchy in which funds from customer payments are to be applied.  Those funds are to be allocated in the following order:  1) interest due under the promissory note; 2) principal due under the promissory note; 3) amounts due for any "escrow item" (such as property taxes or homeowners' insurance premiums); 4) late charges; and 5) fees for default related services and other amounts.  Compl., ¶¶ 76, 77; see also Deed of Trust, Ex. 1 to Ocwen's previously granted Request for Judicial Notice, ECF No. 6-3, ¶ 2.

provided by Altisource, which spun off of Ocwen on August 10, 2009.  The Chairman of
the Board for both Altisource and Ocwen was the same individual, William C. Erbey, and
according to the Complaint, Erbey owns some 27 percent of the common source of
Altisource.  Because of the interconnection between the two companies, Plaintiff alleges
that both entities benefit from inflated fees.  As the Complaint states:

> Ocwen directs Altisource to order and coordinate default-related services, and, in turn, Altisource places orders for such services with third-party vendors.   The third-party vendors charge Altisource for the performance of the default-related services, [and] Altisource then marks up the price of the vendors' services, in numerous instances by 100% or more, before "charging" the services to Ocwen,   In turn, Ocwen bills the marked-up fees to homeowners.

Compl., ¶ 52.

Plaintiff points out that the applicable Deed of Trust[5] provides, in the event of
default, that the loan servicer is authorized to:

> pay for whatever is reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, including protecting and/or assessing the value of the property, and securing and/or repairing the property.

Id. at ¶ 55; see also Deed of Trust, ¶ 9.

The Deed of Trust further discloses that any such "amounts disbursed" by the
servicer to a third party shall become additional debt of the homeowner secured by the
Deed of Trust and shall bear interest at the Note rate from the date of "disbursement."
Compl., ¶ 56.  Moreover, according to Plaintiff, the Promissory Note discloses that with
respect to "Payment of the Note Holder's Costs and Expenses," if there is a default, the
homeowner will have to "pay back" costs and expenses incurred in enforcing the Note to
the extent not prohibited by applicable law.  Compl., ¶ 57.  Plaintiff therefore asserts that
the mortgage instruments provide that the servicer will pay for default-related services
when reasonably necessary, and will be reimbursed or "paid back" by the homeowner for

---

[5] Plaintiff's mortgage contract consists of two documents, the Promissory Note and the Deed of Trust which authorizes the loan servicer to take certain steps to protect the note holder's interest in the property.

1  amounts "disbursed."  Compl., ¶ 58.  Plaintiff maintains that nowhere is it disclosed to

2  borrowers that Ocwen may engage, as it purportedly does, in self-dealing to mark up the

3  actual cost of those services to make a profit.  Id.

4        Plaintiff's Class Action Complaint alleges violations of (1) California's Unfair

5  Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.; (2) The Racketeer Influenced

6  and Corrupt Organizations Act, 182 U.S.C. § 1962(c) and (d) ("RICO"); and (3) the

7  Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788, et seq.  Plaintiff

8  also includes state law claims for unjust enrichment, fraud, and breach of contract, and

9  further seeks to bring his claims on behalf of both himself and others similarly situated by

10 way of a class action under Rule 23.

11       As indicated above, Ocwen moved to dismiss Plaintiff's lawsuit on November 28,

12 2014, arguing  that Plaintiff had failed to present any evidence of fraudulent conduct to

13 support his various claims.  It made this argument despite Ocwen's alleged scheme, as

14 detailed in the Complaint, to charge its customers marked-up default services through

15 use of a spin-off company with shared management and ownership, and despite the

16 Complaint's claim that the language of Plaintiff's mortgage contract, as fairly read,

17 permitted Ocwen to be reimbursed for reasonable and appropriate fees but not inflated

18 fees designed to make a profit.  By Memorandum and Order filed July 29, 2015, the

19 Court denied Ocwen's motion in its entirety.

20       Through the motion now before the Court, Ocwen requests that the Court certify

21 its decision denying Ocwen's Motion to Dismiss for interlocutory review on grounds that

22 the Northern District, in Giotta, came to a different decision when confronted with the

23 same issue on virtually identical facts.  Consequently, according to Ocwen, the Ninth

24 Circuit should resolve the intra-circuit split of authority represented by this case and

25 Giotta.[6]

26 ///

27 _____

28      [6] The docket in Giotta indicates that an appeal to the Ninth Circuit was filed on September 20, 2016.

1

2

**STANDARD**

3    Interlocutory appeal is a special mechanism representing a departure from the

4 usual policy of postponing appellate review until after the entry of final judgment.  It is

5 warranted only upon a showing of exceptional circumstances.  Coopers & Lybrand v.

6 Livesay, 437 U.S. 463, 475 (1978).  The Court may certify a non-final decision for

7 interlocutory review only if all the statutory elements are met:  (1) the order "involves a

8 controlling question of law"; (2) there is "substantial ground for difference of opinion" as

9 to that question; and 3) "an immediate appeal from the order may materially advance the

10 ultimate termination of the litigation."  28 U.S.C. § 1292(b); In re Cement Antitrust

11 Litigation, 673 F.2d 1020, 1026 (9th Cir. 1982).  The moving party, here Sterling, bears

12 the burden of establishing each element of the statute, which should be "narrowly

13 construed."  Coopers & Lybrand, 437 U.S. at 475; James v. Price Stern Sloan, Inc.,

14 283 F.3d 1064, 1068 n.6 (9th Cir. 2002).

15    Certifying an issue for interlocutory appeal is a matter squarely within the court's

16 discretion.  Swint v. Chambers County Comm'n, 514 U.S. 35, 47 (1995).

17

18

**ANALYSIS**

19

20    Giotta, like the present case, involves allegations that Ocwen overcharged for

21 mortgage services by concealing the fact that Altisource, a company that Ocwen spun

22 off to provide BPOs, was marking up its charges to Ocwen who, in turn, passed the

23 resulting inflated charges on to its customers.  The Northern District nonetheless

24 concluded that the plaintiffs in Giotta had "not identified any legal basis for an assertion

25 that Ocwen Servicing had a duty to determine the breakdown of the BPO fee Altisource

26 was charging it and disclose to homeowners what portion of that fee was Altisource's

27 own cost and what portion was profit to Altisource."  Giotta, 2016 WL 4447150 at * 7.

28 ///

1        <u>Giotta</u> diverges from the present matter, however, inasmuch as its allegations of

2   fraud stem from Ocwen's alleged violations of a 2013 Consumer Finance Protection

3   Bureau ("CFPB") Consent Order.[7]  The <u>Giotta</u> court simply stated it was not persuaded

4   that Plaintiffs can rely on the CFPB Consent Order in establishing a disclosure duty for a

5   fraud-based RICO claim, explaining that the plaintiffs' cited authority does "not address

6   the question of whether a consent order (or other judicial order) creates a duty to

7   disclose that may form the basis of a RICO wire fraud or mail fraud claim."  <u>Id.</u> at *8.[8]

8   The <u>Giotta</u> court went on to reject the plaintiffs' alternative reliance on two provisions of

9   the Code of Federal Regulations, stating that neither of those provisions imposed any

10  duty to disclose, either.  <u>Id.</u>

11       The factual underpinnings for the fraud claims levied by the present case, on the

12  other hand, involve the mortgage contract itself.  Plaintiff here points to the Deed of

13  Trust, a fair reading of which, as the Court previously concluded, "permits Ocwen to be

14  reimbursed for reasonable and appropriate fees but not marked up fees designed to

15  make a profit."  July 29, 2015 Order, ECF No. 16, 12:8-10.  Additionally, Plaintiff further

16  relies on his promissory note itself, which he claims provides that in the event of a

17  default, the homeowner will only "have to 'pay back' costs and expenses incurred in

18  enforcing the Note to the extent not prohibited by applicable law."  Pl.'s Compl., ECF

19  No. 1, ¶ 57.  Based on those provisions, Plaintiff contends that Ocwen acted fraudulently

20  by not disclosing to borrowers that the "servicer may engage in self-dealing to mark up

21  the actual costs of those services to make a profit."  <u>Id.</u> at 58.

22  ///

---

23        [7] According to the Second Amended Complaint ("SAC") in the Giotta Action (attached as Ex. 1 to
24  the Decl. of Catalina J. Vergara, ECF No 48-2. ¶ 7), this CFPB Consent Order resulted from a suit filed by
    the attorneys general of 49 states and encompassed the payment of some $2 billion in loan modification to
25  struggling borrowers as well as prohibitions against charging more than the market rate for mortgage
    services.

26        [8] While specifically only discussing the CFPB Consent Order, the <u>Giotta</u> decision also generally
    refers to "prior consent orders entered against Defendants in other jurisdictions."  Examination of <u>Giotta's</u>
27  SAC shows that Ocwen is alleged not only to have violated the CFPB consent order, but also an additional
    consent order resulting from investigation by the New York Department of Financial Services.  SAC, ¶¶ 5-
28  6.

1    Consequently, Plaintiff's complaint here, unlike <u>Giotta</u>, relies upon the mortgage

2    contract documents themselves, and not on any violations of consent orders or federal

3    regulations, to allege fraudulent conduct on Ocwen's part.  The complaint in <u>Giotta</u> does

4    not even mention the language employed by the mortgage contracts as forming a factual

5    predicate for the plaintiff's fraud claims.[9]  Therefore, the factual basis for the two lawsuits

6    appears markedly different, and <u>Giotta</u> was adjudicated on grounds different than those

7    which caused this Court to deny Ocwen's motion to dismiss.  Given this factual disparity,

8    the Court cannot say that its ruling and the <u>Giotta</u> court's decision are "diametrically

9    opposed" as Ocwen argues here, such that immediate Ninth Circuit guidance to resolve

10   the two "inconsistent orders" is required.  Defs.' Mot, 3:19-22.  Ocwen's request for

11   interlocutory review is specifically premised, however, on an "irreconcilable conflict"

12   between the two rulings.[10]

13       Moreover, to be entitled to interlocutory review under 28 U.S.C. § 1292(b) in the

14   first place, Plaintiff here must necessarily show that the non-final order for which review

15   is sought (here this Court's July 28, 2015 order denying dismissal) involves a controlling

16   question of law.  To even qualify as a question of law, let alone a controlling question,

17   the question must be one that the court of appeals could decide "quickly and cleanly

18   without even having to study the record."  <u>Matsunoki Grp., Inc. v. Timberwork Or., Inc.</u>,

19   No. 08-CV-04078, 2011 WL 940218 at * 2 (N.D. Cal. Feb 18, 2011) (citing <u>Ahrenholz v.

20   Bd. Trs. of Univ. of Ill</u>, 219 F.3d 674, 676-77 (7th Cir. 2000)).  Here, the factual basis for

21   ///

22

23       [9] While the <u>Giotta</u> decision does note that the Deed of Trust there contained no express prohibition
     from obtaining reimbursement for marked up fees, it did so only in distinguishing this case from <u>Giotta</u>.
24   While <u>Giotta's</u> discussion of this case is overly simplistic in characterizing the present matter as containing
     such an express prohibition (this Court actually found only that the mortgage contract construed as a
25   whole amounted to such a prohibition), the fact remains that even <u>Giotta</u> recognized that the factual
     underpinnings of the two cases are different.  <u>See</u> <u>Giotta</u>, 2016 WL 4447150, at * 8.

26       [10] The heading for Defendants' substantive contention in favor of appeal, as set forth in Section I
     of Ocwen's argument, is denominated as follows:  "GIVEN THE IRRECONCILABLE CONFLICT
27   BETWEEN THIS COURT'S DISMISSAL RULING AND THE GIOTTA COURT'S DISMISSAL RULING,
     THIS COURT SHOULD CERTIFY ITS JULY 28, 2015 ORDER FOR INTERLOCUTORY APPEAL".  ECF
28   No. 48-1, 4:7-9.

1   the fraud claims asserted in both <u>Giotta</u> and the present case diverge, and this

2   difference belies any claim that the question of law confronted in each case is the same.

3        The different factual bases for the fraud claims in this case and <u>Giotta</u> undercuts

4   any claim that the two cases share a "controlling question of law"  because legal

5   conclusions necessarily change depending on the facts, with this consideration being

6   particularly significant for fraud-based claims which necessarily involve a fact-based

7   inquiry under Rule 9.  <u>See Vess v. Ciba-Geigy Corp USA</u>, 317 F.3d 1097, 1106 (9th Cir.

8   2003) (to satisfy Rule 9(b), "[a]verments of fraud must be accompanied by 'the who,

9   what, when, where and how' of the misconduct alleged.").   Where, as here, the alleged

10  controlling question of law raised by Defendants is "inextricably intertwined" with an

11  analysis of Plaintiff's factual allegations, "an interlocutory appeal is not appropriate."

12  <u>Oliner v. Kontrabecki</u>, 305 B.R. 510, 529 (N.D. Cal. 2004); <u>Keystone Tobacco Co., Inc. v.</u>

13  <u>United States Tobacco Co</u>., 217 F.R.D. 235, 239 (D.D.C. 2003) ("Where the crux of an

14  issue decided by the court is fact-dependent, the Court has not decided a 'controlling

15  question of law' justifying immediate appeal….").

16       Under these circumstances, Defendants here—as the parties seeking

17  interlocutory appeal under § 1292(b)—cannot show, as they must, that "exceptional

18  circumstances justify a departure from the basic policy of postponing appellate review

19  until after the entry of final judgment."  <u>In re Cement Antitrust Litig</u>, 673 F.2d at 1026.

20  Defendants' motion accordingly fails.

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1

**CONCLUSION**

2

3          For all the reasons set forth above, Defendants' Motion for Interlocutory Review

4    (ECF No. 48) is DENIED.

5          IT IS SO ORDERED.

6    DATED:  June 27, 2017

7

8    _____

9          MORRISON C. ENGLAND, JR.
            UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28