UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID WEINER, individually, and on behalf of other members of the public similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>OCWEN FINANCIAL CORPORATION, a Florida corporation, and OCWEN LOAN SERVICING, LLC, a Delaware limited liability company,<br><br>Defendants. | No. 2:14-cv-02597-MCE-DB<br><br>**MEMORANDUM AND ORDER** |

Through the present action, Plaintiff David Weiner ("Plaintiff") alleges that his mortgage servicer, Ocwen Loan Servicing, LLC and OLS' parent company, Ocwen Financial Corporation (collectively referred to as "Ocwen" or "Defendants" unless otherwise indicated), improperly assessed default-related service fees that contained substantial, undisclosed mark-ups which violated the terms of his mortgage contract. Plaintiff further alleges that Defendants misapplied his payments in violation of the terms of the applicable deed of trust. Plaintiff also purports to represent a class of borrowers who have been similarly damaged by Defendants' allegedly improper actions in this regard.

On July 25, 2015, this Court issued a Memorandum and Order denying Defendants' Motion to Dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] Ocwen now asks that that denial be certified for interlocutory appeal under 28 U.S.C. § 1292(b) on grounds that it purportedly is at odds with the Northern District's decision granting a motion to dismiss in Giotta v. Ocwen Financial Corp., No. 15-cv-00620-BLF, 2016 WL 4447150 (N.D. Cal. Aug. 25, 2016) ("Giotta"). According to Ocwen, the alleged divergence between the two rulings creates an intra-circuit split of authority on a controlling question of law, the resolution of which will materially advance the ultimate termination of this litigation. As set forth below, Defendants' Motion is DENIED.[2]

## BACKGROUND[3]

Ocwen assumed the servicing of Plaintiff's home mortgage in late 2012 or 2013. According to the Complaint, the previous servicer on the loan, GMAC, had paid Plaintiff's property taxes in 2010 and accordingly had established an escrow account for Plaintiff's pre-payment of those expenses in the future. Plaintiff nonetheless claims that after fully reimbursing GMAC for the taxes it paid in early 2011, and paying a $400.00 escrow fee, Plaintiff arranged with GMAC that he would pay his own property taxes going forward and would provide timely proof of his payments. Despite meeting his commitment in that regard, Plaintiff asserts that after Ocwen became his loan servicer it began charging a $600.00 annual escrow account fee, and further began diverting funds to that escrow account such that the account carried a positive balance of more than $10,000.00.

---

[1] All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless otherwise noted.

[2] Having determined that oral argument was not of material assistance, the Court ordered this matter submitted on the briefs in accordance with E.D. Local Rule 230(g).

[3] This factual background is drawn directly from the allegations contained in Plaintiff's Class Action Complaint (ECF No. 1).

2

Plaintiff further claims he was denied any access to those funds.  Plaintiff maintains that this diversion resulted in Ocwen failing to properly apply his interest and principal payments, which he alleges are supposed to be credited before any escrow amounts are withheld.[4]  This misallocation ultimately resulted in Ocwen's refusal to accept Plaintiff's interest and principal payments altogether on grounds that they are insufficient to satisfy the defaulted amount on the loan.  Plaintiff states that Ocwen's improper diversion of escrow funds has made him unable to claim interest deduction on his federal and state tax returns, has subjected him to harassing phone calls, has precluded him from refinancing his loan, and has placed Plaintiff in constant fear of imminent foreclosure on his home.

       In addition to misallocation of loan payments and being denied access to surplus funds diverted to his escrow account, Plaintiff also claims that once Ocwen succeeded in forcing him into default by misapplying his loan payments, it proceeded to improperly assess marked-up fees for default-related services on his mortgage accounts, including the so-called Broker Price Option ("BPO") fees, title report fees, and title search fees.  By way of example, Plaintiff asserts that Ocwen assessed BPO fees of $109.00 and $110.00 on September 4, 2013, and February 24, 2014, respectively, despite knowing that the actual cost of a BPO is only approximately $50.00.  Additionally, with respect to fees for services related to the examination of title, Plaintiff claims he was assessed a title search fee on June 9, 2014, in the amount of $829.00, despite the fact that such a fee typically ranges between $150.00 and $450.00.  In both instances, according to Plaintiff, the markup on fees by Ocwen was double.

       Plaintiff asserts that Ocwen profited from this arrangement, and was able to avoid detection, because the computer management programs designed to assess fees were

---

[4] According to the applicable Deed of Trust, the "Application of Payments or Proceeds" establishes a hierarchy in which funds from customer payments are to be applied.  Those funds are to be allocated in the following order:  1) interest due under the promissory note; 2) principal due under the promissory note; 3) amounts due for any "escrow item" (such as property taxes or homeowners' insurance premiums); 4) late charges; and 5) fees for default related services and other amounts.  Compl., ¶¶ 76, 77; see also Deed of Trust, Ex. 1 to Ocwen's previously granted Request for Judicial Notice, ECF No. 6-3, ¶ 2.

provided by Altisource, which spun off of Ocwen on August 10, 2009. The Chairman of the Board for both Altisource and Ocwen was the same individual, William C. Erbey, and according to the Complaint, Erbey owns some 27 percent of the common source of Altisource. Because of the interconnection between the two companies, Plaintiff alleges that both entities benefit from inflated fees. As the Complaint states:

> Ocwen directs Altisource to order and coordinate default-related services, and, in turn, Altisource places orders for such services with third-party vendors. The third-party vendors charge Altisource for the performance of the default-related services, [and] Altisource then marks up the price of the vendors' services, in numerous instances by 100% or more, before "charging" the services to Ocwen, In turn, Ocwen bills the marked-up fees to homeowners.

Compl., ¶ 52.

Plaintiff points out that the applicable Deed of Trust[5] provides, in the event of default, that the loan servicer is authorized to:

> pay for whatever is reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, including protecting and/or assessing the value of the property, and securing and/or repairing the property.

Id. at ¶ 55; see also Deed of Trust, ¶ 9.

The Deed of Trust further discloses that any such "amounts disbursed" by the servicer to a third party shall become additional debt of the homeowner secured by the Deed of Trust and shall bear interest at the Note rate from the date of "disbursement." Compl., ¶ 56. Moreover, according to Plaintiff, the Promissory Note discloses that with respect to "Payment of the Note Holder's Costs and Expenses," if there is a default, the homeowner will have to "pay back" costs and expenses incurred in enforcing the Note to the extent not prohibited by applicable law. Compl., ¶ 57. Plaintiff therefore asserts that the mortgage instruments provide that the servicer will pay for default-related services when reasonably necessary, and will be reimbursed or "paid back" by the homeowner for

---
[5] Plaintiff's mortgage contract consists of two documents, the Promissory Note and the Deed of Trust which authorizes the loan servicer to take certain steps to protect the note holder's interest in the property.

4

amounts "disbursed."  Compl., ¶ 58.  Plaintiff maintains that nowhere is it disclosed to borrowers that Ocwen may engage, as it purportedly does, in self-dealing to mark up the actual cost of those services to make a profit.  Id.

Plaintiff's Class Action Complaint alleges violations of (1) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.; (2) The Racketeer Influenced and Corrupt Organizations Act, 182 U.S.C. § 1962(c) and (d) ("RICO"); and (3) the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788, et seq.  Plaintiff also includes state law claims for unjust enrichment, fraud, and breach of contract, and further seeks to bring his claims on behalf of both himself and others similarly situated by way of a class action under Rule 23.

As indicated above, Ocwen moved to dismiss Plaintiff's lawsuit on November 28, 2014, arguing that Plaintiff had failed to present any evidence of fraudulent conduct to support his various claims.  It made this argument despite Ocwen's alleged scheme, as detailed in the Complaint, to charge its customers marked-up default services through use of a spin-off company with shared management and ownership, and despite the Complaint's claim that the language of Plaintiff's mortgage contract, as fairly read, permitted Ocwen to be reimbursed for reasonable and appropriate fees but not inflated fees designed to make a profit. By Memorandum and Order filed July 29, 2015, the Court denied Ocwen's motion in its entirety.

Through the motion now before the Court, Ocwen requests that the Court certify its decision denying Ocwen's Motion to Dismiss for interlocutory review on grounds that the Northern District, in Giotta, came to a different decision when confronted with the same issue on virtually identical facts.  Consequently, according to Ocwen, the Ninth Circuit should resolve the intra-circuit split of authority represented by this case and Giotta.[6]

///

---

[6] The docket in Giotta indicates that an appeal to the Ninth Circuit was filed on September 20, 2016.

## STANDARD

Interlocutory appeal is a special mechanism representing a departure from the usual policy of postponing appellate review until after the entry of final judgment. It is warranted only upon a showing of exceptional circumstances. Coopers & Lybrand v. Livesay, 437 U.S. 463, 475 (1978). The Court may certify a non-final decision for interlocutory review only if all the statutory elements are met: (1) the order "involves a controlling question of law"; (2) there is "substantial ground for difference of opinion" as to that question; and 3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); In re Cement Antitrust Litigation, 673 F.2d 1020, 1026 (9th Cir. 1982). The moving party, here Sterling, bears the burden of establishing each element of the statute, which should be "narrowly construed." Coopers & Lybrand, 437 U.S. at 475; James v. Price Stern Sloan, Inc., 283 F.3d 1064, 1068 n.6 (9th Cir. 2002).

Certifying an issue for interlocutory appeal is a matter squarely within the court's discretion. Swint v. Chambers County Comm'n, 514 U.S. 35, 47 (1995).

## ANALYSIS

Giotta, like the present case, involves allegations that Ocwen overcharged for mortgage services by concealing the fact that Altisource, a company that Ocwen spun off to provide BPOs, was marking up its charges to Ocwen who, in turn, passed the resulting inflated charges on to its customers. The Northern District nonetheless concluded that the plaintiffs in Giotta had "not identified any legal basis for an assertion that Ocwen Servicing had a duty to determine the breakdown of the BPO fee Altisource was charging it and disclose to homeowners what portion of that fee was Altisource's own cost and what portion was profit to Altisource." Giotta, 2016 WL 4447150 at * 7.

///

1    Giotta diverges from the present matter, however, inasmuch as its allegations of
2 fraud stem from Ocwen's alleged violations of a 2013 Consumer Finance Protection
3 Bureau ("CFPB") Consent Order.[7] The Giotta court simply stated it was not persuaded
4 that Plaintiffs can rely on the CFPB Consent Order in establishing a disclosure duty for a
5 fraud-based RICO claim, explaining that the plaintiffs' cited authority does "not address
6 the question of whether a consent order (or other judicial order) creates a duty to
7 disclose that may form the basis of a RICO wire fraud or mail fraud claim." Id. at *8.[8]
8 The Giotta court went on to reject the plaintiffs' alternative reliance on two provisions of
9 the Code of Federal Regulations, stating that neither of those provisions imposed any
10 duty to disclose, either. Id.

11    The factual underpinnings for the fraud claims levied by the present case, on the
12 other hand, involve the mortgage contract itself. Plaintiff here points to the Deed of
13 Trust, a fair reading of which, as the Court previously concluded, "permits Ocwen to be
14 reimbursed for reasonable and appropriate fees but not marked up fees designed to
15 make a profit." July 29, 2015 Order, ECF No. 16, 12:8-10. Additionally, Plaintiff further
16 relies on his promissory note itself, which he claims provides that in the event of a
17 default, the homeowner will only "have to 'pay back' costs and expenses incurred in
18 enforcing the Note to the extent not prohibited by applicable law." Pl.'s Compl., ECF
19 No. 1, ¶ 57. Based on those provisions, Plaintiff contends that Ocwen acted fraudulently
20 by not disclosing to borrowers that the "servicer may engage in self-dealing to mark up
21 the actual costs of those services to make a profit." Id. at 58.
22 ///

---

[7] According to the Second Amended Complaint ("SAC") in the Giotta Action (attached as Ex. 1 to the Decl. of Catalina J. Vergara, ECF No 48-2. ¶ 7), this CFPB Consent Order resulted from a suit filed by the attorneys general of 49 states and encompassed the payment of some $2 billion in loan modification to struggling borrowers as well as prohibitions against charging more than the market rate for mortgage services.

[8] While specifically only discussing the CFPB Consent Order, the Giotta decision also generally refers to "prior consent orders entered against Defendants in other jurisdictions." Examination of Giotta's SAC shows that Ocwen is alleged not only to have violated the CFPB consent order, but also an additional consent order resulting from investigation by the New York Department of Financial Services. SAC, ¶¶ 5-6.

Consequently, Plaintiff's complaint here, unlike Giotta, relies upon the mortgage contract documents themselves, and not on any violations of consent orders or federal regulations, to allege fraudulent conduct on Ocwen's part. The complaint in Giotta does not even mention the language employed by the mortgage contracts as forming a factual predicate for the plaintiff's fraud claims.[9] Therefore, the factual basis for the two lawsuits appears markedly different, and Giotta was adjudicated on grounds different than those which caused this Court to deny Ocwen's motion to dismiss. Given this factual disparity, the Court cannot say that its ruling and the Giotta court's decision are "diametrically opposed" as Ocwen argues here, such that immediate Ninth Circuit guidance to resolve the two "inconsistent orders" is required. Defs.' Mot, 3:19-22. Ocwen's request for interlocutory review is specifically premised, however, on an "irreconcilable conflict" between the two rulings.[10]

Moreover, to be entitled to interlocutory review under 28 U.S.C. § 1292(b) in the first place, Plaintiff here must necessarily show that the non-final order for which review is sought (here this Court's July 28, 2015 order denying dismissal) involves a controlling question of law. To even qualify as a question of law, let alone a controlling question, the question must be one that the court of appeals could decide "quickly and cleanly without even having to study the record." Matsunoki Grp., Inc. v. Timberwork Or., Inc., No. 08-CV-04078, 2011 WL 940218 at * 2 (N.D. Cal. Feb 18, 2011) (citing Ahrenholz v. Bd. Trs. of Univ. of Ill, 219 F.3d 674, 676-77 (7th Cir. 2000)). Here, the factual basis for

///

---

[9] While the Giotta decision does note that the Deed of Trust there contained no express prohibition from obtaining reimbursement for marked up fees, it did so only in distinguishing this case from Giotta. While Giotta's discussion of this case is overly simplistic in characterizing the present matter as containing such an express prohibition (this Court actually found only that the mortgage contract construed as a whole amounted to such a prohibition), the fact remains that even Giotta recognized that the factual underpinnings of the two cases are different. See Giotta, 2016 WL 4447150, at * 8.

[10] The heading for Defendants' substantive contention in favor of appeal, as set forth in Section I of Ocwen's argument, is denominated as follows: "GIVEN THE IRRECONCILABLE CONFLICT BETWEEN THIS COURT'S DISMISSAL RULING AND THE GIOTTA COURT'S DISMISSAL RULING, THIS COURT SHOULD CERTIFY ITS JULY 28, 2015 ORDER FOR INTERLOCUTORY APPEAL". ECF No. 48-1, 4:7-9.

the fraud claims asserted in both Giotta and the present case diverge, and this difference belies any claim that the question of law confronted in each case is the same.

The different factual bases for the fraud claims in this case and Giotta undercuts any claim that the two cases share a "controlling question of law" because legal conclusions necessarily change depending on the facts, with this consideration being particularly significant for fraud-based claims which necessarily involve a fact-based inquiry under Rule 9. See Vess v. Ciba-Geigy Corp USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (to satisfy Rule 9(b), "[a]verments of fraud must be accompanied by 'the who, what, when, where and how' of the misconduct alleged."). Where, as here, the alleged controlling question of law raised by Defendants is "inextricably intertwined" with an analysis of Plaintiff's factual allegations, "an interlocutory appeal is not appropriate." Oliner v. Kontrabecki, 305 B.R. 510, 529 (N.D. Cal. 2004); Keystone Tobacco Co., Inc. v. United States Tobacco Co., 217 F.R.D. 235, 239 (D.D.C. 2003) ("Where the crux of an issue decided by the court is fact-dependent, the Court has not decided a 'controlling question of law' justifying immediate appeal….").

Under these circumstances, Defendants here—as the parties seeking interlocutory appeal under § 1292(b)—cannot show, as they must, that "exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of final judgment." In re Cement Antitrust Litig, 673 F.2d at 1026. Defendants' motion accordingly fails.

///
///
///
///
///
///
///
///

**CONCLUSION**

For all the reasons set forth above, Defendants' Motion for Interlocutory Review (ECF No. 48) is DENIED.

IT IS SO ORDERED.

DATED: June 27, 2017

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE