# SEALED

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID WEINER, individually, and on behalf of other members of the public similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>OCWEN FINANCIAL CORPORATION, a Florida corporation, and OCWEN LOAN SERVICING, LLC, a Delaware limited liability company,<br><br>Defendants. | No. 2:14-cv-02597-MCE-DB<br><br>**MEMORANDUM AND ORDER**<br><br>**FILED UNDER SEAL** |

Through the present action, Plaintiff David Weiner ("Plaintiff") alleges that his mortgage servicer, Ocwen Loan Servicing LLC ("OLS") and OLS' parent company, Ocwen Financial Corporation (collectively referred to as "Ocwen"), improperly assessed default-related service fees that contained substantial, undisclosed mark-ups which violated the terms of his mortgage contract. Plaintiff further alleges that Defendants misapplied his payments in violation of the terms of the applicable Deed of Trust. Now before the Court is Plaintiff's motion for class certification in which he seeks to certify a nationwide class (along with two California sub-classes) on grounds that each of the four requirements for certification under Federal Rule of Civil Procedure 23(a),[1] as well as

---
[1] All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless otherwise noted.

one of the alternative prerequisite under Rule 23(b)(3), have been satisfied.  As set forth below, Plaintiff's Motion is GRANTED.[2]

**BACKGROUND**

Ocwen assumed the servicing of Plaintiff's home mortgage in late 2012 or 2013. According to the Complaint, the previous servicer on the loan, GMAC, had paid Plaintiff's property taxes in 2010 and accordingly had established an escrow account for Plaintiff's pre-payment of those expenses in the future.  Plaintiff nonetheless claims that after fully reimbursing GMAC for the taxes it paid in early 2011, and paying a $400 escrow fee, Plaintiff arranged with GMAC to pay his own property taxes going forward and to provide timely proof of his payments.  Despite meeting his commitment in that regard, Plaintiff asserts that after Ocwen became his loan servicer it began charging a $600 annual escrow account fee, and further began diverting funds to that escrow account such that the account carried a positive balance of more than $10,000.00, none of which was accessible by Plaintiff.  According to Plaintiff, this diversion of funds resulted in Ocwen failing to properly apply his interest and principal payments, which he alleges are supposed to be credited before any escrow amounts are withheld.[3]  This misallocation resulted ultimately in Ocwen's refusal to accept Plaintiff's interest and principal payments altogether on grounds that they were insufficient to satisfy the defaulted amount on the loan.  Plaintiff states that Ocwen's conduct has prevented him from claiming interest deductions on his federal and state tax returns, subjected him to harassing phone calls,

///

---

[2] Having determined that oral argument would not be of material assistance, the Court ordered this matter submitted on the briefing in accordance with E.D. Local Rule 230(g).

[3] According to the applicable Deed of Trust, the "Application of Payments or Proceeds" establishes a hierarchy in which funds from customer payments are to be applied.  Those funds are to be allocated in the following order:  1) interest due under the promissory note; 2) principal due under the promissory note; 3) amounts due for any "escrow item (such as property taxes or homeowners' insurance premiums); 4) late charges; and 5) fees for default related services and other amounts.  Compl., ¶¶ 76, 77; see also Deed of Trust, Ex. 1 to Ocwen's previously granted Request for Judicial Notice, ECF No. 6-3, ¶ 2.

precluded him from refinancing his loan, and placed Plaintiff in constant fear of imminent foreclosure of his home.

In addition to misallocation of loan payments and being denied access to surplus funds diverted to his escrow account, Plaintiff also claims that once Ocwen succeeded in forcing him into default by misapplying his loan payments, it proceeded to improperly assess marked-up fees for default related services on his mortgage accounts, including so-called Broker Price Opinion ("BPO")[4] fees, and Hybrid Valuations[5] along with title report and search fees. By way of example, Plaintiff asserts that Ocwen assessed BPO fees of $109.00 and $110.00 on September 4, 2013 and February 24, 2014, respectively, despite knowing that the market rate of a BPO is only approximately $85.00. See Pifko Decl., ¶ 2, Ex. 1 at p. 23; ¶ 6, Ex. 5 at p. 114. According to Plaintiff, Ocwen attempts to justify this mark-up by bundling what it calls a "reconciliation" of the BPO into the BPO charge. Id. at ¶ 2, Ex. 1, pp. 10-11, 22. In addition, Plaintiff alleges that through the reconciliation process, Ocwen uses a related company, Altisource, and Altisource's unlicensed analysts, to alter the value placed on properties like his by licensed brokers. Id. at ¶ 3, Ex. 2 at pp. 64, 72; ¶ 2, Ex. 1 a pp. 24-25.

Similarly, with respect to fees for services related to the examination of title, Plaintiff claims he was assessed a title search fee on June 9, 2014 in the amount of $829.00, despite the fact that such a fee typically ranges between $150.00 and $450.00. According to Plaintiff, then, Ocwen significantly marked up both its BPO, Hybrid Valuation and title search fees.

Plaintiff asserts that Ocwen profited from these arrangements, and was able to avoid detection, by the fact that computer management programs designed to assess fees were spun off by Ocwen, on August 10, 2009, to Altisource. The Chairman of the

---

[4] According to Plaintiff, BPOs, while akin to appraisals, are a less formal means for assessing the value of borrowers' properties. BPOS are, by law, performed by licensed real estate brokers and provide lenders with a professional assessment of a property in default. They are less comprehensive, less costly, and have a shorter turnaround time. See Pifko Decl., ¶ 20, Ex. 19 at p. 251.

[5] Hybrid Valuations are valuations obtained using an automated computer model which are then compared with appraisals. Id. at ¶ 20, Ex. 19 at pp. 251-52.

Board for both Altisource and Ocwen was the same individual, William C. Erbey, and according to the Complaint Erbey owns some 27 percent of the common source of Altisource. Because of the interconnection between the two companies, Plaintiff alleges that both entities benefit from inflated fees. As the Complaint states:

> Ocwen directs Altisource to order and coordinate default-related services, and, in turn, Altisource places orders for such services with third-party vendors. The third-party vendors charge Altisource for the performance of the default-related services, [and] Altisource then marks up the price of the vendors' services, in numerous instances by 100% or more, before "charging" the services to Ocwen. In turn, Ocwen bills the marked-up fees to homeowners.

Compl., ¶ 52.

According to Plaintiff, when a BPO is ordered and assessed against a borrower's account, Ocwen communicates this charge in the borrower's monthly statement, but fails to disclose that it unlawfully marked up the actual cost paid to an independent third-party broker to perform the BPO. Pl.'s Mem., 1:22-23.

Plaintiff points out that the applicable Deed of Trust[6] provided that, in the event of default, the loan servicer is authorized to:

> pay for whatever is reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, including protecting and/or assessing the value of the property, and securing and/or repairing the property.

Compl. at ¶ 55; see also Deed of Trust, ¶ 9.

The Deed of Trust further discloses that any such "amounts disbursed" by the servicer to a third party shall become additional debt of the homeowner secured by the deed of trust and shall bear interest at the Note rate from the date of "disbursement." Compl., ¶ 56. Moreover, according to Plaintiff, the Promissory Note discloses that with respect to "Payment of the Note Holder's Costs and Expenses," if there is a default, the homeowner will have to "pay back" costs and expenses incurred in enforcing the Note to

---

[6] Plaintiff's mortgage contract consists of two documents, the Promissory Note and the Deed of Trust, which authorizes the loan servicer to take certain steps to protect the note holder's interest in the property.

1 the extent not prohibited by applicable law.  Plaintiff therefore asserts that the mortgage
2 instruments provide that the servicer will "pay for default-related services when
3 reasonably necessary, and will be reimbursed or 'paid back' by the homeowner for
4 amounts 'disbursed.'"  Compl., ¶ 58.  Plaintiff maintains that nowhere it is disclosed to
5 borrowers that Ocwen may engage, as it purportedly does, in self-dealing to mark up the
6 actual cost of those services to make a profit.  Id.

7 Based on the foregoing, Plaintiff initiated this class action alleging violations of
8 1) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.; 2) The
9 Racketeer Influenced and Corrupt Organizations Act, 182 U.S.C. §§ 1962(c) and (d);
10 and 3) the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788, et seq..
11 Plaintiff also includes state law claims for unjust enrichment, fraud and breach of
12 contract, and further seeks to bring his claims on behalf of both himself and others
13 similarly situated by way of a class action under Rule 23.

14 The motion for class certification presently before the Court seeks certification of
15 a nationwide class, consisting of all United States residents who have or had a loan
16 serviced by Ocwen and who paid one or more BPOs or Hybrid Valuations charged by
17 Owen between November 5, 2010 and the present.  In addition, Plaintiff seeks
18 certification of two California subclasses who have either paid or been assessed with
19 such charges during the same time period.  According to Plaintiff, each of the four
20 requirements of Rule 23(a)---numerosity, commonality, typicality and adequacy of
21 representation—are met.  In addition, Plaintiff alleges that under a Rule 23(b)(3)
22 analysis, common issues predominate over any individual questions, making class
23 action treatment a superior method for adjudicating Plaintiff's claims.   Finally, Plaintiff
24 also seeks to have his attorneys appointed as class counsel.
25 ///
26 ///
27 ///
28 ///

# STANDARD

A court may certify a class if a plaintiff demonstrates that all of the prerequisites of Federal Rule of Civil Procedure 23(a) have been met, and that at least one of the requirements of Rule 23(b) have been met. See Fed. R. Civ. P. 23; see also Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996). Before certifying a class, the trial court must conduct a "rigorous analysis" to determine whether the party seeking certification has met the prerequisites of Rule 23. Id. at 1233. While the trial court has broad discretion to certify a class, its discretion must be exercised within the framework of Rule 23. Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186 (9th Cir. 2001).

Rule 23(a) provides four prerequisites that must be satisfied for class certification: (1) the class must be so numerous that joinder of all members is impracticable; (2) questions of law or fact exist that are common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. See Fed. R. Civ. P. 23(a). Rule 23(b) requires a plaintiff to establish one of the following: (1) that there is a risk of substantial prejudice from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be appropriate; or (3) that common questions of law or fact predominate and the class action is superior to other available methods of adjudication. See Fed. R. Civ. P. 23(b).

# ANALYSIS

**A.     The Proposed Class Satisfies All Four Requirements of Rule 23(a)**

    **1.     Numerosity**

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. See Fed. R. Civ. P. 23(a)(1). Moreover, "the class must be adequately

1  defined and clearly ascertainable . . . [b]ut the class need not be so ascertainable that
2  every potential member be identified at the commencement of the action.  As long as the
3  general outlines of the membership of the class are determinable at the outset of the
4  litigation, a class will be deemed to exist." Whitaker v. Bennett Law, PLLC,
5  No. 13-cv-3145-L(NLS),  2014 WL 5454398 at *4 (S.D. Cal. Oct. 27, 2014).

6  "Courts have routinely found the numerosity requirement satisfied when the class
7  comprises 40 or more class members." Collins v. Cargill Meat Solutions. Corp.
8  274 F.R.D. 294, 300 (E.D. Cal. 2011).  Nonetheless "[t]he numerosity requirement
9  contains no specific numerical threshold." Andrews Farms v. Calcot, Ltd., 258 F.R.D.
10 640, 651 (E.D. Cal. 2009), order clarified on reconsideration, 268 F.R.D. 380 (E.D. Cal.
11 2010).  Rule 23(a)'s numerosity requirement "does not mean that joinder of all members
12 is impossible, but rather means only that the court must find that the difficulty or
13 inconvenience of joining all members of the class makes class litigation desirable." In re
14 Itel Sec. Litig., 89 F.R.D. 104, 112 (N.D. Cal. 1981) (citing Harris v. Palm Springs Alpine
15 Estates, Inc., 329 F.3d 909, 913-14 (9th Cir. 1964)).  Courts have been inclined to certify
16 classes of even relatively modest size. See, e.g.,Jordan v. Los Angeles County,
17 669 F.2d 1311, 1319 (9th Cir. 1982) (willing to find numerosity for classes with thirty-
18 nine, sixty-four, and seventy-one people, respectively), vacated on other grounds,
19 459 U.S. 810 (1982).

20 Here, the numbers involved easily satisfy the numerosity requirement.  In their
21 responses to Plaintiff's discovery requests, for example, Ocwen identified a total of
22 1,940,778 BPOs charged to 871,189 loans, for a total of $274,098,507, for which Ocwen
23 was reimbursed $132,730,904 by borrowers, during the limited time between
24 November 5, 2010 and November 5, 2015, alone.  Pifko Decl., ¶13, Ex. 12 at pp. 165-
25 67.  Plaintiff has thus established that numerous potential class members exist.

26 **2.    Commonality**

27 Under Rule 23(a)(2), Plaintiff must demonstrate that there are "questions of law or
28 fact common to the class." Fed. R. Civ. P. 23(a)(2).  This requirement is construed

permissively and can be satisfied upon a finding of "shared legal issues with divergent factual predicates." Hanlon v.Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998). As the Supreme Court has clarified: "What matters to class certification . . . is not the raising of common 'questions' - - - even in droves - - - but, rather, the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011).

     The classwide claims alleged here depend on whether or not the BPOs and Hybrid Valuations charged to Plaintiff and members of the purported class were unlawful. Because Plaintiff challenges Ocwen's practices on a classwide basis, based on what are alleged to be uniform practices, a finding for Plaintiff under any theory is common to the entire class. Resolution therefore does not depend on the unique facts of any particular homeowner, since Plaintiff contends that the propriety of Ocwen's charges do not depend on either the loan status, the loan amount or the individual conduct of any particular homeowner. If the disputed charges are determined unlawful, "the class members 'have suffered the same injury.'" Id. at 2551 (quoting Gen. Tel. Co. v. Southwest v. Falcon, 457 U.S. 147, 157 (1982). The commonality requirement is thus satisfied. See In re First Alliance Mortgage Co., 471 F.3d 977, 991 (9th Cir. 2006) (affirming certification of claims that lender employed a scheme to mislead homeowners through standardized procedures).

     In determining that common issues predominate with respect to Plaintiff's allegations, the Court is unpersuaded by Ocwen's claim that the facts here turn on borrower-specific factual circumstances. The fact, for example, that the contractual terms may vary slightly in various instances is not dispositive and does not render each individual claim separate and independent. Ocwen has not shown that any such variations made any material difference. In addition, the fact that some borrowers may not have paid a valuation fee at all does not detract from the force of Plaintiff's class-related allegations. Nor does the fact that some class members may have gone into bankruptcy preclude the claims from proceeding on a class basis. If the bankruptcy of

some prospective class members precluded class action treatment altogether, it would be all but impossible to certify most any class.

### 3. Typicality

Rule 23(a)(3) requires that "the claims and defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The test for whether typicality is present is "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992). The inquiry is "permissive" and requires only that the representative's claims are "reasonably coextensive with those of the absent class members; they need not be substantially identical." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998). In other words, the action must be based on conduct not unique to Plaintiff but conduct which has injured other class members. Ellis v. Costco Wholesale Corp., 657 F.3d 970, 984 (9th Cir. 2011)

Here, because Plaintiff and class members alike were allegedly overcharged by BPOs and Hybrid Valuations, it would appear that Plaintiff's claims and injuries are typical of those suffered by the purported classes. Resolution of that question therefore also weighs in favor of class treatment.

### 4. Adequacy

"The final hurdle interposed by Rule 23(a) is that 'the representative parties will fairly and adequately protect the interests of the class.'" Hanlon, 150 F.3d at 1020 (quoting Fed. R. Civ. P. 23(a)(4)). "To satisfy constitutional due process concerns, absent class members must be afforded adequate representation before entry of a judgment which binds them." Id. (citing Hansberry v. Lee, 311 U.S. 32, 42-43 (1940)). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the

///

1  named plaintiffs and their counsel prosecute the action vigorously on behalf of the
2  class?" Hanlon, 150 F.3d at 1020.
3        Plaintiff here is a homeowner who alleges he was subjected by Ocwen to unlawful
4  BPO and Hybrid Valuations under circumstances both identical and co-extensive to
5  those inuring to the class as a whole. According to Plaintiff, he seeks the same
6  categories of damages and there is no conflict of interest.[7] Significantly, too, Plaintiff
7  states he is ready, willing and able to accept his role as class representative and will
8  dutifully represent the interests of the class. Pifko Decl., ¶ 17, Ex. 16 at pp. 186-197.
9  Under these circumstances the Court finds Plaintiff to be an adequate class
10 representative.
11       As for counsel, Rule 23(g) lists four factors for consideration: (1) the work counsel
12 has done in identifying or investigating potential claims in the action; (2) counsel's
13 experience in handling class actions or other complex litigation and the type of claims in
14 the litigation; (3) counsel's knowledge of the applicable law; and (4) the resources that
15 counsel will commit to representing the class. Fed. R. Civ. P. 23(g).  Plaintiff's counsel
16 here represent that they "are experienced attorneys with a history of complex litigation
17 and a strong class action rack record of successfully representing similar categories."
18 Pl.'s Mem., 14:5-16,
19       The Court has no reason to doubt these representations, and even Ocwen does
20 not challenge the adequacy of Plaintiff's counsel. Thus this prerequisite is satisfied on
21 counsel's part as well.
22       **C.    The Putative Class Satisfied Both Requirements of Rule 23(b)(3)**
23       In addition to the requirements of Rule 23(a), a plaintiff must also satisfy one of
24 the requirements of Rule 23(b). Hanlon, 150 F.3d at 1022. Plaintiff seeks to certify
25 under subdivision (b)(3), which requires "that the questions of law or fact common to

---

[7] While Ocwen appears to argue that the particular circumstances that led Plaintiff to becoming in default (he allegedly failed to pay his property taxes when they became due because it was inconvenient to do so) should preclude him from being an adequate representative for individuals that paid for improperly levied services after they defaulted, in the Court's view the circumstances leading to the default are irrelevant with the salient issue being the propriety of fees charged or assessed thereafter.

10

class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Both of those issues—predominance and superiority—will be addressed in turn.

### 1.   Predominance of Common Questions

"The predominance inquiry focuses on the relationship between the common and individual issues and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Vinole v. Countrywide Home Loans, Inc., 571 F.3d 935, 944 (9th Cir. 2009). "This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045. As the Supreme Court states:

> An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof. The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.

Id. (citations and quotations omitted).

If indeed the BPO and Hybrid Valuation charges are determined to be unlawful through any of the theories espoused by Plaintiff, the same rationale as to the unlawfulness will apply to each potential class member. Because this outcome is best amenable to determination on a classwide basis without any particular individual inquiry, the Court finds that common questions predominate.

In order to establish predominance under Rule 23(b)(3), Plaintiff must also show that "damages are capable of measurement on a classwide basis." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013). Ocwen claims that Plaintiff has failed to offer any expert testimony as to the appropriate measure of damages should the class be certified. Comcast does not stand for the proposition, however, that Plaintiff must calculate damages for all class members. Instead, "so long as the damages can be

11

1  determined and attributed to a plaintiff's theory of liability, damage calculations for
2  individual class members do not defeat certification." Lindell v. Synthes USA, Case
3  No. 1:11-cv-02053-lJO-BAM, 2014 WL 841738 at *14 (E.D. Cal. Mar. 4, 2014); see also
4  Johns v. Bayer Corp., 280 F.R.D. 551, 555 (S.D. Cal. 2012) ("The amount of damages is
5  invariably an individual question and does not defeat class action treatment.");
6  Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d 1087, 1089 (9th Cir. 2010).

   At the class certification, stage, as Plaintiff points out, he need only propose a valid method for calculating classwide damages such that a trier of fact could accurately calculate damages. Leyva v. Medline Industries, Inc., 716 F.3d 510, 514 (9th Cir. 2013). Here, Plaintiff's method of calculating damages would appear straightforward. He proposes to simply calculate the amounts improperly charged for improperly-levied default-related services (like BPO's and Hybrid Valuations) so that the amounts wrongfully imposed can be refunded. That is sufficient for purposes of class certification. Plaintiff's damages model need neither be perfect nor "precisely correct." See Vaccarino v. Midland Nat'l Life Ins. Co., Case No. 2:11-cv-05858-CAS(MANx), 2014 WL 572365 at *10-13 (C.D. Cal. Feb. 3, 2014) ("Comcast requires that courts determine whether damages are susceptible of classwide measurement, not whether that measurement is precisely correct.").

### 1. Superiority of Class Action

Plaintiff must also establish that the proposed class action is the superior method for resolving the dispute as compared to available alternatives. "A class action is the superior method for managing litigation if no realistic alternative exists." Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234-46 (9th Cir. 1996). The Ninth Circuit has recognized that a class action is a plaintiff's only realistic method of recovery if there are multiple claims against the same defendant for relatively small sums. Local Joint Exec. Bd.of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1163 (9th Cir. 2001).

///

As Plaintiff indicates, relative to the cost of litigation each proposed member's individual claim is relatively small. Pifko Decl., ¶ 3, Ex. 2 at p. 66; ¶ 7, Ex. 6 at p. 123. This makes adjudication by a class action superior and weighs in favor of certifying a class. See Zinser v. Accfix Research Inst., Inc., 253 F.3d 1180, 1190 (9th Cir. 2001); Allen v. Hyland's Inc., 300 F.R.D. 643, 671 (C.D. Cal. 2014).

### 2. Availability of Injunctive Relief

While Plaintiff's claim on behalf of California subclass against which fees have improperly been assessed seeks injunctive relief to reverse such assessments, and while Ocwen argues that such relief is unavailable, an injunctive relief class can in fact be certified under Rule 23(b)(2) where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); see also Walmart, 131 S. Ct. at 2557 (holding that certification under rule 23(b)(2) is appropriate "when a single injunction or declaratory judgment would provide relief to each member of the class").

## CONCLUSION

Having determined as set forth above that the proposed classes should be certified under Rules 23(a) and 23(b)(3), Plaintiff's Motion for Class Certification (ECF No. 77) is GRANTED. Consequently, the Court hereby certifies the following class:

**Nationwide Class:**

> All residents of the United States of America who have or had a loan serviced by Ocwen Financial Corporation or Ocwen Loan Servicing, LLC and who paid for one or more Broker Price Opinions or Hybrid Valuations charged by Ocwen Financial Corporation or Ocwen Loan Servicing, LLC through Altisource, from November 5, 2010 through the present.

Under Federal Rules of Civil Procedure 23(a) and 23(b)(3), the Court additionally certifies the following sub-class:

**California Paid Sub-Class:**

All residents of the State of California who have or had a loan serviced by Ocwen Financial Corporation or Ocwen Loan Servicing, LLC and who paid for one or more Broker Price Opinions or Hybrid Valuations charged by Ocwen Financial Corporation or Ocwen Loan Servicing, LLC through Altisource, from November 5, 2010 through the present.

Under Federal Rules of Civil Procedure 23(a) and 23(b)(2), the Court hereby certifies a second sub-class as follows:

**California Assessed Sub-Class:**

All residents of the State of California who have or had a loan serviced by Ocwen Financial Corporation or Ocwen Loan Servicing, LLC and to whom charges for one or more Broker Price Opinions or Hybrid Valuations were assessed to their mortgage account by Ocwen Financial Corporation or Ocwen Loan Servicing, LLC through Altisource, from November 5, 2010 through the present.

The Court further orders that Plaintiff David Weiner is appointed class representative and Plaintiff's counsel is appointed as Class Counsel.

The Clerk's Office is directed to file this Memorandum and Order under seal, with service to be effectuated on counsel for the parties, only.

IT IS SO ORDERED.

Dated: September 29, 2017

MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE