UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID WEINER, individually, and on behalf of other members of the public similarly situated,<br><br>            Plaintiff,<br><br>      v.<br><br>OCWEN FINANCIAL CORPORATION, a Florida corporation, and OCWEN LOAN SERVICING, LLC, a Delaware limited liability company,<br><br>            Defendants. | No. 2:14-cv-02597-TLN-DB<br><br>**ORDER** |

This matter is before the Court on Defendants Ocwen Financial Corporation and Ocwen Loan Servicing, LLC's Motion for Decertification.[1] (ECF No. 194.) Plaintiff David Weiner ("Plaintiff") filed an opposition. (ECF No. 200-1.) Ocwen filed a reply. (ECF No. 206-1.) For the reasons set forth below, Ocwen's motion is GRANTED.[2]

///

---

[1] Consistent with the September 29, 2017 Order, the Court will continue to refer to Defendants collectively as "Ocwen."

[2] The Court notes that all of the briefing accompanying the instant motion for decertification has been filed under seal, in addition to Judge Morrison C. England's September 29, 2017 Order granting Plaintiff's Motion for Class Certification (ECF No. 102). To remain consistent, this Order will also be filed under seal.

1

**I.   FACTUAL AND PROCEDURAL BACKGROUND**[3]

Plaintiff alleges that his mortgage servicer, Ocwen Loan Servicing, LLC ("OLS") and OLS's parent company, Ocwen Financial Corporation (collectively, "Ocwen") improperly assessed default-related service fees that contained substantial, undisclosed mark-ups that violated the terms of Plaintiff's mortgage contract. Plaintiff further alleges that Ocwen misapplied his payments in violation of the terms of the applicable Deed of Trust.

Ocwen assumed the servicing of Plaintiff's home mortgage in late 2012 or 2013. According to the Complaint, the previous servicer on the loan, GMAC, had paid Plaintiff's property taxes in 2010 and accordingly had established an escrow account for Plaintiff's pre-payment of those expenses in the future. Plaintiff nonetheless claims that after fully reimbursing GMAC for the taxes it paid in early 2011 and paying a $400 escrow fee, Plaintiff arranged with GMAC to pay his own property taxes going forward and to provide timely proof of his payments. Despite meeting his commitment in that regard, Plaintiff asserts that after Ocwen became his loan servicer it began charging a $600 annual escrow account fee and further began diverting funds to that escrow account such that the account carried a positive balance of more than $10,000.00, none of which was accessible by Plaintiff. According to Plaintiff, this diversion of funds resulted in Ocwen failing to properly apply his interest and principal payments, which he alleges are supposed to be credited before any escrow amounts are withheld.[4] This misallocation resulted ultimately in Ocwen's refusal to accept Plaintiff's interest and principal payments altogether on grounds that they were insufficient to satisfy the defaulted amount on the loan. Plaintiff states that Ocwen's conduct has prevented him from claiming interest deductions on his federal and state tax returns,

---

[3] The factual and procedural background is taken almost verbatim from Judge England's September 29, 2017 Order. (ECF No. 102.) All the internal citations in this section have been removed to remain consistent with this Court's formatting preferences, but are available in the original document.

[4] According to the applicable Deed of Trust, the "Application of Payments or Proceeds" establishes a hierarchy in which funds from customer payments are to be applied. Those funds are to be allocated in the following order: (1) interest due under the promissory note; (2) principal due under the promissory note; (3) amounts due for any "escrow item" (such as property taxes or homeowners' insurance premiums); (4) late charges; and (5) fees for default related services and other amounts.

2

subjected him to harassing phone calls, precluded him from refinancing his loan, and placed Plaintiff in constant fear of imminent foreclosure of his home.

In addition to misallocation of loan payments and being denied access to surplus funds diverted to his escrow account, Plaintiff also claims that once Ocwen succeeded in forcing him into default by misapplying his loan payments, it proceeded to improperly assess marked-up fees for default-related services on his mortgage accounts, including so-called Broker Price Opinion ("BPO") fees[5] and Hybrid Valuations,[6] along with title report and search fees. By way of example, Plaintiff asserts that Ocwen assessed BPO fees of $109.00 and $110.00 on September 4, 2013, and February 24, 2014, respectively, despite knowing that the market rate of a BPO is only approximately $85.00. According to Plaintiff, Ocwen attempts to justify this mark-up by bundling what it calls a "reconciliation" of the BPO into the BPO charge. In addition, Plaintiff alleges that through the reconciliation process, Ocwen uses a related company, Altisource, and Altisource's unlicensed analysts to alter the value placed on properties like his by licensed brokers.

Similarly, with respect to fees for services related to the examination of title, Plaintiff claims he was assessed a title search fee on June 9, 2014, in the amount of $829.00, despite the fact that such a fee typically ranges between $150.00 and $450.00. According to Plaintiff, Ocwen then significantly marked up its BPO, Hybrid Valuation, and title search fees.

Plaintiff asserts that Ocwen profited from these arrangements and was able to avoid detection by the fact that computer management programs designed to assess fees were spun off by Ocwen, on August 10, 2009, to Altisource. The Chairman of the Board for both Altisource and Ocwen was the same individual, William C. Erbey, and according to the Complaint, Erbey owns some 27 percent of the common stock of Altisource. Because of the interconnectedness

---

[5] According to Plaintiff, BPOs, while akin to appraisals, are a less formal means for assessing the value of borrowers' properties. BPOs are, by law, performed by licensed real estate brokers and provide lenders with a professional assessment of a property in default. They are less competitive, less costly, and have a shorter turnaround time.

[6] Hybrid Valuations are valuations obtained using an automated computer model which are then compared with appraisals.

between the two companies, Plaintiff alleges that both entities benefit from the inflated fees. As the Complaint states:

> Ocwen directs Altisource to order and coordinate default-related services, and, in turn, Altisource places orders for such services with third-party vendors. The third-party vendors charge Altisource for the performance of the default-related services, [and] Altisource then marks up the price of the vendors' services, in numerous instances by 100% or more, before "charging" the services to Ocwen. In turn, Ocwen bills the marked-up fees to homeowners.

According to Plaintiff, when a BPO is ordered and assessed against a borrower's account, Ocwen communicates this charge in the borrower's monthly statement, but fails to disclose that it unlawfully marked up the actual cost paid to an independent third-party broker to perform the BPO. Plaintiff points out that the applicable Deed of Trust[7] provides that, in the event of default, the loan servicer is authorized to:

> pay for whatever is reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, including protecting and/or assessing the value of the property, and securing and/or repairing the property.

The Deed of Trust further discloses that any such "amounts disbursed" by the servicer to a third party shall become additional debt of the homeowner secured by the deed of trust and shall bear interest at the Note rate from the date of "disbursement." Moreover, according to Plaintiff, the Promissory Note discloses that with respect to "Payment of the Note Holder's Costs and Expenses," if there is a default, the homeowner will have to "pay back" costs and expenses incurred in enforcing the Note to the extent not prohibited by applicable law. Plaintiff therefore asserts that the mortgage instruments provide that the servicer will "pay for default-related services when reasonably necessary, and will be reimbursed or 'paid back' by the homeowner for amounts 'disbursed.'" Plaintiff maintains that nowhere is it disclosed to borrowers that Ocwen may engage, as it purportedly does, in self-dealing to mark up the actual cost of those services to make a profit.

---

[7] Plaintiff's mortgage contract consists of two documents, the Promissory Note (the "Note") and the Deed of Trust, which authorize the loan servicer to take certain steps to protect the note holder's interest in the property.

4

Based on the foregoing, Plaintiff initiated this class action alleging violations of: (1) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200–17210; (2) the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 182 U.S.C. §§ 1962(c) and (d); and (3) the Rosenthal Fair Debt Collection Practices Act (the "Rosenthal Act"), Cal. Civ. Code §§ 1788–1788.33. (ECF No. 1.) Plaintiff also alleges state law claims for unjust enrichment, fraud, and breach of contract. (*Id.*)

On September 29, 2017, Judge England granted Plaintiff's Motion for Class Certification. (ECF No. 102.) The Court found that all four prerequisites of Federal Rule of Civil Procedure ("Rule") 23(a) were met, as well as the requirements of Rule 23(b)(3). Judge England certified the following classes:

**Nationwide Class**:

> All residents of the United States of America who have or had a loan serviced by Ocwen Financial Corporation or Ocwen Loan Servicing, LLC and who paid for one or more Broker Price Opinions or Hybrid Valuations charged by Ocwen Financial Corporation or Ocwen Loan Servicing, LLC through Altisource, from November 5, 2010 through the present.

**California Paid Sub-Class**:

> All residents of the State of California who have or had a loan serviced by Ocwen Financial Corporation or Ocwen Loan Servicing, LLC and who paid for one or more Broker Price Opinions or Hybrid Valuations charged by Ocwen Financial Corporation or Ocwen Loan Servicing, LLC through Altisource, from November 5, 2010 through the present.

**California Assessed Sub-Class**:

> All residents of the State of California who have or had a loan serviced by Ocwen Financial Corporation or Ocwen Loan Servicing, LLC and to whom charges for one or more Broker Price Opinions or Hybrid Valuations were assessed to their mortgage account by Ocwen Financial Corporation or Ocwen Loan Servicing, LLC through Altisource, from November 5, 2010 through the present.

(*Id.* at 13–14.)

On April 12, 2021, this case was reassigned to this Court. (ECF Nos. 189, 190.) On September 20, 2021, Ocwen filed the instant motion for decertification. (ECF No. 194.) On

November 4, 2021, Plaintiff filed the instant motion to compel testimony. The Court will consider each motion in turn.

## II.    STANDARD OF LAW

Under Rule 23, an order that grants or denies class certification may be altered or amended before final judgment. Fed. R. Civ. P. 23(c)(1)(C). "A district court retains the flexibility to address problems with a certified class as they arise, including the ability to decertify." *United Steel Workers, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802, 809 (9th Cir. 2010). "Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Arredondo v. Delano Farms Co.*, 301 F.R.D. 493, 501 (E.D. Cal. 2014) (citing *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982)). "For such an order, particularly during the period before any notice is sent to members of the class, is inherently tentative." *Falcon*, 457 U.S. at 160 (internal quotations omitted).

The standard for class decertification is the same as the standard for class certification. *Arredondo*, 301 F.R.D. at 502. The legal standard to obtain class certification is found under Rule 23. A class action may be maintained only if all four prerequisites of Rule 23(a) are met along with at least one of the requirements of Rule 23(b). *Blake v. Arnett*, 663 F.2d 906, 912 (9th Cir. 1981). In deciding whether to certify or decertify a class, a district court "will resolve factual disputes by a preponderance of the evidence and make findings that each Rule 23 requirement is met or is not met, having considered all relevant evidence and arguments presented by the parties." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3rd Cir. 2008).

## III.   ANALYSIS

Ocwen argues the previously-certified classes must be decertified because Plaintiff fails the predominance inquiry after the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021).[8]  (ECF No. 197-1 at 16–22.) Ocwen notes that Judge England previously

---

[8]  Ocwen also argues the predominance inquiry fails because individualized issues will also predominate for the purposes of class members' statutory standing under RICO and the UCL, Plaintiff lacks standing, and the typicality inquiry fails because Plaintiff's claims are atypical. (ECF No. 197-1 at 22–26.) However, because the Court finds that the predominance inquiry fails

found "there is a factual dispute between the parties about whether numerous class members ever paid any of the fees at issue here and therefore whether they suffered concrete harm," and that after TransUnion "individual issues surrounding whether each class member suffered concrete harm, and therefore whether they can be part of the class, will predominate over any common issues if the class claims proceed to trial." (ECF No. 197-1 at 17.) Ocwen contends this individualized inquiry "would dwarf any common issues in the litigation" because it would involve Plaintiff producing evidence as to each of the 321,226 class members if the class claims proceed to trial. (*Id.*)

In opposition, Plaintiff argues *TransUnion* is inapposite to the instant case because *TransUnion* did not involve a factual dispute as to whether class members suffered an injury but rather whether TransUnion's statutory violation alone conferred Article III standing. (ECF No. 200-1 at 17.) Plaintiff maintains *TransUnion* involved stipulated facts, whereas here Judge England found there is a disputed factual issue as to whether Plaintiff and class members suffered any injury, an issue to be resolved at trial. (*Id.*) Plaintiff further contends that he has sufficient evidence to demonstrate at trial that all class members suffered an Article III injury, as Ocwen admitted in its discovery responses that Plaintiff can prove standing on a class-wide basis, Plaintiff's expert repeatedly demonstrated he can establish economic injury and thus standing on a class-wide basis, Ocwen's expert is not qualified or credible, and Plaintiff repeatedly established that he paid valuation fees. (*Id.* at 18–23.) Plaintiff finally notes that the members of the "California Assessed Sub-Class" have sufficient evidence to establish at trial they suffered an Article III injury because "the law is clear that class members who merely had the unlawful charges assessed on their accounts also suffered Article III injury regardless of whether they paid." (*Id.* at 23.)

---

due to necessary individualized inquiries as to whether each class member suffered a concrete harm for the purposes of Article III standing, it declines to address these remaining arguments.

　　The Court also notes that Ocwen filed a Notice of Supplemental Authority (ECF No. 210), to which Plaintiff filed a response (ECF No. 214). Because the Court does not rely on the case submitted as supplemental authority in reaching its decision, it will not address this supplemental briefing.

7

1    In reply, Ocwen asserts that Plaintiff mischaracterizes *TransUnion*, which does not state
2 that trial is the appropriate venue to resolve disputes regarding standing. (ECF No. 206-1 at 8–9.)
3 Ocwen notes that "after the [Supreme] Court in *TransUnion* found standing lacking for a
4 significant percentage of class members, it remanded to the Ninth Circuit to determine whether
5 class certification was still appropriate in light of its decision." (*Id.* at 9.) Ocwen argues
6 Plaintiff's attempt to distinguish *TransUnion* on the basis that certain facts in that case were
7 stipulated fails because a stipulation of certain facts does not limit its holding. (*Id.*) Ocwen also
8 disputes that Plaintiff has class-wide proof with respect to standing and maintains that class
9 members who were only assessed but did not pay fees (such as the California Assessed Sub-
10 Class) cannot remain part of the class after *TransUnion*. (*Id.* at 9–14.)

11   Judge England previously certified the class pursuant to Rule 23(b)(3), which states: "the
12 questions of law or fact common to class members predominate over any questions affecting only
13 individual members, and that a class action is superior to other available methods for fairly and
14 efficiently adjudicating the controversy." The Rule 23(b)(3) predominance test assesses whether
15 proposed classes are "sufficiently cohesive to warrant adjudication by representation." *Amchem*
16 *Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). A court should look to the common
17 questions because "when common questions present a significant aspect of the case and they can
18 be resolved for all members of the class in a single adjudication, there is clear justification for
19 handling the dispute on a representative rather than on an individual basis." *Hanlon v. Chrysler*
20 *Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998), *overruling on other grounds recognized by Castillo*
21 *v. Bank of Am., NA*, 980 F.3d 723 (9th Cir. 2020). "To ensure that common questions
22 predominate over individual ones, the court must 'ensure that the class is not defined so broadly
23 as to include a great number of members who for some reason could not have been harmed by the
24 defendant's allegedly unlawful conduct.'" *Castillo*, 980 F.3d at 730 (quoting *Torres v. Mercer*
25 *Canyons Inc.*, 835 F.3d 1125, 1138 (9th Cir. 2016)). "If many class members have no claim
26 whatsoever because they were never exposed to the challenged conduct to begin with, the class
27 does not satisfy Rule 23(b)(3)." *Id.* (internal quotations and citations omitted).
28 ///

Based on the foregoing arguments, the crux of the inquiry in the instant matter is whether the Supreme Court's decision in *TransUnion* changes Judge England's finding of predominance of common questions in his order certifying the class. In *TransUnion*, the Supreme Court considered whether a class of 8,185 individuals had standing to sue TransUnion, a credit reporting agency, for: (1) failure to use reasonable procedures to ensure the accuracy of their credit files; (2) failure to provide individuals with all the information in a credit file upon request; and (3) a violation of its obligation to provide individuals a summary of rights "with each written disclosure." 141 S. Ct. at 2200, 2202–03. At issue was TransUnion's OFAC Name Screen Alert product, which compares a consumer's name against the OFAC list of "specifically designated nationals who threaten America's national security," and if the consumer's first and last name matched the first and last name of an individual on the OFAC list, then TransUnion would place an alert on the credit report indicating that the consumer's name was a "potential match" to a name on the OFAC list. *Id.* at 2201 (internal quotation marks omitted). As thousands of "law-abiding Americans" shared a first and last name with individuals on the OFAC list, Name Screen "generated many false positives." *Id.*

The question in *TransUnion* was whether the 8,185 class members met the requirement of demonstrating a "concrete harm" essential for Article III standing. *Id.* at 2203, 2208. The Supreme Court noted that in this inquiry, "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* at 2204 (citing *Spokeo v. Robins*, 578 U.S. 330, 341 (2016)). The Supreme Court stated that such harms that qualify as concrete injuries under Article III include "traditional tangible harms, such as physical harms and monetary harms," but also "intangible harms" such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* The Supreme Court noted as a preliminary matter that "[e]very class member must have Article III standing in order to recover individual damages" and "the specific facts set forth by the plaintiff to support standing must be supported adequately by the evidence adduced at trial." *Id.* at 2208 (internal citations and quotations omitted).

///

Applying these principles, the Supreme Court found with respect to the reasonable procedures claim that only the 1,853 class members whose credit reports were disseminated to third parties suffered a concrete harm under Article III. *Id.* at 2209. The Supreme Court noted that as these credit reports contained OFAC alerts labeling the 1,853 class members as potential terrorists, drug traffickers, or serious criminals, these class members "suffered a harm with a 'close relationship' to the harm associated with the tort of defamation." *Id.* For the remaining 6,332 class members whose credit reports were not disseminated, the Supreme Court concluded that they did not establish standing because "the mere existence of a misleading OFAC alert in a consumer's internal credit file at TransUnion" without disclosure to a third party does not cause a concrete harm. *Id.* at 2209–10. Nor did the Supreme Court find "the mere risk of future harm, standing alone," qualified as a concrete harm. *Id.* at 2211. The Supreme Court addressed the disclosure and summary-of-rights claims together and found "the plaintiffs have not demonstrated that the format of TransUnion's mailings caused them a harm with a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts" or "that they suffered any harm *at all* from the formatting violations." *Id.* at 2213 (emphasis in original). The Supreme Court concluded that "[w]ithout any evidence of harm caused by the format of the mailings, these are 'bare procedural violation[s], divorced from any concrete harm'" that are insufficient for Article III standing. *Id.* at 2214 (citing *Spokeo*, 578 U.S. at 341). The Supreme Court did not address the typicality of the claims under Rule 23 and remanded the case to the Ninth Circuit to "consider in the first instance whether class certification is appropriate in light of [its] conclusion about standing." *Id.*

In the instant case, Judge England found in his September 29, 2017 Order that "the fact that some borrowers may not have paid a valuation fee at all does not detract from the force of Plaintiff's class-related allegations." (ECF No. 102 at 8.) After discovery was conducted, Ocwen filed a Motion for Partial Summary Judgment, which Judge England denied. (*See* ECF Nos. 176, 181.) In the discussion of Plaintiff's standing to pursue RICO claims, Judge England concluded that whether all class members actually paid the fees in question — "since they are uniformly marked as 'paid' from funds designated by Ocwen" — is disputed and could not be resolved on

summary judgment. (ECF No. 181 at 17–18.) Judge England explained that Plaintiff asserts the "paid" designation by Ocwen means "actually sent by customer," while Ocwen's expert contends "just the opposite after examining Ocwen's testimony and Plaintiff's loan transaction records." (*Id.* at 18.) Based on this conclusion and the Supreme Court's holding in *TransUnion*, Ocwen contends that if the class claims proceed to trial, "Plaintiff will need to resolve this factual dispute, providing evidence to establish that each individual borrower in the class paid the fee and consequently suffered concrete harm." (ECF No. 197-1 at 20.)

In light of *TransUnion*, this Court finds Ocwen's argument persuasive. The decision in *TransUnion* compels an inquiry as to whether the alleged injuries the class members assert have "a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts."[9] *Id.* at 2204. The Court concludes Ocwen is correct that "[t]hese individualized inquiries" into whether all the class members actually paid the fees in question "would predominate because there are several different categories of borrowers who suffered no concrete harm, and, in order for each borrower to remain in the class, Plaintiff will need to establish that each borrower does not fall into any of these categories."[10] (ECF No. 197-1 at 20.)

The Ninth Circuit has also found that maintenance of a class action is inappropriate where common questions do not predominate the class. *See Bahamas Surgery Ctr., LLC v. Kimberly-Clark Corp.*, 820 F. App'x 563, 565 (9th Cir. 2020) (finding the district court abused its discretion in failing to decertify the class because "the record does not support the conclusion that common questions . . . predominated in the defined class"); *Westways World Travel, Inc. v. AMR Corp.*, 265 F. App'x 472, 476 (9th Cir. 2008) (finding the district court did not abuse its discretion in finding that maintenance of the class action was inappropriate because plaintiff's

---

[9] The Court also agrees with Ocwen that the Supreme Court in *TransUnion* did not state "trial is the appropriate venue to resolve the experts' dispute regarding class members' Article III standing" nor does the fact that *TransUnion* involved stipulated facts limit its holding. (ECF No. 206-1 at 8–9.)

[10] The Court declines to specifically address these categories of borrowers who have allegedly not paid these fees — as the parties dispute these categories in their briefing — because Judge England has already found that there is a genuine dispute of material fact as to whether all the class members actually paid the fees in question.

claims "would require individualized inquiries into [defendant's] legal and contractual relationship with each class member, and these individual inquiries would predominate over common questions of law and fact").

The Court at this juncture cannot take at face value Ocwen's assertion that "almost half of the borrowers in Plaintiff's purported class . . . never paid and will never have to pay the fee" because that is disputed.  (ECF No. 197-1 at 19.)  Similar to the foregoing cases, however, the Court is convinced that ascertaining which class members have or have not paid the fees will entail an individualized inquiry.  At issue in this case is the class members' payment of allegedly unlawfully assessed fees, which is a monetary harm recognized by the Supreme Court as one "with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts."  *TransUnion*, 141 S. Ct. at 2204.  Pursuant to *TransUnion*, every class member must have suffered this monetary harm in order to establish Article III standing to proceed before this Court.  *Id.* at 2208.  Because Plaintiff cannot definitively establish at this juncture that each class member in each of the three classes certified by Judge England has suffered this concrete harm, the Court finds "that the questions of law and fact common to class members" *does not* "predominate over any questions affecting only individual members" under Rule 23(b)(3).

Accordingly, the Court GRANTS Ocwen's Motion for Decertification.

### IV.  CONCLUSION

Based on the foregoing, the Court GRANTS Ocwen's Motion for Decertification.  (ECF No. 194.)  The parties are ordered to file a Joint Status Report within thirty (30) days of the electronic filing date of this Order indicating: (1) their willingness to attend a Settlement Conference before a magistrate judge; (2) their willingness to proceed to trial if they are not willing to attend a Settlement Conference; and (3) what impact, if any, this Order has on the pending Motion to Compel Testimony (ECF No. 207).

IT IS SO ORDERED.

**DATED:  August 2, 2022**

Troy L. Nunley
United States District Judge